# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| KATERRA INC., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors | ) ) ) ) | Case No. 22-cv-00271-UNA |
| Plaintiff, | ) ) | |
| *v.* | ) ) | DEMAND FOR JURY TRIAL |
| MICHAEL E. MARKS, MATTHEW M. MARSH, GA-LANE CHEN, ADAM FISHER, JEFF HOOPES, JOHN HUI, PAAL KIBSGAARD, BRAD KNIGHT, NEIL MEHTA, LISA PICARD, MARK RANDALL, TREVOR SCHICK, KRISHNA SHIVRAM, JOANNE SOLOMON, MATT TACHOUET, AND ALAN YEUNG, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 2

PARTIES ............................................................................................................................ 5

JURISDICTION AND VENUE .......................................................................................... 12

STATEMENT OF FACTS ................................................................................................... 12

    I.      Procedural Background And The Company's Bankruptcy Filings .................... 12

    II.     Katerra's Business Pre-Petition ......................................................................... 13

    III.    The Defendants' Failures To Monitor and Lack of Oversight ........................... 16

        A.    Revenue Recognition at Katerra ............................................................. 16

        B.    The Company Entered into Contracts Without Estimating Costs of
             Completing the Projects ........................................................................... 16

        C.    The Company's Business Model Led it to Take Unnecessary Risks
             and Caused Substantial Losses ................................................................ 20

        D.    The Company's Lack of Internal Controls Significantly Devalued
             Katerra Saudi Arabia and Destroyed Its Sale Value ................................ 22

        E.    The Defendants Knew There Were No Spending Controls and that the
             Business Model Was Not Working but Failed to Act ............................... 25

        F.    The Officer Defendants Ignored and Did Not Understand the
             Financial Operations of the Company ...................................................... 29

        G.    The Director Defendants Wanted to Remove Marks as CEO, But
             Waited Over a Year to Remove Him ........................................................ 31

    IV.    Katerra Went on an Acquisition Spending Spree without Performing
        Adequate Due Diligence .................................................................................... 33

        1.    The Company's Overpayment is Demonstrated by the Negative
             Net Tangible Assets Acquired .................................................................. 35

        2.    The Company's Overpayment Is Demonstrated by Its Subsequent
             Sale of Acquired Companies for Pennies on the Dollar ............... 36

    V.    The Director Defendants Caused the Company to Enter Into Transactions
        That Benefitted Themselves In Breach of Their Duties of Loyalty and Care ...... 38

i

A.    The Director Defendants Approved Executive Compensation Deals and Raises As the Company Was Losing Money ..................................... 38

B.    Additional Transactions Which Unfairly Benefited Katerra's Officers and Directors To The Detriment of the Company .................................... 40

1.    Forgiven Loan to Ash Bhardwaj ..................................................... 40

2.    Unnecessary Personal Expenses for Defendants and Their Families ................................................................................................. 40

VI.   The Director Defendants Approved Related Party Transactions Benefitting Marks, Davidson and Wolff, Who Stood on Both Sides of Multiple Deals ......... 42

A.    The Director Defendants Steered the Company Into Deals Which Personally Benefitted The Defendants ...................................................... 42

1.    Paxion ............................................................................................ 43

2.    AlgoSquare .................................................................................... 43

3.    Construct Corps ............................................................................. 44

B.    Agreements with Wolff Entities on Unfavorable, Non-Standard Terms .................................................................................................... 45

C.    The Lifebridge and Amberglen Transaction ............................................. 47

1.    The Lifebridge and Amberglen Transaction Forced Katerra to Take On Unnecessary Risk and Miss Out on the Profitability of the Projects ........................................................................................... 48

2.    Marks, Wolff and Davidson Stood on Both Sides of the Lifebridge and Amberglen Transaction and Personally Benefitted from the Deal ............................................................................................... 49

VII.  The Company Entered a Damaging Receivables Facility With Greensill ........... 52

A.    The Director Defendants Caused the Company to Enter into a Burdensome Receivables Facility That Worsened the Company's Financial Position ...................................................................................... 52

B.    The Terms of The RPA Set Up Katerra For Immediate Losses ............... 52

C.    The Short Lifespan of the Greensill Receivables Facility Was Foreseeable And Should Have Been Recognized by the Director Defendants ................................................................................................. 53

D.    The Officer Defendants Failed to Oversee the Company's Borrowing and Accounting Practices under the Greensill Receivables Facility ........ 55

E.    The Director Defendants Failed to Mitigate Damage to the Company Following Greensill's Insolvency ............................................................. 55

VIII.    The Defendants' Constant Pressure on Employees to Meet Certain Targets Led to the Creation of Misleading Financial Statements ...................................... 57

A.    Revenue Recognition Methods of Long Term Construction Contracts under GAAP ................................................................................................ 58

B.    The Officer Defendants Oversaw and Directed the Manipulation of the Company's Financial Statements ...................................................... 61

       1.    Renovation-related Emails ............................................................ 64

       2.    Katerra West-related Emails ........................................................ 70

C.    Katerra Self-Reports to SEC on Renovations ................................... 74

D.    Katerra Self-Reports to SEC on Katerra West .................................. 75

E.    Fallout from Defendants' Faustian Deals: Defendants' Adverse Interests and Conflict Predominate ..................................................... 78

       1.    Upon His Exit, Marks Attempted to Steal Katerra's Apollo Software Division For His Own Benefit ...................................... 79

       2.    The iFly Connection ..................................................................... 83

F.    The Company's Impending Doom is Revealed ................................. 86

       1.    Marsh and Marks Intentionally Tried to Push Through Deloitte Audit In Order To Hide The Financial Misreporting ................... 86

       2.    Marks Accelerates His Efforts To Improperly Extract Value from Katerra For His Personal Benefit .................................................. 89

G.    Marsh Is Required To Pay Back $1 Million Signing Bonus Back to the Company ........................................................................................ 100

IX.    Katerra Was Insolvent During the Relevant Period ............................................. 101

REQUEST FOR RELIEF .......................................................................................... 102

COUNT ONE Breach of Fiduciary Duties (Against the Defendants) ........................ 102

COUNT TWO Breach of Duty to Creditors (Against the Defendants) ...................... 106

COUNT THREE Waste of Corporate Assets (Against the Defendants) .................................... 107

COUNT FOUR Unjust Enrichment (Against the Defendants) ................................................... 108

COUNT FIVE In the Alternative, Aiding and Abetting Breach of Fiduciary Duty (Against the
    Director Defendants) ........................................................................................ 108

Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors,[1] ("Plaintiff" or the "Plan Administrator"), by and through his counsel, hereby files this Complaint (the "Complaint") against Michael E. Marks, Matthew M. Marsh, Ga-Lane Chen, Adam Fisher, Jeff Hoopes, John Hui, Paal Kibsgaard, Brad Knight, Neil Mehta, Lisa Picard, Mark Randall, Trevor Schick, Krishna Shivram, Joanne Solomon, Matt Tachouet, and Alan Yeung ("Defendants"), upon (i) review of certain documents internal to Katerra including, but not limited to electronic mail, financial statements and meetings of the Katerra Board of Directors; (ii) work papers from Katerra's auditor, Deloitte & Touche LLP ("Deloitte"); (iii) interviews of current and former Katerra employees and vendors; (iv) filings and presentations by Katerra with the United States Securities and Exchange Commission ("SEC"), and other sources of public and non-public information, and alleges upon information and belief, as follows:

---

[1] Katerra Inc., a Delaware corporation, sought Chapter 11 bankruptcy protection on June 6, 2021 in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  (Case No. 21-31861(DRJ)).  Katerra Inc.'s related debtor entities are Katerra Inc. (Cayman), Kirkland 1 Project LLC, Kirkland 2 Project LLC, Hillsboro 1 Project LLC, Hillsboro 2 Project LLC, Dangoo Electronics (USA) Co, Ltd., CAPGro Construction Management, LLC, UEB Builders, Inc., WM Aviation, LLC, Roots Software, LLC, Valpico Glenbriar Apartments, LLC, Katerra Pegasus RiNo Investment LLC, Katerra XSC Houston Investment LLC, Katerra RO2 Knipe Village Investment, LLC, Katerra Construction LLC, Kirkland 1 Project MM LLC, Kirkland 2 Project MM LLC, Hillsboro 1 Project MM LLC, Hillsboro 2 Project MM LLC, Construction Assurance, Ltd., Apollo Technologies, Inc., Katerra Affordable Housing LLC, Bristlecone 28th Ave, LLC, Bristlecone Residential LLC, Edge @ LoHi, LLC, Perimeter Building Services LLC, Katerra Pearson Ranch Investment LLC, AlgoSquare Inc., Katerra Engineering LLC, Katerra Architecture LLC, Lord, Aeck & Sargent, Inc., and Skyview Concrete LLC (together with Katerra Inc., the "Wind-Down Debtors").

## **NATURE OF THE ACTION**

1.      This is an action brought by the Plan Administrator against Defendants, former directors and officers of Katerra Inc., a Delaware corporation ("Katerra" or the "Company"), seeking to remedy violations of law, including breaches of fiduciary duties and other claims that have caused substantial monetary losses and other damages to the Company.

2.      Prior to its bankruptcy filing in June 2021, Katerra was a construction company that developed, manufactured, and marketed products and services in the commercial and residential construction spaces in the United States, the Middle East and Asia.

3.      The Company was founded in 2015 by Michael E. Marks ("Marks"), Jim Davidson ("Davidson"), and Fritz H. Wolff ("Wolff"), who had the novel idea to use their Silicon Valley savvy and tech experience to disrupt the age-old construction industry.

4.      Their vision was that Katerra would "disrupt" the construction industry by implementing end-to-end integration of construction products and related services.  For example, Katerra-owned factories could efficiently mass produce pre-designed "building blocks" of environmentally-sustainable construction materials that could then be quickly assembled on-site like Lego pieces.  As envisioned by Marks, Davidson, and Wolff, the process had the potential to be faster and less expensive than the traditional method of transporting raw materials to a construction site for the construction of a building.

5.      Katerra, with its revolutionary approach to the design and assembly of modular construction units, set out to alter the landscape of the construction business the way that Uber and Airbnb transformed the taxi and the hospitality industries.

6.      The Company's potential was so compelling that investors initially lined up to support the Company.  Indeed, Katerra was able to raise close to $3 billion in equity investments in just a few years.

7.     Katerra's promising future was never realized.  While the Company's founders had a worthy idea, they utterly failed to execute, due to an utter lack of financial controls, a misguided focus on signing new customers at any cost, and a complete failure to understand the fundamentals of the construction industry.

8.     At the very same time that Katerra's directors and officers ignored the mounting operational problems and escalating financial losses the Company was suffering, they were lining their own pockets in the form of compensation increases, bonuses, unnecessary executive perks, rides on the corporate jet for non-business purposes, and the diversion of Katerra business to their own side entities (and for their own personal gain).

9.     As set forth in greater detail in this complaint, the Defendants engaged in, and approved, insider transactions that were for the benefit of the founders, directors, and officers and not in the best interests of Katerra.  The Defendants failed to exercise proper oversight of critical aspects of Katerra's business and made uninformed decisions concerning vital issues of the Company.

10.    One clear example, among many, of the Defendants' self-dealing is the agreements entered into between Katerra and the Wolff Company (the "Wolff Company"), a real estate investment firm with numerous entanglements with Katerra.  Wolff, one of Katerra's co-founders and a director on the Company's board of directors, is currently the Chairman Emeritus and a Special Advisor to the Wolff Company.

11.    In addition, the Wolff Company was owned 100% by Paxion Capital ("Paxion"), a venture capital firm founded by the same three founders of Katerra—Marks, Wolff, and Davidson—in the same year that Katerra was founded, 2015.  As set forth below, Paxion had a direct financial interest in a number of Katerra clients.

3

12.     Accordingly, Marks, Wolff, and Davidson stood on both sides of any transactions the Company entered into relating to the Wolff Company or Paxion.  Yet, Katerra's directors approved multiple Insider Transactions, as defined below, despite the fact that they were guaranteed to cause losses to Katerra and were solely for the benefit of the Wolff Company, Paxion, Marks, Wolff and Davidson.

13.     In addition, the Defendants lacked sufficient knowledge of the construction industry and failed to implement controls or procedures governing the process by which the Company would estimate and bid on new construction jobs.  With free reign and pressure to enlist new clients, Katerra salespeople committed to unrealistic contract terms that Katerra could not fulfill without sustaining massive and unsustainable losses.

14.     This practice was encouraged.  CEO Marks was aware of and pushed Company employees to bid up to 40% below market price in order to capture business.  The Defendants knew or should have known that this significant underbidding meant that the Company could not complete projects at a profit.

15.     The Company rapidly amassed a project backlog, full of jobs it could not complete timely or for the low contract cost to which it had committed.  The Company was then forced to spend multiple times the original anticipated price in order to finish such projects.

16.     As the Company's losses accelerated, the directors worsened Katerra's financial position by approving expenditures of over half a billion dollars on acquisitions of other construction companies. Led by Marks, the Director Defendant (defined *infra*) approved acquisitions without conducting sufficient diligence, reviewing historical financial information, or even negotiating the purchase price.

17.     The Defendants' willful lack of oversight into the accounting practices at the Company also caused years of false and misleading financial statements to be produced and disseminated to the Company's investors, an issue which the Company ultimately had to report to the SEC.

18.     Marks also used Celesta (f/k/a WRVI), a venture capital firm which he started, in an attempt to pluck some of the Company's "best" assets, in his own words, from Katerra and for his own personal benefit when Marks was forced to resign as CEO in the spring of 2020, after years of disapproval by his own board of directors.  Throughout his tenure at Katerra, Marks and certain others in Marks' inner circle at the Company engaged in misconduct to benefit themselves to the detriment of Katerra.

19.     As detailed further below, Defendants engaged in a course of conduct that caused the Company to incur billions of dollars in damages in just a few years.  Deloitte, Katerra's auditor also caused substantial damage to the Company.  The bottom line being that, as described *infra*, Katerra's Board of Directors breached their fiduciary duties to the Company and other interested parties to whom fiduciary duties were owed, Katerra's key executives breached their fiduciary duties to benefit themselves at the expense of the Company and the Company's auditor failed to properly audit the Company during the entire relevant time period.  Katerra's insolvency eventually forced it to file bankruptcy.

## PARTIES

20.     Plaintiff is Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors, collectively the Wind-Down Debtors. The Plan Administrator was appointed in the Order (I) Approving the Disclosure Statement and (II) Confirming the Amended Joint Chapter 11 Plan of Katerra Inc. and its Debtor Subsidiaries (the "Confirmation Order") (United States Bankruptcy Court for the Southern District of Texas, Case

No. 21-31861 (DRJ), DE 1372).  Pursuant to the Confirmation Order, the Plan Administrator is duly authorized to assert claims on behalf of the Wind-Down Debtors. The Confirmation Order expressly states that "The Wind-Down Debtors, through the Plan Administrator, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors."   The claims asserted against the Defendants, former directors and officers of the Company, were specifically retained by the Plan Administrator, as "Non-Released D&O Claims" which the Plan Administrator may pursue on behalf of the Katerra Wind-Down Debtors and their respective estates.  Further, the specific Defendants were expressly named as "Non-Released D&O Parties," as the Wind-Down Debtors' "former directors or officers, solely in their respective capacities as such, against whom the Debtors and their respective Estates or creditors may hold Claims and Causes of Action." Pursuant to 11 U.S.C. § 1123(b), the Plan Administrator has standing to assert the claims set forth in this Complaint because he was appointed as a representative of the Wind-Down Debtors' bankruptcy estates, as set forth in the Confirmation Order.

21.     Katerra's operating company was formed under Delaware law by way of the filing of Articles of Incorporation on January 23, 2015.  Katerra Inc. ("Katerra Cayman"), the holding company and parent of Katerra was formed under the laws of the Cayman Islands.

22.     Marks was at all times material hereto co-founder of Katerra and Katerra's CEO, President and Chairman of the Board of Directors of the Company (the "Board") from January 22, 2015 to July 20, 2020.  Marks is a resident of Woodside, California.  Marks was a member of the Share Repurchase Committee and the Acquisition Committee of the Board.  Marks also served as the Chief Operating Decision Maker and was the second largest shareholder in the Company. Marks controlled multiple seats on the Board.

23.     In addition, Marks was the Chairman and general partner of Paxion, the venture capital firm he founded in 2015 with Wolff and Davidson.  Marks is also the founding managing partner of Celesta, a venture capital firm focusing on disruptive technologies and innovative businesses.

24.     Prior to founding Katerra, Marks was the CEO and Chairman of Flextronics, Inc. ("Flextronics"), a technology company.  In January 2004, Marks was sued by way of a consolidated class action complaint filed by shareholders of Flextronics in the United States District Court for the Northern District of California (*In re Flextronics Int'l Ltd. Securities Litig*., Case No. C-03-2102-PJH).  Marks was accused of insider trading, selling a substantial number of Flextronics stocks receiving over $82 million in proceeds personally.  That case settled later in 2004 and Marks left the company the following year.  While at Flextronics, Marks led the company on a massive acquisition spree despite saying at a later interview that "building companies through acquisition is generally not a good idea, but obviously I did a lot of that."  Marks bragged about his favorite saying on a sign in his office: "It's not the big companies that eat the small ones, it's the fast ones that eat the slow ones."  Marks added that one had to move fast, make decisions and not have a lot of meetings.  This style of management had not only gotten Marks in trouble in the past, but it also led to the demise of Katerra.

25.     In 2006, after leaving Flextronics as its chief executive officer, Marks joined KKR (f/k/a Kohlberg Kravis Roberts & Co.), a global investment company, as a partner and senior advisor.  Flextronics was a portfolio company of KKR.  However, Marks left KKR in 2007 to start Bigwood Capital, later known as Riverwood Capital.  Nic Brathwaite ("Brathwaite"), who would later work with Marks at Katerra, was also part of the group forming Riverwood Capital. Riverwood Capital had a strategic relationship with Foxconn, a large electronics manufacturing

services provider that later invested in Katerra.  Marks later formed WRVI Capital, now known as Celesta Capital following a May 2021 name change, also a former investor of Katerra.

26.     After serving on the Flextronics board, Marks joined the board of directors of KLA-Tencor Corporation where he was again sued in a federal securities class action in August 2006 in his capacity as a member of KLA-Tencor's compensation committee of the company's board during the time the committee was unlawfully awarding backdated options to certain company representatives.  The litigation, *Police and Fire Retirement System of the City of Detroit v. KLA-Tencor Corp., et al.*, United States District Court for the Northern District of California (Case No. C-06-4709-MHP) settled in 2008 for $65 million.

27.     Following his involvement in the massive options backdating scheme, Marks went on to serve as an interim chief executive officer of Tesla Motors starting in August 2007.  By this time, Marks had joined KKR.  Marks only lasted four months at Tesla, leaving before Tesla launched the company's first production car.

28.     Marks engaged in related party dealings with WRVI while serving as CEO of Katerra.  After Marks was removed from Katerra, he remained involved with Celesta, even attempting to strip two key assets of Katerra and spinning them off to WRVI as he left the rest of the Company in shambles.  Marks is currently a director of various portfolio companies including Berkeley Lights, Bossa Nova, Maui Greens and others.

29.     Defendant Matthew M. Marsh ("Marsh") was Chief Financial Officer ("CFO") of Katerra from September 2019 to September 2020.  Pursuant to his offer of employment letter dated September 3, 2019 (the "Marsh Employment Letter"), Marsh was employed by Katerra Inc. (Delaware).  Marsh is a resident of Barrington, Illinois.  Marsh is currently the CFO of Celesta, where he was recruited by Marks before Marks was terminated as CEO of Katerra. Like Marks, Marsh engaged in misconduct to benefit his own interests to the detriment of the Company.

30.     Defendant Joanne Solomon ("Solomon") served as Secretary and Treasurer of the Company from 2017 to February 2018 and CFO from February 2018 to September 2019. Solomon's separation agreement with Katerra was with Katerra, Inc. (Delaware).  Solomon is a resident of West Chester, Pennsylvania.

31.     Defendant Paal Kibsgaard ("Kibsgaard") was a member of the Board from May 11, 2016 to May 17, 2021, the Chief Operating Officer ("COO") from August 2019 to July 2020, and CEO from July 2020 to May 2021.  Kibsgaard's salary was paid by Katerra, Inc. (Delaware). Kibsgaard is a resident of Houston, Texas.

32.     Defendant Trevor Schick ("Schick") was President of Katerra Materials, a division of Katerra, from April 2016 to June 2020.  Schick is a resident of Austin, Texas.

33.     Defendant Krishna Shivram ("Shivram") was CFO of Katerra from January 2021 to May 2021.  Shivram is a resident of Houston, Texas.

34.     Defendant Matt Tachouet ("Tachouet") was Global Corporate Controller of Katerra from June 2019 to October 2020 and Vice President of Finance from October 2020 to the present. Tachouet is a resident of San Mateo, California.

35.     Defendant Ga-Lane Chen ("Chen") was a member of the Board from January 16, 2019 to March 12, 2019 and from November 1, 2019 to October 1, 2020.  During the times he sat on the Board, Chen was the Chief Technology Officer and Chief Information Officer of Foxconn, an investor of the Company.  Chen is a resident of Fremont, California.

36.     Defendant Adam Fisher ("Fisher") was a member of the Board from January 21, 2018 to June 7, 2019.  During the time he sat on the Board, Fisher was the Global Head of Macro and Real Estate at Soros Fund Management, LLC.  Fisher is a resident of Los Angeles, California.

9

37.     Defendant Jeff Hoopes ("Hoopes") was an independent member of the Board from January 24, 2020 to March 16, 2020.  During the time he sat on the Board, Hoopes was the CEO of Swinerton Inc.  Hoopes is a resident of Kelseyville, California.

38.     Defendant John Hui ("Hui") was a member of the Board from June 15, 2017 to January 16, 2019.  During the time he sat on the Board, Hui was the Head of Strategy at Foxconn. Hui is a resident of Pasadena, California.   Hui was also a member of the Company's Audit Committee.

39.     Defendant Brad Knight ("Knight") was a member of the Board and President. Knight served as a board member from November 11, 2015 to March 28, 2017, in addition to serving as a COO of the Company for a period.   Pursuant to an offer of employment letter dated March 30, 2018, Knight was employed by Katerra, Inc. (Delaware).  Knight is a resident of Dallas, Texas.  Knight was CEO of Construct Corps, LLC ("Construct Corps"), a labor staffing firm in which defendant Marks was a majority investor and which was acquired by Katerra.  Knight and Marks also knew each other from Flextronics.

40.     Defendant Neil Mehta ("Mehta") was a member of the Board from March 30, 2017 to May 11, 2020.  During the time he sat on the Board, Mehta was the Managing Partner of Greenoaks Capital.  Mehta is a resident of Atherton, California.

41.     Defendant Lisa Picard ("Picard") was an independent member of the Board from June 25, 2019 to September 1, 2020.  Picard is a resident of Sebastopol, California.

42.     Defendant Mark Randall ("Randall") was a member of the Board from November 11, 2015 to May 6, 2016.  Randall is a resident of San Diego, California.

43.     Defendant Alan Yeung ("Yeung") was a member of the Board from March 12, 2019 to November 1, 2019 and from March 20, 2020 to October 1, 2020.  During the times he sat

on the Board, Yeung was the Director of US Strategic Initiatives of Foxconn.  Yeung is a resident of Elm Grove, Wisconsin.

44.    Defendants Marks, Marsh, Kibsgaard, Schick, Shivram, Solomon and Tachouet are collectively referred to as the "Officer Defendants" to the extent each such defendant was an officer of the Company at the time of the specified conduct.

45.    Defendants Marks, Chen, Fisher, Hoopes, Hui, Kibsgaard, Knight, Mehta, Picard, Randall, and Yeung are collectively referred to as the "Director Defendants" to the extent each such defendant was a director of the Company at the time of the specified conduct.

46.    Non-defendant Celesta is a limited liability formed in the state of Delaware and is owned and/or controlled by Marks.  Celesta was formerly known as WRVI.  Celesta has a principal place of business located at 1 California St. #1750, San Francisco, California.  As described on Celesta's website, "The firm comprises a team of technologists and business executives with extensive operating experience. Celesta Capital invests early in disruptive technologies and innovative businesses, and mentors young companies to create long-term value for our investors."  As described further below, Celesta's team includes a number of former Katerra employees, including Marks as one of the founding managing partners, Brathwaite as a founding managing partner, Marsh as the CFO, and Robin Clewley ("Clewley"), Katerra's former Vice President of Marketing & Public Affairs, as the Chief Marketing Officer.

47.    Non-Defendant Jeffrey Housenbold ("Housenbold") was a member of the Board from January 2018 to March 2021.  During the times he sat on the board of Katerra, Housenbold was a founding managing partner at SoftBank Investment Advisers.

48.    Non-Defendant Justin Wilson ("Wilson") was a member of the Board from December 2017 to October 2020.  During the times he sat on the Board, Wilson was a partner of SoftBank Vision Fund (together with SoftBank Investment Advisers, "SoftBank").

11

49.     Non-Defendant Davidson was a co-founder of Katerra and a member of the Board from January 2015 to August 2020.  Davidson was also a co-founder of Paxion, along with Marks and Wolff. Davidson was the head of the Board's Audit Committee.

50.     Non-Defendant Wolff was a co-founder of Katerra and member of the Board from January 2015 to October 2019.   Wolff was the co-founder of Paxion, along with Marks and Davidson. Wolff is also the Chairman Emeritus of the Wolff Company, one of Katerra's largest customers, and is affiliated with the Wolff Company's affiliate and subsidiary companies (the "Wolff Entities").

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction over this controversy in accordance with 28 U.S.C. § 1332 because each plaintiff is diverse from each defendant and the amount in controversy exceeds $75,000.

52.     This Court can exercise personal jurisdiction over each of the Defendants pursuant to 10 Del. C. § 3114 because each defendant is or was at all relevant times an officer and/or director of Katerra or aided and abetted an officer and/or director in his or her misconduct against the Company.

## STATEMENT OF FACTS

**I.     Procedural Background And The Company's Bankruptcy Filings**

53.     On June 6, 2021 (the "Petition Date"), the Company and its related debtor entities each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Southern District of Texas, Houston Division, commencing their cases.

54.     The Company continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

55.     On October 21, 2021, the Confirmation Order was entered and on October 29, 2021 (the "Effective Date"), Plaintiff was appointed as the Plan Administrator for the Wind-Down Debtors.

## II.     Katerra's Business Pre-Petition

56.     Katerra was founded in 2015 by Marks, Davidson, and Wolff, for the purpose of revolutionizing the traditional construction industry.

57.     The Company's hallmark was the design and manufacture of standardized building components which were produced in a factory and then assembled onsite.

58.     In theory, Katerra was able to manufacture the components at a higher level of quality control and standardization than if the components had been built onsite, as done in typical construction projects.

59.     These "building blocks" could be reproduced and utilized for multiple projects, which, Katerra promised its customers, would result in greater efficiency, sustainability, and cost savings.

60.     The Company focused on crosslaminated timber ("CLT") as its primary building material, which is created by bonding smaller boards together in a perpendicular pattern.  The Company billed CLT as an attractive and environmentally-friendly substitute for conventional building materials, such as steel or masonry.



61.     At one time, Katerra operated two factories in the United States, three factories in India, and five factories in Saudi Arabia, manufacturing construction materials, such as CLT in the United States or precast concrete in India and Saudi Arabia.

62.     Both nationally and internationally, the Defendants dedicated themselves to recklessly expanding the Company quickly and grabbing market share while giving little attention to quality of the materials or logistical details of Katerra's construction projects.

63.     In their quest to broaden Katerra's footprint, the Defendants caused the Company to commit itself to projects for contract prices significantly below market rate.  As a result, the Company experienced waves of staggering losses, as it faced significant cost overruns trying to complete projects for which it underbid.

64.     The Company also incurred losses on numerous jobs for the Wolff Company, pursuant to a contract which offered the Wolff Company a non-standard, highly-lucrative double digit discount.

65.     This all but guaranteed that Katerra would lose money on the projects performed for its largest customer.  Marks, Wolff, and Davidson all had direct financial interests in the Wolff

14

Company and stood to benefit from this arrangement, even while the Company itself suffered financial losses.

66.    Katerra was able to raise significant equity investments—almost $3 billion in the six years between its founding and the filing of the Petition—including approximately $2 billion from SoftBank alone.

67.    However due to the unrelenting uncontrolled rate of its cash burn, Marks sought additional sources of funding at the end of 2019, namely a receivables facility (the "Greensill Receivables Facility") from an entity called Greensill Ltd. ("Greensill").   The terms of the Greensill Receivables Facility were onerous and antithetical to Katerra's business model.

68.    From the start, the Greensill Receivables Facility burdened the Company with significant costs that outpaced the money loaned by Greensill.  In just a few months, the Company owed $440 million under the Greensill Receivables Facility.  The Board approved the Greensill Receivables Facility without conducting sufficient due diligence on or analysis of the agreement with Greensill.  Had the Board performed even a modicum of analysis, the Director Defendants would have realized that the facility had a short lifespan and an inadequate lending limit, which resulted in the Company becoming $440 million in debt to Greensill in a matter of months.

69.    The Director Defendants' willingness to approve related-party transactions in which Katerra directors, namely Marks, Davidson, and Wolff, had financial interests in both sides was a clear conflict of interest and breach of their duties of loyalty and care, which led directly to Katerra's precipitous downfall, as the Director Defendants caused the Company to enter into deals on terms that were highly unfavorable to Katerra.

70.    Despite its ready access to funding and innovative ideas, the Company never generated a profit, due to rapid cash burn, lack of internal financial controls, egregious mismanagement and a lack of expertise on the ground.

15

### III.    **The Defendants' Failures To Monitor and Lack of Oversight**

#### A.    **Revenue Recognition at Katerra**

71.    As discussed in detail infra, Katerra used the "Percentage of Completion" accounting method to recognize revenues at Katerra because its business involved long-term construction contracts.  Critically, Percentage of Completion accounting can only be used where a company can reasonably estimate the costs of a project at the outset and throughout the life of a project, which necessitates the ability to reasonably estimate the project's progress.

72.    Katerra woefully failed to meet the requirements of Percentage of Completion accounting as evidenced by the efforts of certain of the Officer Defendants and their reports to manage earnings by artificially inflating revenues.  Such failure is evidenced by the massive level of construction loss contract provisions charged to cost of sales and reported on the face of the 2019 and 2018 audited income statements.

#### B.    **The Company Entered into Contracts Without Estimating Costs of Completing the Projects**

73.    From the Company's inception, the Defendants failed to implement internal controls and procedures with respect to a core component of Katerra's business: the entry into construction agreements for new business.

74.    As one confidential witness who was a former employee of the Company stated in an interview on December 17, 2021 ("Confidential Witness 1"), there were significant process gaps in the way that Katerra bid on and priced new work.

75.    Members of employee sales teams would enter into construction agreements with lower than market pricing terms in order to capture new customers.

76.    Katerra salespeople, under the direction of Steven Weilbach, Head of US Construction Sales from July 2015 to June 2020, would ask new customers what price they wanted a project to cost, e.g. $100/square foot.

16

77.     Katerra salespeople would then proceed to bid the project at less than the number named by the customer (e.g. $90/square foot) in order to "beat" the best price, without first conducting analysis of the actual cost to perform the contract (e.g. $130/square foot).

78.     One customer, Legacy Partners, a California-based property developer, contracted with Katerra to complete two multi-unit residential projects.

79.     A representative of Legacy Partners ("Confidential Witness 2") stated in an interview on November 23, 2021 (the "November 23 Interview") that Katerra's bids were so low that it appeared that the Company did not know what it was doing.

80.     In reality, the Company could not perform the job for the same price as their competitors, let alone the price they actually committed to with the customer.

81.     The Company was committed to perform contracts for knowingly less than market price, thus guaranteeing an avalanche of loss-making projects, under the guise of being a start-up business and needing to scale its business rapidly.

82.     For example, in an email dated February 10, 2019, Marks informed executives that he was "taking on personally" a project upon which the "future of this company depends."

83.     Marks stated that the Company needed to determine the "cost per square foot in a number of markets" and then "compare that to what we believe today's market costs are in these areas, and know how much cheaper we can be."

84.     Marks estimated that "30% discount to market" on a project called 2.1 and a 40% discount on a project called K4 was "eminently doable."

85.     In many cases, the sales teams would commit the Company to these below-market pricing terms, regardless of the actual costs of construction and without having spoken with the Company's estimating department to determine if the project could be completed on those terms.

86.     On certain occasions, Katerra salespeople even signed contracts onsite, without any cost analysis, oversight or determination of whether the project could be performed by the Company.

87.     In these cases, the project would go to field without any budget or estimate, just a contract value.

88.     Inevitably, the Company's costs often quickly exceeded the contracted-for amounts and, given the fact that construction contracts take multiple years to complete, the Company would be locked into a loss-making project for the next three to four years.

89.     In other instances, the Company's estimating department did provide estimates for projects that the Company wanted to bid on.

90.     However, as Confidential Witness 1 described, the estimates were too aggressive, completed too quickly and performed by unqualified people without experience.

91.     For example, in one instance, estimators simply forgot to include a project's parking garage in the estimated contract cost, which resulted in a $6 million discrepancy.

92.     Defendants were aware that they had insufficient protocols relating to the bidding and estimating process, and that the lack of such protocols was damaging the Company.

93.     In a January 2019 D&O Underwriters Presentation, the Company included a slide titled "What we got wrong," identifying several areas where the Company had failed, including: underestimating the time it would take to get Company materials and labor into jobs; underestimating project delays; establishing pricing too early; and doing a "poor job" of estimating market conditions and setting pricing too low.

94.     In April 2019, in a Company memo entitled "Loss Provision Discussion" (the "Loss Provision Discussion Memo"), the Company stated that estimates were also based on "dated" pricing and on incorrect, non-industry standard modeling.

18

95.     The Loss Provision Discussion Memo set forth the Company's own identified "Drivers of Loss," including:

- "underestimated time it would take to get our materials and labor into jobs"

- "underestimated project delay caused by us (ex. Component design) and some outside our control (ex. Weather, permitting, customer changes)"

- "established pricing too early in the process, and [in]sufficiently appreciating that labor and material costs could increase as much as 25% since 2017"

- "did a poor job of estimating market conditions and set early pricing too low"

96.     The Defendants staffed the Company's operations team with people who had little or no construction industry experience, but who came from the technology and/or start up world. Accordingly, they were ill-equipped to recognize the Company's construction industry-specific problems before they started or to adequately address such problems as they multiplied.

97.     In addition, one confidential witness, a former Company executive with experience at a number of construction firms ("Confidential Witness 3"), stated in an interview on December 20, 2021 that Katerra was the only firm that did not have a forecast review process or require project management to present numbers to upper leadership on a regular basis.

98.     The Company's practices were indisputably out of line with industry norms. According to the American Institute of Certified Public Accountants ("AICPA"), "adequate internal controls normally provide that personnel responsible for billing receive accurate, timely information from job sites and include billing procedures designed to recognize unique contract features…."

99.     The AICPA further instructs that: "A contractor uses information on contract costs to control costs, evaluate the status and profitability of contracts, and prepare customer billings. Contract costs are also necessary in the determination of revenue when the percentage of completion approach is utilized."

19

100.    As set forth above, the Company was unable to control costs, evaluate the profitability of contracts, or accurately determine revenue because the Defendants failed to implement adequate internal controls, despite being aware that the free-for-all approach to project bidding and project management was causing increasing losses to the Company.

101.    To the contrary, Marks, the CEO himself, was encouraging employees to underbid projects by as much as 40%.

102.    The Defendants intentionally jeopardized its business operations, by knowingly bidding for projects at a substantial loss, in order to raise capital and continue their investment prospects.

103.    The losses incurred by Katerra, at the hands of the Defendants, not only caused the Company to become increasingly unprofitable, but in turn, trickled down to its subsidiaries, the individual companies which operated on a project-level basis.

104.    As a result of these loss drivers, which the Defendants were aware of but ignored, the Company entered into a never-ending cycle of higher costs to complete existing projects, delayed project timelines, and failure to earn a profit on an increasing number of contracts, most if not all of which were underbid.

### C.    The Company's Business Model Led it to Take Unnecessary Risks and Caused Substantial Losses

105.    One of the Company's key promises was that it would cut costs and increase efficiencies to customers by self-performing much of the work that is typically performed by subcontractors, such as drywall installation, plumbing and electrical work.

106.    Typically, when these trades are completed by different subcontractors, the risks and costs are spread among many different entities, thus decreasing the risk on the general contractor – Katerra's role.

107.    However, Katerra lacked the expertise to carry out these specialized trades.

108.    In addition, Katerra did not employ onsite managers who were qualified to recognize the deficiencies in the work performed and, thus, could not adequately perform the job of general contractor either.

109.    Confidential Witness 2 stated in the November 23 Interview that it became clear immediately that in contradiction of Katerra's intriguing sales pitch, the Company lacked the necessary construction, financial and operational skills to execute upon its promises.

110.    Confidential Witness 2 said that he met with Marks personally about the problems with Katerra's work and about replacing onsite construction managers for Legacy's projects. According to Confidential Witness 2, Marks and Katerra inadequately addressed the problems on the Legacy jobs and ultimately walked off both projects.

111.    When the Company did hire subcontractors, the subcontractors could be assigned to up to four jobs at once, more than they were capable of performing, causing additional delays and losses on the projects.

112.    Confidential Witness 1 stated that there was a lack of oversight related to the hiring of subcontractors and that subcontractors were accepted for work without the Company completing background checks or requiring the subcontractors to sign any contracts with the Company.

113.    The Company did not have leadership in place that understood the construction industry, could hire experienced staff, or put processes in place that could handle the enormous costs, risks and expertise necessary to self-perform projects.

114.    The explosive losses caused by the Company's poor business model and unchecked bidding processes continued to accelerate under the watch of CFO Solomon and later Marsh,

neither of whom had experience in the construction industry and both of whom failed to take necessary action to control the Company's worsening financial condition.

     **D.**     **The Company's Lack of Internal Controls Significantly Devalued Katerra Saudi Arabia and Destroyed Its Sale Value**

     115.    The Defendants' reckless approach to the business operations, and the lack of internal controls, was echoed in Katerra's Middle East entity, Katerra Saudi Arabia LLC ("KSA"), an indirect subsidiary of Katerra Cayman.

     116.    In an interview dated February 14, 2022 (the "February 14 Interview"), one current financial KSA executive and one former operations manager (the "Confidential KSA Witnesses") noted that there were a number of deficiencies in KSA's operations, which caused significant delays in completing jobs and in KSA getting paid by its customers.

     117.    Similar to the U.S. operations, the Confidential KSA Witnesses said that the first priority of KSA's management team was to expand its customer base and not produce quality work on job sites in a timely manner.

     118.    The Confidential KSA Witnesses stated that they had weekly calls with Kibsgaard and/or Steve Kaufman ("Kaufman"), another Katerra executive, about KSA's day-to-day operations and that Kibsgaard and Kaufman were aware of the value-destructive issues plaguing KSA. Kaufman was more focused on KSA reaching certain revenue numbers and ignored the inherent problems with KSA's business operations, as reported by the Confidential KSA Witnesses.

     119.    For example, as of March 2021, the Confidential KSA Witnesses stated that KSA lacked a number of key operational roles, including contracts manager, planning manager, commercial manager, and quantity surveyors.

120.   The lack of even the most basic construction personnel led to substantial logistical and quality control failures on KSA's job sites throughout Saudi Arabia.

121.   In the February 14 Interview, the Confidential KSA Witnesses stated that a staggering 94% of the units built by KSA needed repair work and at one time, up to 2000 units were unfinished.  In essence, every component manufactured by KSA was done incorrectly and needed to be fixed.

122.   The Confidential KSA Witnesses stated the focus in the factory precast yards was on quantity rather than quality. There was no quality control in the factory precast yards, and clearly defective works were transported to the sites around Saudi Arabia.

123.   The site erection team was then required to rectify all manner of defects, which should have been concluded in the factory yards. Because the units were made of precast concrete, a material that cannot be easily manipulated, the repair work was expensive and took several months, further delaying projects.

124.   Though there was ostensibly a quality assurance and quality control team at KSA, they were inexplicably based in Dubai, the United Arab Emirates, a neighboring country to Saudi Arabia, and therefore, essentially useless.

125.   With no planning or contracts manager, KSA also suffered from a lack of a coherent logistical strategy.  For example, the Confidential KSA Witnesses stated that suppliers of outsourced building materials would drop off the materials at one site, rather than deliver them to each worksite.  KSA was then forced to transport the materials to the multiple job sites, often thousands of miles apart, once again losing time and money.

126.   KSA also did not have procedures in place with respect to timely invoicing.  So at the same time it was losing money, it was not collecting payment from its customers.

127.     Both Kibsgaard and Kaufman were aware of the high rate of cash burn and lack of incoming cash flow.  In fact, Kibsgaard told the Confidential KSA Witnesses that Katerra was experiencing the same issues in the United States.

128.     In April 2020, Katerra entered into a non-binding offer to sell 49% of its interest in Katerra Middle East Inc. ("Katerra Middle East"), the direct parent company of KSA, for $150 million.  The sale of Katerra Middle East, which was supposed to close in the second half of 2020, fell through.

129.     Nonetheless, in and around February 2021, Kibsgaard, Shivram, and Brendan Franich ("Franich"), Vice President of Legal, orchestrated the transfer of an intercompany loan of approximately $23 million to KSA for the purposes of keeping KSA in compliance with a net worth covenant in one of its loan agreements.

130.     In an email dated February 23, 2021, Shivram wrote to Kibsgaard and Franich that the transfer should be structured as a loan from "Katerra parent to [Katerra Middle East] and then a std interco loan from [Katerra Middle East] into [KSA]."

131.     Shivram acknowledged that the "$23m will likely be stuck in Saudi for a while."

132.     In an email from earlier on the same day, Franich also stated to Kibsgaard and Shivram that "we might not be seeing that $23M again."

133.     Franich then wrote an email later on the same day to Shivram and Kibsgaard "I can pull those docs together," referring to the paperwork necessary to effectuate the KSA Transfer, and added that "the [Katerra Middle East] board (=Paal+ me) approve this for good order."

134.     The KSA Transfer was subsequently approved, despite Kibsgaard, Shivram and Franich's knowledge that the "loan" would not be able to be repaid to the Company, which was suffering from its own liquidity crisis, given KSA's substantial losses.

24

135.    During the following months, as described above, KSA continued to drop in value due to mismanagement and lack of internal controls.  As a result, the Plan Administrator anticipates that the $23 million intercompany loan to KSA will not be repaid.

### E.    The Defendants Knew There Were No Spending Controls and that the Business Model Was Not Working but Failed to Act

136.    Focused solely on scaling the business quickly, the Defendants knew that the lack of controls were leading to reckless activity by its employees but failed to take corrective action.

137.    For example, Kibsgaard, who started as a director of Katerra in 2016 and eventually stepped in as CEO in July 2020, was aware of the problems plaguing the Company.  In an interview on July 2, 2021, Kibsgaard stated that when he became CEO, he already knew the Company had a problem with poor internal controls and the Company had a number of jobs that were loss-making.  Thus, since 2016, Kibsgaard had knowledge that the Defendants' failure to adequately monitor the Company's operations was directly resulting in devastating financial consequences, but did not take remedial steps.

138.    Also in an interview on July 2, 2021, Shivram, who joined the Company as a financial advisor to the CEO in 2020 and became CFO in January 2021, admitted that he was aware that virtually any employee could commit the Company to millions of dollars of obligations without oversight.

139.    To the extent that the Defendants attempted to put controls into place, they were in name only and ineffective at curbing the unchecked financial practices within the Company.

140.    On February 6, 2018, the Board held a meeting and approved the formation of an audit committee, consisting of directors Davidson, as the chairman, and Hui (the "Audit Committee").

141.    The Audit Committee was formed at the request of SoftBank to review Company financial information and ensure that it was accurate.

142.    Any member of the Audit Committee was required to "have the ability to read and understand fundamental financial statements, including the Company's balance sheet, income statement, and cash flow statement, and have sufficient financial sophistication and experience to perform the responsibilities and duties [of the Audit Committee]."

143.    In addition, any member of the Audit Committee was required to "be free from any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a Committee member."

144.    In handwritten notes on a copy of Board minutes, Solomon questioned whether Davidson should be on the Audit Committee, ostensibly because of his affiliation with Paxion and the Wolff Company, noting "should we have the Board acknowledge that Jim is not independent…?"

145.    Nonetheless, Marks, Kibsgaard, Hui, Mehta, Fisher, along with Wolff, Davidson, and Housenbold, were the directors present at the meeting and voted unanimously for the formation of the Audit Committee.

146.    The minutes from the February 6, 2018 Board meeting reflect that Davidson disclosed that he had certain "related party relationships between himself and the Company's officers and directors (or their affiliates)."

147.    Despite acknowledging Davidson's conflicts, the Board determined that "Mr. Davidson is able to exercise independent judgment as a member of the Audit Committee."

148.    The Company records do not appear to include minutes of any Audit Committee meetings or any other documents substantiating that the Audit Committee regularly met.

149.    The nonexistence of the Audit Committee was confirmed in an email dated March 14, 2020, in which Davidson admitted to Marsh, Marks, Wilson, Housenbold, Mehta, Kibsgaard, Picard, Chen, Yeung, and Hoopes that though the Audit Committee had been formed, it never met. In that same email, Davidson suggested a lack of clarity about the Company's financials presented by Marks and Marsh by asking Marsh to send the Board "actual financial statements for 2019 quarters and year end.  Don't care if audited. . . No PowerPoint summary.  No flowcharts.  Please send the actual financial statements."

150.    Two days later, in an email dated March 16, 2020 to the Board, Marks reiterated Davidson's statement and acknowledged to the Board that Davidson never called a meeting of the Audit Committee nor requested review of financial information.

151.    In the same email, Marks further informed the Board that Davidson never once communicated with CFO Marsh regarding the "processes and procedure, get Matt's views on the quality of the numbers, or in any other way took his responsibility seriously."  Marks added that if Davidson "felt that there was any kind of problem with how numbers were represented or [if Davidson] wanted to take a closer look at anything, the board had provided the mechanics to do that. But so far as I'm aware, [Davidson] didn't raise these issues before, or requested any regular audit committee review. He never called a meeting."

152.    It is evident Marks had been aware that the Audit Committee was not functioning, but did not raise it to the Board until March 2020, in response to what he perceived as Davidson's insinuation that Marks and Marsh "lied about our financial information."

153.    None of the Director Defendants took steps to re-constitute the Audit Committee following Davidson and Marks' admissions in March 2020 that the Audit Committee was never active.

154.    Marks' March 16, 2020 email to the Board bore the Subject line " Board Independence" and Marks used the email to also highlight certain conflicts among members of the Board:

> You of course have every right to have independent meetings and have legal representation.  Personally, I can say that after forty years in business and success in everything I have done, I find the approach that is being taken here to be unprecedented in my experience.  No conversation with management, just behind the scenes maneuvering.  So let me provide some information for your discussion.
>
> To begin, there are only two truly independent directors, who are Lisa Picard and Jeff Hoopes.  No other director is independent, because they are either investors in the company or members of management.  In addition, of those who may purport to be "independent", there are conflicts of which we should all be aware.
>
> Foxconn is currently in the market attempting to sell their shares, they have actively engaged in requesting Softbank not to invest in Katerra.  So clearly they are not doing what is in the best interest of Katerra, and they are conflicted because they have made it clear they just want to sell and get out.  So they are not representing any shareholders who have any long term view.
>
> Jim Davidson is a principle [sic] in both Kandle and the Wolff Company (owned by Paxion) which is invested in the bulk of Katerra's legacy projects ad is entirely US focused.  So when Jim talks about getting out of Saudi and India, and I quote "I don't give a shit about Saudi or India", that is of course a conflict because he is involved in real estate activities only in the U.S., so he is again not representing the views of investors who are not involved in US construction. . . . In addition, Jim Davidson is still actively engaged with Silver Lake Partners, where GIC is one of the largest investors.  So again, behind the scenes he has conflicts of interest.

155.    In an email dated March 26, 2020 from Marks to Justin Wilson and Housenbold, Marks made clear his desire to have more control over the Board and push Davidson to the side, writing:

> I wanted to put in my pitch again for a five person board.  You two plus me plus two others that can be helpful.  It's critical that we get back to a positive

relationship between management and the board.  It's not just me, everyone on my team knows that Jim D[avidson] is not helpful or constructive, and Ash for one can't stand him and I think he told you that.

I also want to give you a bit of quick history here.  Jim is NOT a founder of Katerra.  I founded it, I owned 100% of it.  I then gave shares to Fritz [Wolff] and Jim because of their importance in the ecosystem, assuming they would be great partners.  Obviously, I'm not sorry I did this.  I am just not going to be able to go into a Board meeting with Jim sitting there, who has never lifted a finger to help, orchestrated this group to try to oust me, and he really doesn't represent anyone but himself.

**F.**     **The Officer Defendants Ignored and Did Not Understand the Financial Operations of the Company**

156.    The Defendants failed to exercise sufficient oversight over the financial operations of the Company.

157.    The instability of the Company's financial organization was evident in the rotating executives cycling through the C-suite.

158.    In a period of just three years, from February 2018 to January 2021, Katerra went through three CFOs: Solomon from February 2018 to September 2019, Marsh from September 2019 to July 2020, and Shivram from January 2021 to May 2021.  Shivram started at the Company under the title "Financial Advisor to the CEO" in July 2020 and was elevated to CEO in January 2021, leaving a six-month gap at the Company without a CFO.

159.    In an interview on July 5, 2021 (the "July 5 Interview"), SoftBank-appointed director Housenbold stated that the Board believed that Solomon lacked the rigor and talent necessary to serve as CFO for the Company and encouraged Marks to "upgrade" with a more well-qualified candidate.

160.    Prior to being appointed as CFO in February 2018, Solomon served as Secretary and Treasurer of the Company.  Almost immediately, she revealed she was out of her league in the role as top financial executive of Katerra.

161.    Solomon lived up to the Board's low opinion of her by shielding herself from the financial operations of the Company.

162.    On February 28, 2018, Solomon received a financial and cybersecurity due diligence report from PricewaterhouseCoopers LLP ("PwC") (the "PwC Diligence Report"), which PwC performed at the direction of SoftBank, the Company's largest investor.

163.    Solomon forwarded the PwC Diligence Report to other employees at the Company, stating: "Attached is PwC's diligence report. I haven't read yet. Pretty much afraid."

164.    As early as September 2018, only seven months into Solomon's term as CFO, Marks informed the Board in an email dated September 22, 2018, that Solomon would not be the "long term CFO" and that they were looking for a new CFO to be in place "by the end of the year or in first quarter."

165.    Marks was also aware that Solomon was not preparing and issuing regular financial forecasts based on current and accurate historical data.

166.    In an email dated January 26, 2019, Marks wrote Solomon an email asking for a detailed cash flow statement.

167.    In response, Solomon told Marks that she had "deprioritized" doing weekly cash flow statements and implied that such statements had not even been prepared on a monthly basis.

168.    Five days later, on January 31, 2019, Solomon had still not produced the cash flow statement, prompting Marks to write her again, asking "when am I going to see something."

169.    By the beginning of February 2019, Marks was actively searching for a new CFO to replace Solomon, informing various executives, including Solomon, in an email dated February 2, 2019 that he had found "two very good candidates…so far."

170.    A few months later, in an email to the Board dated July 22, 2019, Marks informed the Board that "**Our finance organization is a disgrace.  We don't have the financial capability**

30

**to provide us with what we need, the numbers keep moving around and I don't trust them.**

**I'm extremely embarrassed about this and have worked diligently to hire a CFO for many**

**months now.  And we got a real professional one**.  Matt Marsh is also fully on board with what

is needed and in fact has begun to work with me on key issues." (emphasis added).

171.    By October 2019, the Company's financial reporting was worsening.

172.    In an email dated October 25, 2019, Marks wrote to various Katerra directors and

officers, including Marsh, Ash Bhardwaj ("Bhardwaj"), Schick, Kibsgaard and Matt Ryan

("Ryan"), Head of Manufacturing at Katerra, responding to September 2019 Financial Results:

> "I find these financials very hard to follow.  I can't tell what is really happening
> with regards to writeoffs, forecast v actuals don't seem to make that much sense to
> me.  I also don't understand how much these numbers relate to what we just told
> the board that we expect $319m of operating losses in 2019.  Does all this mean we
> expect to do much worse than what we told the board a week ago?  For the operating
> expects this just HAS TO STOP.  We again miss every number all of the time…So,
> the reporting isn't good, and the results are worse…This just sucks.  Has to get
> better.

173.    In an email to Marsh and two other Katerra executives, Bhardwaj and Schick, on

June 21, 2020, **Marks wrote that Marsh had "uncovered all of the crap that Joanne…was**

**responsible for**." (emphasis added).

### G.    The Director Defendants Wanted to Remove Marks as CEO, But Waited Over a Year to Remove Him

174.    As the Company was falling into further disarray, the Director Defendants only

held thirteen total board meetings in the years 2017, 2018 and 2019, as stated by Franich, in an

email dated January 9, 2021.

175.    Board meeting minutes refer to the "Board of Directors of Katerra, Inc., an

exempted company incorporated with limited liability in the Cayman Islands."

176.    There do not appear to be separate board meeting minutes for Katerra, the Delaware

corporation.  The Board operated as the Board of both Katerra Cayman and Katerra.

177.    The Director Defendants and other directors of Katerra had knowledge that various officers were consistently failing in their responsibilities as top management executives to the Company and that as a direct result of these failures, Katerra was steadily bleeding money.

178.    As CEO, Marks was never able to secure sufficient capital, implement measures to control spending, or position Katerra to turn a profit, leaving the Company highly dependent on SoftBank for additional investments.

179.    The Director Defendants and other directors of Katerra knew Marks was failing in his role as CEO but tolerated his deficiencies because of his domination over the Board, as well as his status as founder and chief operating decision maker of Katerra.

180.    Housenbold was the Board representative for SoftBank and served as a director from January 2018 to March 2021.

181.    In the July 5 Interview, Housenbold stated that during his time as director, he recognized that there were significant concerns with Marks' leadership ability, specifically with his inability to realize free cash flow to the business.

182.    Housenbold stated that he not only shared his concerns with Marks directly, but communicated with the Board and outside consultants about Marks' poor performance and failure to meet financial projections.

183.    In the July 5 Interview, Housenbold further stated that the need to replace Marks as CEO was "not a mystery" and moved to replace him fourteen months before Marks was ultimately forced out by the Board.

184.    According to Housenbold, multiple directors knew that Marks should be removed but were hesitant to remove him because of his experience and reputation, his control over certain Board seats, and his status as founder and second largest shareholder.

185.   For example, Fisher, a Katerra board member who was Global Head of Macro and Real Estate at Soros Fund Management, one of the Company's investors, was aware that Marks was failing to fulfill his duties as CEO.

186.   In Spring of 2019, Fisher tried to discuss the "Marks problem" with other Board members, but no action was taken to remove Marks at that time.

187.   The Board was unable to come to a consensus about bringing in a new leader to replace Marks and was slow moving in their decision-making, according to Housenbold in the July 5 Interview.

188.   In the fourteen months between when Housenbold first raised the idea that Marks should be replaced to when he was forced to resign in May 2020, the Company continued to suffer millions of dollars in losses, at the hands of Marks.

## IV.   Katerra Went on an Acquisition Spending Spree without Performing Adequate Due Diligence

189.   Marks' obsession with rapid growth led to the Company's acquisition of businesses at a cost of over half a billion dollars, approximately $528 million, during the Company's short existence.

190.   Katerra's Consolidated Financial Statements and the accompanying Independent Auditor's Reports show that the Director Defendants approved the acquisition of at least nineteen (19) companies during the fiscal years 2017 through 2019.

191.   These acquisitions put significant financial strain on the Company at the same time that it was continuing to lose money from its backlog of construction projects, failing to obtain new investment sources, and exhausting the Greensill Receivables Facility.

192.   Marks and the Director Defendants orchestrated the acquisition process so that Marks had total control over which companies were acquired and what was paid for them.

193.    At a Board meeting on August 24, 2017, Marks, Davidson, Kibsgaard, Mehta, and Hui approved the formation of an Acquisition Committee.  The Acquisition Committee was to be constituted of Marks alone and gave him authority to approve the purchase of entities of up to $5 million provided that he "reasonably believes such [acquisition] to be consistent with the Company's then current strategy."

194.    The Company's Amended and Restated Voting Agreement dated on or about June 15, 2017 provided that the directors may delegate any of their powers, authorities and discretions, including the power to sub-delegate to any committee consisting of one or more directors, and that any committee established by the directors must include the director named "Special Ordinary Director," unless inclusion on such committee is waived by the Special Ordinary Director.

195.    The Special Ordinary Director expressly waived inclusion on the Acquisition Committee, leaving Marks as the only member and with full discretion to approve acquisitions up to $5 million.

196.    Even though Marks only had authority to approve acquisitions up to $5 million, in practice, Marks drove and controlled the Company's rampant and hastily-investigated acquisition process, while the Board rubber-stamped proposed acquisitions he brought to their attention.

197.    Confidential Witness 1 stated that Emily Mills ("Mills"), though titled as the Head of Mergers and Acquisitions at Katerra, was frustrated by the fact that she was nothing more than a puppet of Marks.

198.    Mills was instructed to push acquisitions through at a price that had been previously determined, without Mills being able to perform a discounted cash flow analysis or engage in any negotiations.

199.    As a result, without having analyzed the value of the targets or negotiated the purchase price, Katerra overpaid for the companies it acquired, as demonstrated by an examination of the net tangible assets acquired versus purchase consideration.

### 1.    The Company's Overpayment is Demonstrated by the Negative Net Tangible Assets Acquired

| Fiscal Year | Acquisition | | Net Tangible Assets Acquired | Purchase Consideration |
|---|---|---|---|---|
| | Date | Name | | |
| 2017 | 04/07/17 | United Renovations Holdings, LLC | $ 5.106M | $ 59.750M |
| 2017 | 04/07/17 | CAPGro Construction Management, LLC | 1.972M | 8.266M |
| 2018 | 05/01/18 | Fields Hi-Rise Construction Company, LLC | 6.766M | 103.383M |
| 2018 | 06/19/18 | KEF Holding Pte. Ltd./KEF Infrastructure India Private Ltd. | (21.898M) | 75.985M |
| 2019 | 06/03/19 | UEB Builders, Inc. | (3.521M) | 36.429M |
| 2019 | 09/01/19 | Fortune-Johnson, Inc. | (2.120M) | 14.500M |
| 2019 | N/A | Roots | 0.035M | 2.150M |
| 2019 | N/A | Skyview | 1.962M | 5.088M |
| | | | $ (11.698M) | $ 305.551M |

200.    As shown in the table above, Katerra expended purchase consideration of $305.6 million for the acquisition of negative net tangible assets approximating $11.7 million.

201.    A comparison of a target company's recorded assets and liabilities on their closing date balance sheet will, in general terms, reveal the net tangible assets being acquired.  If the value of the "hard assets" being purchased such as inventory, accounts receivable, plant and equipment, is greater than the acquired liabilities including accounts payable and accrued expenses, then there is positive net tangible assets or identifiable value being acquired.

202.    To the extent an agreed-upon purchase price exceeds the net assets being acquired, then the difference must be attributed to intangible assets including the establishment of goodwill, to justify the excess monies paid over the net tangible assets acquired.

203.    In the case of the UEB Builders, Inc. ("UEB") and Fortune-Johnson, Inc. acquisitions, not only were their closing date balance sheet comprised of negative net assets, but

the current assets acquired (i.e., accounts receivable, cost in excess of billings) were less than the current liabilities acquired (i.e., accounts payable, accrued expenses) indicating negative net working capital and active projects operating at a loss.

204.    Had Marks even allowed a rudimentary analysis of these acquisition targets, the Company could have recognized earlier that it was significantly overpaying for these companies.

### 2.    The Company's Overpayment Is Demonstrated by Its Subsequent Sale of Acquired Companies for Pennies on the Dollar

205.    In addition, the sale of some of these companies following Katerra's bankruptcy filing in June 2021 further shows how the Company paid significantly over market value, as evidenced by the pennies on the dollar return.

206.    For example, Katerra purchased the United Renovations business for $59.7 million in April 2017 and sold it for just $1 million in July 2021.

207.    Similarly, the Company purchased Lord Aeck & Sargent, Inc. for $18 million in June 2018 and sold it for only $1.6 million in July 2021.

208.    In May 2018, the Company completed its acquisition of Fields Hi-Rise Construction Company, LLC ("Fields"), a New Jersey-based company that provided residential and commercial construction services, for approximately $167 million.

209.    The acquisition was unanimously approved at a Board meeting on April 30, 2018 by Marks, Kibsgaard, Davidson, Wolff, Mehta, Hui, Housenbold, and Fisher.

210.    Confidential Witness 3 stated that the Fields acquisition was particularly egregious, as it amounted to a 10 to 12 market multiple, which was far in excess of the typical 3 to 4 times market multiple for construction companies.

211.    Pre-acquisition, Fields was a profitable mid-size general contractor, which received the majority of its work from the affiliated Fields Development Group.

212.    Post-acquisition, the Defendants put tremendous pressure on Fields to grow, directing to expand beyond its New Jersey-region focus, and ultimately causing it to take on a number of problematic and loss-making jobs.

213.    Thus, the Company further devalued its already highly-inflated purchase of Fields.

214.    In May 2019, the Company purchased UEB, an Arizona-based general contractor focusing on the multi-family health care, higher education, and commercial industries, for $26.5 million in cash, plus other consideration.

215.    According to a Company executive, the Company significantly overpaid for UEB, which prior to the acquisition by Katerra was experiencing its own financial problems and on the brink of filing for bankruptcy.

216.    Confidential Witness 3 stated that the there was a failure to perform due diligence when evaluating companies to acquire, one of the reasons that led the Company to overpay for companies or to purchase companies that ultimately ended up failing.

217.    For example, the Defendants focused on forward-looking financial projections from the target companies and did not adequately consider historical financial information.

218.    In some cases, such as with UEB, the financial projections were not met and the proposed contracts did not materialize.

219.    By placing greater emphasis on future financial projections, rather than past performance, the Director Defendants, led by Marks, failed to sufficiently investigate the value and stability of companies Katerra acquired, leading the Company to overpay for the acquisitions and purchase already-failing construction firms.

## V. The Director Defendants Caused the Company to Enter Into Transactions That Benefitted Themselves In Breach of Their Duties of Loyalty and Care

### A. The Director Defendants Approved Executive Compensation Deals and Raises As the Company Was Losing Money

220.    At the same time that the Company was suffering from staggering financial losses, the Director Defendants did not hesitate to reward themselves with raises, bonuses, and other benefits, as detailed below (the "Insider Transactions").

221.    The Director Defendants increased salaries and compensation to officers, even as those officers were actively participating in wrongful conduct and failing to adequately perform their job responsibilities.

222.    On February 6, 2018, Schick, who was instrumental in the false and misleading financial reporting at the Company, received a raise, bumping his salary from $550,000 per year to $600,000 a year.

223.    On March 15, 2019, Marks proposed that Schick's salary be increased again, to $625,000.

224.    Similarly, on August 6, 2019, Solomon, who had been sidelined for at least a month, demanded that she stay on Katerra's payroll for another five months, through December 31, 2019, and be paid an additional $500,000 "separation payment."

225.    Despite the Board and Marks' knowledge that Solomon's tenure as CFO rendered the Company financials a "disgrace," Marks told Solomon that her demand for a $500,000 separation payment was "likely" to be approved.

226.    In addition, at a Board meeting on February 19, 2020, the Board voted to increase the executive compensation of Marks to $1,000,000 a year, effective January 1, 2020, with a $687,500 bonus payment.

227.    This increase in compensation came well after the Board expressed concerns about Marks' leadership abilities and attempted to remove Marks from his role as CEO and just a few months before he was terminated effective July 1, 2020.

228.    The Board also granted Marks options for over 5.4 million shares with a backdated vesting commencement date to February 1, 2017.  The options had a five year vesting schedule with 40% of the options vesting on the second anniversary of the vesting commencement date (February 1, 2019), and 1/60th of the options vesting each month thereafter on the same day of the month as the vesting commencement date.  The improper backdating of options just a few years earlier while Marks was the chair of the compensation committee of KLA-Tenacor cost that company a $65 million settlement with that company's shareholders.

229.    At the same meeting, the Board voted to increase Schick's compensation yet again, to $700,000.  Schick was terminated several months later, effective July 1, 2020, for his role in the creation of false and misleading financial statements for the Katerra Renovations business unit ("Renovations").

230.    Shortly thereafter, the Board approved a massive compensation package for Kibsgaard, who assumed the role of CEO after Marks was terminated.

231.    In October 2017, the Company had loaned Kibsgaard $6 million in the form of a promissory note to exercise options.

232.    In August 2020, as part of Kibsgaard's CEO compensation package, Katerra purchased Kibsgaard's shares for $3.6 million and applied it to reduce the loan balance, (ii) forgave the remaining $3 million loan, and (iii) paid Kibsgaard a $1 million tax gross-up payment.

233.    Housenbold, on behalf of the Company, signed a document approving this transaction.

39

**B.** **Additional Transactions Which Unfairly Benefitted Katerra's Officers and Directors To The Detriment of the Company**

234.    In addition to exorbitant compensation and salary increases described above, the Director Defendants approved other transactions which favored various directors and officers without providing any benefit to the Company.

**1.** **Forgiven Loan to Ash Bhardwaj**

235.    Pursuant to a secured promissory note dated November 27, 2019, the Company loaned $3,000,000 to Ash Bhardwaj ("Bhardwaj") to assist Bhardwaj with the purchase of a home in Dubai (the "Bhardwaj Loan"), where Bhardwaj had relocated in order to oversee Katerra operations in the Middle East and Asia.

236.    As of October 31, 2020, pursuant to a transition agreement with Bhardwaj, the equivalent of $1,000,000 in USD was forgiven from the Bhardwaj Loan (the "Bhardwaj Transition Agreement").

**2.** **Unnecessary Personal Expenses for Defendants and Their Families**

237.    Katerra paid for and/or had an ownership stake in one or more private jets.

238.    The Company spent excessively on these unnecessary private jets and paid for personal travel for several of the Defendants, such as Marks, Marsh, Solomon and their family members, through a company called CTP Aviation, LLC ("CTP").

239.    For example, CFO Solomon's employment contract permitted her to use the Company plane to fly herself, her parents and her dog.

240.    The exorbitant fees were paid for by the Company, despite the fact that the Company was experiencing heavy financial losses across the board and despite the fact that the private jet usage provided no benefit to the Company.

241.    Throughout her tenure on numerous occasions, Solomon was emailed invoices from CTP and immediately approved them without incident or without any questions as to the

40

usage of the jet, including but not limited to April 2, 2018, August 23, 2018, September 26, 2018, and October 25, 2018.

242.    The use of the jets for personal reasons was rampant throughout the Company, with one employee noting in an email dated May 2, 2018 that she had the "invoicing processed for most of the personal flights of the Lear 60 Katerra Jet" and that a time share agreement would be needed for "all individuals who have used the aircraft for personal flights."

243.    On April 16, 2020, Marks wrote in an email to Clewley, the Vice President of Marketing & Public Affairs, that "we are going through every penny of spend" and asked if certain invoices could be put on "hold," including a CTP invoice for $109,182.78.

244.    Marks' request to Clewley evidences the fact that the Company (as opposed to Marks personally) was paying CTP despite the fact that the jets were being used for non-Company purposes.

245.    The Company also paid for executives' living expenses.  For example, on August 1, 2019, Marks approved a request from Ryan to pay Ryan's year-long lease on a mansion for $12,500 a month.

246.    In addition, the Company paid for a corporate box at the Golden State Warriors, the NBA team in which Marks had previously owned a twenty-percent stake.

247.    For the 2018/2019 season, the Company was sent a $139,000 invoice by Golden State Warriors, LLC.

248.    The Company's excessive spending on the Warriors box was exacerbated by the fact that certain of the Defendants used it for personal, rather than for Company purposes, despite the box and related costs being paid for by Katerra.

249.    On November 17, 2018, Samantha Rist, Head of Human Resources for Katerra, wrote an email to Schick, Ryan, and Brathwaite, stating: "Do you and your wives want to join us

41

on Monday, November 26th?  Joanne and I have the suite.  I'll be bringing Rist and Joanne will

be bringing her Dad.  Thought we could make it family night!"

## VI.   The Director Defendants Approved Related Party Transactions Benefitting Marks, Davidson and Wolff, Who Stood on Both Sides of Multiple Deals

### A.   The Director Defendants Steered the Company Into Deals Which Personally Benefitted The Defendants

250.    The  Director  Defendants  were  aware  of  and  approved  numerous  related  party

transactions with entities in which top Company executives had an interest.

251.    In the PwC Diligence Report, PwC expressed concern about the significant number

of related party relationships and transactions in which the Company was involved, specifically

noting that:

> The Company has a substantial number of related parties through the relationships
> of a few key Executives. **As part of its on-going efforts to attain operational
> scale, the Company has relied significantly on transactions with related
> parties**. In FY16, The Wolff Company (100% owned by Paxion–Katerra
> shareholder) generated 94% of Katerra Inc.'s revenue.  Acquisitions of Construct
> Corps and AlgoSquare involved related parties as well. Several supplier
> relationships are also with related parties. **These relationships increase the risk
> that transactions are not carried out at arms length**. The customer relationship
> provides  volume  to  enable  the  Company  to  develop  its  proof  of  concept.
> Diversification of revenues beyond related parties is critical to future success.

(emphasis added)

252.    The PwC Diligence Report included a table of the key related party transactions in

which the Director Defendants were personally involved.

253.    As  recognized  by  PwC,  the  Director  Defendants  approved  transactions  with

companies in which various directors and officers had an ownership stake, which allowed the

directors and officers to personally benefit from the Company's outsized purchase prices.  In the

process, the  Director Defendants failed to use a process and reach a price fair to the Company.

These insider transactions were also a red flag for Katerra's auditor, Deloitte.

### 1.    Paxion

254.    Paxion was a venture capital firm co-founded in 2015, the same year in which Katerra was founded and by the same three people, Marks, Davidson and Wolff.

255.    Marks also served as the Chairman and general partner of Paxion.

256.    Marks, Davidson and Wolff used Paxion as a means to funnel Company dollars directly into their own pockets, as Paxion had an ownership interest in or affiliation with a number of Katerra current and prospective customers, including Avenue 5 Property Management Group, Brain of Things, Lolli & Pops, and Mina Group.

257.    According to the PwC Diligence Report, Paxion also owned 100% of the Wolff Company, Katerra's largest customer accounting for $30.8 million (38%) of Katerra's sales as of November 20, 2017.  Wolff was the Chairman Emeritus of the Wolff Company.

258.    In addition, the Company paid the salaries of key Paxion employees, including Katie Fifer, Duncan Robertson, Zach Hulsey and Jonathan Van Gorp.

### 2.    AlgoSquare

259.    On August 24, 2017, the Director Defendants approved the purchase of AlgoSquare Inc. ("AlgoSquare"), a provider of technology consulting, data engineering, day, advanced analytics, and visualization services based in San Francisco, California, for total consideration of 51,520 shares of Katerra's common stock worth approximately $1.6 million at the date of the merger, including 8,300 shares to pay off related party debt of $0.3 million.

260.    Bhardwaj was AlgoSquare's sole selling stockholder, a board member and officer, as well as an employee and officer of the Company, with the title President, Asia and the Middle East, at Katerra.

261.    In addition, the Resolutions of the Board of Directors of the Company dated August 24, 2017 (the "August 24 Resolutions") stated that "Michael Marks currently owns 5.0% of the equity of AlgoSquare."

262.    Though the August 24 Resolutions state that Marks "intends" to sell his shares back to AlgoSquare prior to the closing of the acquisition and was not "expected" to receive any proceeds in the acquisition, at the time the transaction was approved, Marks owned the AlgoSquare equity.

263.    The Agreement and Plan of Merger between the Company and AlgoSquare was executed on September 29, 2017 by Bhardwaj, on behalf of AlgoSquare, and Solomon, on behalf of the Company.

264.    Ultimately, the AlgoSquare transaction did not close.  Nonetheless, the August 24 Resolutions indicate that Marks, along with Wolff, Davidson, Kibsgaard, Mehta and Hui, voted to approve the AlgoSquare purchase, despite Marks and Bhardwaj's interests in AlgoSquare,

### 3.    Construct Corps

265.    The Director Defendants also approved the purchase of Construct Corps, a labor staffing company later known as Katerra Labor Management, which had numerous ties to the Company.

266.    According to the PwC Diligence Report and the Independent Auditors' Report for the Years Ended December 31, 2017 and 2016 performed by Deloitte, Brad Knight, a Katerra executive had a 10% equity ownership in and served as CEO of Construct Corps prior to acquisition and served as a director and COO of Katerra post acquisition.

267.    Marks was a majority investor in Construct Corps and controlled operations and management of the company.

44

268.    Katerra purchased Construct Corps for $4.9 million, of which Marks received $200,000.

**B.    Agreements with Wolff Entities on Unfavorable, Non-Standard Terms**

269.    From December 2016 through July 2019, the Director Defendants approved several agreements ("Prime Contractor Agreements") between the Company and the Wolff Company and the Wolff Entities, in which Paxion had an ownership interest.

270.    The Prime Contractor Agreements are generally dated between December 2016 and July 8, 2019.

271.    Under the Prime Contractor Agreements, Katerra acted as general contractor for various Wolff Entities projects.

272.    The Company lost money on every project with the Wolff Entities, its largest customer.

273.    In fact, in an April 2019 Loss Provision Discussion Memo, the Company stated that the losses on Wolff projects had risen to approximately $45 million.

| Project Name | November Estimated Incremental Loss |
| --- | --- |
| Fort Apache | (6,326) |
| Fort Collins | (9,000) |
| Reynolds Ranch Senior | (6,784) |
| Rancharrah | (7,202) |
| Silver Lake | (6,506) |
| Union South Bay | (600) |
| Union Village Ph II | (8,332) |
| Total | (44,750) |

274.    The Loss Provision Discussion Memo stated that Katerra had "expected" that Wolff would increase the contract value of certain projects because of early pricing discrepancies and unanticipated cost escalations, thus providing some relief to the Company.

275.    However, "in a series of meetings culminating in November [2018], it was concluded that… Wolff could not adjust the contract value."

45

276.    Marks, Davidson, and Wolff were the chairman and directors of Paxion, respectively.

277.    Paxion, in turn, owned 100% of the Wolff Company.

278.    Thus, Marks, Davidson and Wolff were in control of this determination not to adjust the contract value, as the Loss Provision Discussion Memo later states that a pending agreement relating to how Katerra could be "made whole" in light of the anticipated losses would be negotiated directly with Marks, Davidson and Wolff.

279.    The Loss Provision Discussion Memo admitted that the Fort Collins project, the first student housing project for the Company, was "entered at a lower estimated rate to secure the business."

280.    As set forth in the Loss Provision Discussion Memo, the Company knew that "due to the highly customized nature of the project, 83 unique unit types, it was determined that the Katerra model would not impact the estimated cost of completion enough to prevent the loss."

281.    The Loss Provision Discussion Memo further stated, however, that it was "believed that the other projects were early enough along that we would have opportunities to mitigate the loss," a "belief" which was clearly disproven by the estimated losses of almost $45 million by the end of 2018.

282.    Making matters worse for Katerra, on May 21, 2019, the Director Defendants caused Katerra to enter into a Most Favored Nation Pricing Agreement ("MFN") with the Wolff Entities pursuant to which Wolff Entities secured discounts on its projects ranging from ████ ██.

283.    In the construction industry, that discount exceeds standard overhead and profit, meaning that Katerra was essentially entering into GMP contracts at (or below) actual cost.

284.    Indeed, Katerra's customary fee was 4%.  Thus, for example, the agreement for a Wolff Entities project, the 207 Meridian Project entered into before the MFN had a GMP of

███████████████████████████████████████████████████████████

███████████████████████████████████ Simple math reveals that a ███████████████

█████████████████

285.    On July 1, 2019, the Director Defendants then caused Katerra to enter into a certain Side Letter Agreement to Standard Form of Construction Agreement (the "<u>Side Letter</u>").  Pursuant to the Side Letter, Katerra agreed to ██████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ The amount of the ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████

286.    Thus, the Side Letter shifted █████████████████████████████████████

███████████████████████████████████████

287.    The Wolff Entities had absolutely no incentive to terminate the substantially below cost Prime Contract Agreements under any set of circumstances.  This was particularly true where, as here, Katerra was contractually obligated to ████████████████████████████████████

████████████████████████████████████████

288.    The Side Letter Agreement and the MFN were insider transactions benefitting Wolff to the detriment of Katerra.

C.    <u>The Lifebridge and Amberglen Transaction</u>

289.    In December 2019, the Director Defendants approved a transaction in which Katerra purchased four large, loss-making multi-family and senior independent living projects in

47

Washington and Oregon, Amberglen Market Rate, Amberglen Senior, Lifebridge Market Rate and Lifebridge Senior (the "Lifebridge and Amberglen Transaction"), from one of the Wolff Entities, Wolff Real Estate Partners ("WREP").

290.    Total consideration for the Lifebridge and Amberglen Transaction was $164.7 million, including cash of $146.4 million and forgiveness of accounts receivable and unbilled receivables of $18.3 million.  Total forecasted development costs on the project, which included all the costs incurred to date, the forecast construction cost to complete, all future development costs, and the Wolff Entities' future development fees, were $425 million.

291.    Prior to the transaction, Katerra was acting as the general contractor on the projects and after the purchase, Katerra acquired the real property and improvements, as well as the construction contracts.

### 1.    The Lifebridge and Amberglen Transaction Forced Katerra to Take On Unnecessary Risk and Miss Out on the Profitability of the Projects

292.    The Lifebridge and Amberglen Transaction amounted to a highly troubling decision by the Director Defendants from a financial perspective.

293.    The transaction was approved in December 2019, when the Company was also already in severe financial distress and had just entered into the Greensill Receivables Facility. Nonetheless, the Board made the decision to take on the financial liability of a massive, four-part construction project with a projected $425 million in development costs.

294.    The purchase required the Company, already in a liquidity crisis, to make an immediate $146 million payment to the Wolff Entities and ended a secure revenue stream from the Wolff Entities, as owner, for the construction of the four projects already underway.

295.    In addition, the deal exposed Katerra to finance approximately $281 million for the completion of the four developments over a projected seven months.

**2.      Marks, Wolff and Davidson Stood on Both Sides of the Lifebridge and Amberglen Transaction and Personally Benefitted from the Deal**

296.    In addition, the approval of the Lifebridge and Amberglen Transaction breached the Director Defendants duties of loyalty to the Company.  The transaction was approved despite the fact that the Director Defendants did not disclose the conflicts of some of the voting directors, Marks and Davidson, who stood on both sides of the transaction.

297.    The Lifebridge and Amberglen Transaction was first introduced to the Board at a meeting on October 18, 2019.  At this same meeting, Marks announced the resignation of Wolff from the Board.

298.    At a December 17, 2019 Board meeting, the directors present, Marks, Davidson, Housenbold, Kibsgaard, Mehta, Picard, and Wilson, approved the Lifebridge and Amberglen Transaction.

299.    The minutes from the December 17, 2019 Board meeting (the "December 17 Board Minutes") indicate that "the directors present were aware that each of Fritz Wolff, a shareholder and former director of the Company, and Paxion, a shareholder of the Company, is affiliated with Seller, and therefore each of Mr. Wolff and Paxion has an interest in the Transaction."

300.    The December 17 Board Minutes also state that "the directors are aware of the material facts related to the Transaction and have had an adequate opportunity to ask questions regarding, and investigate, the interests of Buyer and Mr. Wolff and Paxion in the Transaction."

301.    Marks and Davidson, both Katerra directors who voted to approve the Lifebridge and Amberglen Transaction, were closely affiliated with Paxion.  Davidson was Paxion's founder and Marks was its founder, chairman and general partner.

49

302.    However, the directors present never discussed the inherent conflict with Marks and Davidson, in addition to Wolff, having interests in both sides of the Lifebridge and Amberglen Transaction.

303.    Further, Marks and Davidson were permitted to participate in the vote to approve the Lifebridge and Amberglen Transaction.

304.    Katerra described the Lifebridge and Amberglen Transaction in its 2019 Financial Statement as follows:

### 6.  ACQUISITION OF DEVELOPMENT PROPERTIES

In December 2019, Katerra, through four wholly-owned subsidiaries, entered into separate purchase and sale agreements with a developer to purchase properties, including real properties and improvements, as well as contracts of four construction projects for which Katerra was engaged as the general contractor. These purchase and sale agreements effectively assigned all the rights and liabilities pertaining to the four projects to Katerra, including the construction contracts previously executed by and among Katerra and the developer. As of the date of the transaction, Katerra had previously recorded a loss accrual of $71.7 million related to the construction contracts, for future project-related expenses in excess of anticipated revenue to be billed. The transaction was determined to be an asset acquisition of a group of assets which comprised of land and construction in progress. The total consideration was $164.7 million, including cash of $146.4 million and forgiveness of accounts receivable and unbilled receivables of $18.3 million. The fair value of the unfavorable construction contracts of $71.7 million effectively reduced the purchase consideration for the assets, due to the settlement of these preexisting contractual relationships. As such, Katerra recorded the acquired group of assets at $93.0 million after deducting $71.7 million from the total consideration for the fair value of the unfavorable construction contracts.

305.    Notably, Katerra had already accrued $71.7 million in losses related to the Lifebridge and Amberglen projects by the date they acquired the property and the contracts.

306.    The $71.7 million in losses Katerra had already accrued from the Lifebridge and Amberglen projects, the purchase consideration of almost $150 million, the fact that the Board did not discuss Marks and Davidson's conflicts, combined with the fact that Marks and Davidson were able to vote to approve the Lifebridge and Amberglen Transaction, demonstrate that the Board breached its fiduciary duties to the Company.

307. The lopsidedness of the transaction, weighing highly in favor of Paxion and the Wolff Entities and against the Company, was captured by a statement of Jay Petunkas ("Petunkas"), CEO of the Wolff Company.

308. In an interview on January 26, 2022, a vice president at Katerra ("Confidential Witness 4"), stated that Petunkas, who negotiated the deal on behalf of the Wolff Entities, told Confidential Witness 4 that he had secured the "deal of a lifetime" for his boss.

309. Not surprisingly given the lack of diligence and overall mismanagement, the Company failed to complete the Lifebridge and Amberglen developments and thus did not realize the potential development revenue streams for which they paid significant upfront and ongoing costs.

310. Like so many of its other projects and as set forth above, the Company was quickly in over its head, playing the roles of owner, architect and contractor on all four construction projects, but without the necessary expertise, clear lines of responsibility or careful management.

311. As a result, construction costs significantly increased, and construction progress was delayed.

312. In September 2020, the Board approved the sale of the four developments to Artemis Real Estate Partners ("AREP") for approximately $76 million, $68 million less than Katerra paid the Wolff Entities only nine months earlier.

313. The Board had initially agreed on a purchase price of $105 million, but quickly discounted the purchase price by a further $29 million to $76 million in order to secure a larger upfront cash payment.

314. The Lifebridge and Amberglen Transaction constituted a blatant breach of the Director Defendants' fiduciary duties to the Company, a huge boon to the Wolff Entities, which Wolff, Davidson and Marks benefitted from, and a disastrous loss for already-struggling Katerra.

51

## VII.   The Company Entered a Damaging Receivables Facility With Greensill

### A.   The Director Defendants Caused the Company to Enter into a Burdensome Receivables Facility That Worsened the Company's Financial Position

315.    SoftBank-appointed director Housenbold stated in the July 5 Interview that Marks surprised the directors at a Board meeting by saying that he had obtained a line of credit from Greensill, after Marks had met Greensill principal, Lex Greensill, at a SoftBank event.

316.    On or about December 9, 2019, following unanimous approval by the Board, Katerra entered into a Receivable Purchase Agreement ("RPA") with Greensill, governing the terms of the Greensill Receivables Facility, in which Katerra would sell its receivables to Greensill.

317.    The structure of the Greensill Receivables Facility plunged the Company further into financial distress and led to its ultimate demise, which the Director Defendants should have recognized at the outset before causing the Company to enter into the RPA.

318.    The Director Defendants did not adequately assess the terms of the RPA, which provided for no more than five-months of net borrowing availability and through the untenable economics of the RPA and Katerra business model, exacerbated the existing challenges to profitability and liquidity.

319.    Combined with the absence of any financial or operational oversight to manage the RPA, an atmosphere of unbridled borrowing led to the pledging of receivables generated from loss-producing acquisitions that were further inflated by the duplicative submission of invoices and uncollectible amounts.

### B.   The Terms of The RPA Set Up Katerra For Immediate Losses

320.    Pursuant to the RPA, Katerra agreed to sell future cash receipts from clients to Greensill for work completed on Katerra projects.

321.    In return, Greensill would loan Katerra an advance amount at either 90 percent for those receivables supported by issued invoices for work completed or 60 percent for those

receivables designated as future receivables not completed but projected and for which invoices had yet to be issued.

322.    Additionally, Greensill charged a fee to be paid by Katerra for each transaction at 6 percent plus LIBOR.

323.    Thus, by the very terms of the RPA, the design of the Greensill Receivables Facility meant that for every receivable, Katerra would either realize a lower net profit or be in a loss position.

324.    In addition, the maximum outstanding advance amount under the Greensill Receivables Facility was $400,000,000 although there were provisions to increase this by an additional $200,000,000, to a maximum of $600,000,000 subject to the on-going performance of the Company under the terms of the RPA.

**C.    The Short Lifespan of the Greensill Receivables Facility Was Foreseeable And Should Have Been Recognized by the Director Defendants**

325.    The first advance by Greensill to Katerra, in the amount of approximately $204 million, was requested and then funded, on or about December 19, 2019, just ten days after the RPA was executed.

326.    By April 15, 2020, just four months after Katerra's initial draw, Katerra had borrowed $440 million from the Greensill Receivables Facility.

327.    From that point forward, Katerra was merely pledging both issued and future invoices to Greensill for the sole purpose of repaying the approximately $440 million outstanding that had accumulated on the credit line.

328.    The unsuitability of the Greensill Receivables Facility with Katerra's business model and financial operations would have been obvious to the Director Defendants if they had conducted even a cursory review of the audited financial statements from 2017, 2018 and 2019.

329.    For example, the Statement of Operations for this three-year period just prior to Katerra's entering into the RPA, shows operating losses that grew from approximately $141 million to $769 million from 2017 to 2019.

330.    In addition, the Statements of Cash Flows show that Katerra's Operating Activities burned through $119 million, $351 million and $787 million in cash for the years 2017, 2018 and 2019, respectively.

331.    Clearly, as the Director Defendants should have recognized, a $440 million line of credit structured to require repayments within 90 days from advanced monies, was woefully insufficient to ensure Katerra's cash needs were met for any extended period.

332.    Katerra began to rely on the Greensill advances, in some instances prior to the inception of a project, and fueled its operations by borrowing against future invoices.

333.    Effectively, the Greensill Receivables Facility was a front-loaded cash generating arrangement, which would fail unless it is continuously funded with new receivables.

334.    The Director Defendants also failed to plan for the inadequate loan limit of $440 million, which as Katerra's historical performance unmistakably demonstrated, had no more than a four to five month lifespan.

335.    Though the RPA provided that the Company could request a $200 million increase in the borrowing amount, the Company could not access those additional funds because by the first quarter of 2020, it had already or was forecasted to, breach certain required financial covenants included within the RPA.

336.    Further, any additional funds would have come with an additional 1% fee and likely would have been drawn down the Company in a matter of months, just like the initial $440 million.

337.   In addition, the Defendants not adequately consider or investigate alternative facilities to borrow money that would have been better suited to Katerra's business model and financial needs.

**D.   The Officer Defendants Failed to Oversee the Company's Borrowing and Accounting Practices under the Greensill Receivables Facility**

338.   A review of the receivables in the Greensill Receivables Facility reveals a number of inconsistencies in the Company's tracking of invoices, which indicate the careless monitoring of the facility by the Officer Defendants and the employees working under their supervision.

339.   These inconsistencies include, but are not limited to:

- Pledged receivables not matching actual invoices submitted to project owners;

- Duplicate invoices submitted for the same project;

- Future invoices overlapping the same time frame as actual submitted invoices; and

- Multiple instances of Katerra requesting payment for the same future invoice multiple times over the course of one year.

340.   These examples demonstrate a lack of internal controls related to the borrowing and record keeping by Katerra's management, which led to an unnecessarily faster burn rate under the Greensill Receivables Facility.

**E.   The Director Defendants Failed to Mitigate Damage to the Company Following Greensill's Insolvency**

341.   As part of a recapitalization in December 2020, Softbank invested $200 million into the Company and paid $440 million of Greensill debt.

342.   During the first quarter of 2021, the Company believed it was turning the corner financially. New management had been brought on and with the additional Softbank investment, the Company was optimistic about the Company's future.

343.    One of the independent directors of the Company testified that the Board and management shared that optimism about the Company's future.

344.    However, on or about March 8, 2021, Greensill filed for bankruptcy protection.

345.    In its bankruptcy filings, Greensill incorrectly claimed that Katerra still owed it the $440 million debt from the facilities agreement.

346.    This false claim that Katerra still owed $440 million to Greensill was reported in the Wall Street Journal.

347.    The Company's sureties, customers and investors refused to work with the Company after learning that Greensill stated the debt was still owed by the Company.

348.    One of the independent directors of the Board testified that this created a crisis for Company and that the Board determined that "it was important for Katerra to take its own stand, have its own public relations position, which documented the fact that Katerra had been fully discharged and released from this facility and that Softbank had paid value to obtain that release."

349.    Yet, the Defendants did not cause the Company to take its own public stand; failed to put forth the Company's own public relations position; failed to seek a correction from the Wall Street Journal or to work to have another article written that would inform the public (including Katerra's sureties, customers and investors) that the $440 million debt was paid; and failed to even issue a press release addressing the issue.

350.    The Director Defendants stayed publicly silent while the Company suffered irreparable harm from the public's belief that the $440 million debt was not satisfied.

351.    The temporary relief created by new management and the additional Softbank investments were lost and the Company was forced to file its own bankruptcy petition in early June 2021.

## VIII.    The Defendants' Constant Pressure on Employees to Meet Certain Targets Led to the Creation of Misleading Financial Statements

352.    The Officer Defendants, especially Marks and Marsh, intentionally pressured subordinates at various business units, including Renovations and Katerra West ("Katerra West"), to meet financial targets at least through fiscal years 2018, 2019 and the first half of 2020 to falsely represent that Katerra was a viable, growing and successful enterprise.  The pressure started at the top with Marks who exerted pressure on Company management individually and through Marks' regular executive staff meetings where Marks pushed his top executive staff to improve Katerra's numbers and to push those below the chain of command to take whatever steps were necessary for the Company to meet targets and generate investments.  By way of example only, the notes and minutes of Marks' executive staff meeting for the meeting held on February 25, 2020 included the following with respect to forecasting for 2020:

| | |
|---|---|
| Materials | "Renovations: pull ins from 2Q into 1Q.  Risk for the year." |
| | "$539 million of revenue 70% confidence.  95+% closer to $510 million.  100% confidence revenue at or below $500 million." |
| | "Gross Margins at 14.5% Trevor [Schick] has confidence." |
| US Construction | "KW no change and Paal [Kibsgaard] is confident there." |

353.    In follow up emails from the meeting, Marks reminded the executive staff about the discussions on how to "improve our numbers" with Marsh responding to the executive staff affirming Marks' commentary, reinforcing the objective of "how best to achieve our shared goal." Following a later executive staff meeting, Marsh sent a memo to Marks' executive staff dated March 18, 2020 about the need to "aggressively drive collections and increase billings."  Those usually attending Marks' staff meeting, Marsh, Ryan, Brathwaite, Kibsgaard, Schick, and Bhardwaj, fell in line with those dictates and exerted pressure to the subordinates in their respective business units.

354.     Katerra's business units reported monthly to the Company's executives who, in turn, reported financial results to the Board.  Consequently, the downward pressure to meet targets was non-stop and increased at quarter and year ends.

355.     Marks and Marsh as well as other employees of Katerra, knew the Company's financials were hard to decipher but did nothing to remedy the problem because the indecipherable and unreliable financials furthered their goal to maintain artificially inflated revenues and earnings.

356.     In the process, the Officer Defendants oversaw and promoted multiple material violations of Generally Accepted Accounting Principles ("GAAP").

**A.     Revenue Recognition Methods of Long Term Construction Contracts under GAAP**

357.     From the inception of the Company, Katerra entered into construction contracts in which the term of the contracts spanned multiple accounting periods.

358.     GAAP recognizes two primary methods that Katerra could have used for the recognition of revenue in connection with those contracts: percentage of completion and completed contract.

359.     The percentage of completion method is favored among construction companies because that method allows a company to recognize revenue from long-term contracts ratably over the life of the multi-accounting period contracts.

360.     Conversely, under the completed contract method, a company has to wait until the contract is completed to recognize revenue to account for the uncertainty of quantifying income and expense during the life of a project.  The completed contract method of recognizing revenue must be used under GAAP when it is difficult for an entity to reasonably estimate total contract costs and the associated percentage of total expenses incurred at a given point in time.

361.   The percentage of completion and completed contract methods are not substitutes for one-another.   In order to use percentage of completion accounting, GAAP (Accounting Standards Codification (ASC) 605-35, as amended effective after December 15, 2018 ("ASC 606")) requires a company to be able to reasonably estimate its costs associated with each contract (both in advance of the project and the remaining costs during the project) and the stages of project completion.

362.   Using percentage of completion, a company calculates the total expenses for the accounting period as a percentage of the overall cost to complete the contract and multiplies that number by the total revenue created by the contract.

363.   The purpose of the change to GAAP resulting from ASC 606 for recognizing revenue on long term construction contracts was to establish principles to report useful information to users of financial statements about the nature, timing and uncertainty of revenue from contracts with customers.

364.   Under the new GAAP revenue recognition standard, which was effective for public filers for fiscal years beginning after December 15, 2018 (so, in Katerra's case of early adoption, starting with its first quarter 2019), revenue recognition requires the application of a five step model:   (1) identify the contract with the customer; (2) identify the performance obligations (promises) in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when (or as) the reporting organization satisfies a performance obligation.

365.   Revenue can be recognized when the contractor satisfies certain performance obligations evidencing the transfer of control of either goods or services to the customer.   The transfer of control to a customer can occur over a period of time or at a single point in time.   Since

59

most construction contracts transfer control over a period of time, contractors will strive to continue to recognize revenue on the percentage of completion method.

366.    One notable change resulting from ASC 606 is that construction companies like Katerra will have to determine whether they have a single or multiple performance obligation in each contract.  Each performance obligation must be evaluated as a separate revenue stream recognized based on facts and circumstances.

367.    If the contract has multiple performance obligations then each one has to be evaluated and revenue recognition may be different for each performance obligation.

368.    Fulfillment costs (costs directly related to a project and expected to be recovered such as engineering and design, surety bonds) are supposed to be capitalized on the balance sheet and then amortized over the expected contract life.  Significantly, construction companies must still be able to reasonably estimate costs and reasonably measure progress toward project completion.  At all times material hereto, Katerra could not reasonably estimate costs or progress toward completion.

369.    Under either ASC 605 or 606, GAAP continued to require that anticipated project losses be recognized in their entirety as soon as the loss becomes evident.  In order to understand that Katerra did not meet the standard to use percentage of completion accounting for revenue recognition, it is apparent on the face of the 2018 and 2019 audited income statements, which reported Construction and Design Losses (anticipated losses on various uncompleted construction and design projects), of $249 million and $223 million, respectively, within Cost of Sales.  Such massive losses are either indicative of management's inability to make reasonably dependable project estimates, or in the alternative, that management could accurately estimate project revenue and expenses but intentionally entered into contacts that would never be completed at a profit.

**B.**     **The Officer Defendants Oversaw and Directed the Manipulation of the Company's Financial Statements**

370.     Katerra did not recognize losses for losing contracts, even where it intentionally underbid on a contract in order to be awarded the project contract.

371.     Katerra improperly continued to recognize revenue on losing projects and projects that the Company had no way to reasonably estimate costs or progress toward completion.

372.     As such, Katerra's financial statements for fiscal years 2018, 2019, and the first two quarters of 2020 were prepared in violation of various GAAP principles.

373.     As evidenced below, at Renovations, costs were intentionally manipulated and front loaded to create artificially inflated revenue.

374.     Intentionally improper accrual accounting was also commonplace at the Company.

375.     As also evidenced below, at Katerra West, a $40 million slush fund (cookie jar reserve) was wrongfully used to conceal losing contracts and artificially inflate earnings.

376.     Katerra's key executives, including but not limited to the Officer Defendants, were aware of the improper manipulation of the Company's financial statements.  Nevertheless, the Officer Defendants, specifically Marks, Marsh, and Solomon, falsely represented to the Company's auditors, Deloitte, in connection with the 2018 and 2019 financial statements that the Company had complied with GAAP in preparing its financial statements.

377.     While Deloitte appears to have violated Generally Accepted Auditing Standards ("GAAS") in failing to exercise proper professional skepticism in determining what was actually happening with Katerra's operations and financial reporting and the Company's grossly inadequate internal controls, the representations that the Company was following GAAP were knowingly false.

378.    The management representation letter addressed to Deloitte for the Company's audit of fiscal year 2017, dated May 31, 2018 and signed by Marks and Solomon, falsely stated that the Company's financial statements were prepared in accordance with GAAP and presented the Company's financials fairly and that the Company was not aware of any allegations of fraud.

379.    The management representation letter addressed to Deloitte for the Company's audit of fiscal year 2018, dated June 28, 2019 and signed by Defendants Marks and Solomon, falsely stated that the Company's financial statements were prepared in accordance with GAAP and presented the Company's financials fairly and that the Company was not aware of any allegations of fraud.

380.    As discussed in more detail below, the management representation letter addressed to Deloitte for the Company's audit of fiscal year 2019 (the "2019 Management Representation Letter"), dated May 14, 2020 and signed by Marks, Marsh and Tachouet, falsely stated that the Company's financial statements were prepared in accordance with GAAP and presented the Company's financials fairly and that the Company was not aware of any allegations of fraud.

381.    Further, when Marks, Marsh, and Tachouet signed the 2019 Management Representation Letter they were also aware that the Company was conducting an underbilling review which was uncovering "accounting issues" that ultimately led to the investigation into Renovations and the self-reporting to the SEC.

382.    Despite an intentionally ignored request by Kibsgaard to Marsh to hold off closing the audit of the Company's fiscal 2019 audit (the "2019 Audit") on May 15, 2020, to be described further below, Deloitte issued the Company's audited financial statements for fiscal 2019 on May 16, 2020.

383.    After Marks, Marsh, and Tachouet realized their exposure with having rushed their signing of the 2019 Management Representation Letter to conclude the 2019 Audit while they

knew about the ever-worsening accounting situation at Renovations and Katerra West, Marks messaged Tachouet on May 22, 2020 asking whether there was "a way to just not accept the audit and reissue it in a month?"

384.    The false and misleading financial statements were the direct result of the pressure placed by the Officer Defendants, especially Marks and Marsh, to meet unrealistic financial forecasts and manage earnings.

385.    Marks and Marsh directed the management of earnings for various reasons including to meet targets, to show growth and success since the Company was a start-up, to raise capital and to increase their personal compensation.

386.    Earnings were managed on both the revenue and expense sides of the Company's financials.  Since Katerra business units reported their financial results monthly, the pressure on these subordinates grew geometrically as the Company's financials were manipulated to meet its financial targets.

387.    The most obvious of the wrongful conduct resulting from Marks and Marsh's pressure occurred at Renovations and Katerra West.

388.    For the Company's fiscal years 2018 and 2019 and the first two quarters of fiscal 2020, at the least, Katerra's financials were grossly misstated.

389.    The Company's financial statements were similarly misstated for prior and subsequent reporting periods.

390.    The misstated financial statements were provided to existing and potential investors of Katerra including in connection with a Series F capital raise in which Katerra's audited misstated financial statements for fiscal year 2019 and unaudited financial statements for the first quarter of 2020 were provided to investors.

391.    Internally, Company executives and employees at Renovations and Katerra West admitted to wrongdoing through various emails, as further described below.  The wrongdoing includes the false recording of project costs to artificially recognize revenues at Renovations and the improper use of a slush fund (executive contingency reserve) to manage and inflate earnings at Katerra West.

### 1.    Renovation-related Emails

392.    On October 25, 2019, Marks sent an email concerning the Company's financial results for September 2019 to a number of executives including Marsh, Schick and other operating executives.  In the email, Marks complains about the business units missing targets.  "[T]his just HAS TO STOP.  We again miss every number all of the time, that includes MEA where the numbers are as bad as the U.S. in terms of missing revenue and margins and bottom line. . . .So the reporting isn't good, and the results are worse.  I am not expecting this to happen in Q4.  This just sucks.  Has to get better."

393.    On November 8, 2019, Robert Tolstyka ("Tolstyka"), a Vice President of Finance, wrote an email to Aleem Virani ("Virani"), a member of Katerra's financial planning and analysis team, discussing additional accruals for the month ending October 2019.  Tolstyka told Virani to add accruals on two projects including $600,000 for the Fairfield Lakes project.  Tolstyka added that "the[y] got the green light to order all interior finishes, cabinets and tops so they are about to place a huge order on Monday.  Unfortunately **this is robbing Peter to pay Paul**.  I took some profits on jobs. . . . I know we wanted to save, but we need to hit the number."  Tolstyka followed up with another email later that day instructing Virani to add additional accruals for October 2019 so the Renovations business unit would show higher revenue and margin adding: "**I feel crazy uneasy about this.  Calling Steve [Deleon] to tell him we are taking from future months to**

64

**hit this month and see what he says**.  We have done our job and now it is a mgmt.. decision."  (emphasis added).

394.    On November 21, 2019, Schick emailed leaders of Renovations about the business unit's budget.  Schick wrote:  "I want everyone to take a last review of your 2020 plans.  **I do not expect any change to the Management plans, as that is what you signed up for in 2020.  . . . As I have said over and over, and for those with Michael this week you heard it again, we need to hit the numbers for Q4 and 2020, every month, every quarter. No more excuses**."  (emphasis added).

395.    On December 8, 2019, Tolstyka and Steve Deleon ("Deleon"), a managing director of Renovations, exchanged emails about the November 2019 financials for the Market Rate division of Renovations which had hundreds of pending construction projects at any given time.  Tolstyka told Deleon that if they accrued at least 50% of what was missed on each job that missed revenue forecast" that they'd be at $12.5 million.  Deleon responded by telling Tolstyka "**We can't miss a dollar in November.  I'm not kidding, we will have zero cred with Trevor [Schick] and above if that happens**."  Tolstyka responds by saying: "**I agree but I'm also getting to a point where I'm making up numbers soon. . . I'm taking dollars from December to hit November. No matter if they need materials or not that month**.  It's up to them to deal with inventory issues."  (emphasis added).

396.    On December 10, 2019, Tolstyka emailed Jimmy Foster ("<u>Foster</u>") (Vice President of Eastern Division (Market Rate), Andrew Chansley ("<u>Chansley</u>") (Sr. Vice President of National Operations (Market Rate)) and Deleon concerning a missed forecast for the month of November 2019:  "We missed forecast by 3M dollars this month.  **What we did this month is did an accrual to essentially catch-up these costs we were expecting so we can hit revenue but what this does is take away revenue from December**."  (emphasis added).

397.     On December 24, 2019, Chansley, a regional vice president at Renovations, wrote an email to several subordinates on his team commenting on end of year cost and revenue by saying:  "**As we reach the end of the year need to push to hit our financial goals**.  Please scrub your job and look for material deposits that need to be made, subcontractors that are past due for payments of need mobilization payments.  **Please encourage your teams to order and stock for unit flow through February.  Be generous with payments to subcontractors that we trust. Please look to pay a little in advance on the HGI jobs**.  Please start reviewing now and I will touch base with each of you on Thursday."  (emphasis added).

398.     On December 26, 2019, Deleon emailed Tolstyka: "WE HAVE TO HIT FORECAST."

399.     On December 27, 2019, Foster wrote to various others at the business unit with a subject line titled "Finish Strong" saying:  "**Quick reminder to spend some money for the finish of 2019.  Materials can be our biggest mover.  If you can order product to last over the next 4-6 weeks, that would be great.  Please also make sure that you have the storage capabilities to do so.  We have a bit of a shortfall for our year end revenue goals so every little bit helps. If you have some subs that could get some invoicing in, that is fine too**."  (emphasis added). Three days later, on December 30, 2019, Foster told the same recipients by email to get vendors to submit invoices as soon as possible "regardless of when items are to be shipped.  **We need invoicing to recognize costs**.  For subs, do the same.  **Please collect invoices ASAP and let finance know that we have an invoice in hand and will be processing it for this calendar year**."  (emphasis added).

400.     On January 30, 2020, Schick emailed a group of subordinates at Renovations summarizing a meeting he had attended with  Marks' staff earlier that day.  Schick told the group that "[t]he most important thing in front of us is to maximize Q1.  **Getting the revenue and EBIT**

over the next 60 days, and being creative where necessary is job #1 for meeting investors expectations. . . . [d]riving the revenue gets us the profits and company growth. . . . ."

401.    On February 6, 2020, Tolstyka sent an email to Deleon concerning the reporting of revenue at the Market Rate division of Renovations.  Tolstyka began by writing "**I hope you are sitting down**."  Tolstyka continued: "We have done all of our accruals . . . and revenue at that point was $7.1M at (-17.3%) margin.  Yes, you are reading that correctly. . . . The guys said in the last forecast we would be around $11.5M in the forecast.  What happened where we do not have the costs to support that level**?  I am really at a loss at what to do at this point.  I said I can't keep propping this up as I am not comfortable with doing it anymore.  This is everything we have to deal with on the back-end to make the numbers presentable monthly**."  (emphasis added).

402.    On February 17, 2020, Kyle Weaver, a Managing Director of Renovations (Affordable Housing) ("Weaver") wrote to Deleon about possible forecast changes saying:  "My big question is going to be how much exposure do you guys want us to have.  Like we discussed, **I can get a bunch of costs in and run up revenue, but that leaves us exposed if we had to pull back money** from the sub."  (emphasis added).

403.    On February 19, 2020, Schick and Deleon exchanged emails about fourth quarter 2019 costs at Renovations.  Schick began by asking Deleon whether they were able to "move some of the  Q4 costs back to Q$?"  Deleon responded that he did not think the Company finance group approved moving those costs.  Schick responded: "**We should push it, as I would rather show in Q4, as people forget that quickly.  I will need to live with this Q1 number for the next 11 months**."  The following day, February 20, 2020, Deleon write to Schick: "**I told Robert to push the $600k loss back to 2019.  This should make Q1 $2.6 net profit now**."  (emphasis added).

404.    On February 27, 2020, Schick cut Renovations' forecast by $10 million, but told Deleon not to tell the team or reduce pressure on the team to meet forecast.

405.    On March 2, 2020, Weaver sent an email to a number of recipients at Katerra preparing Renovations for a revenue push for the month of March/end of the first fiscal quarter of 2020.  Weaver began the email: "Team, Just a reminder we are looking to have a big push here in March for revenue. . . . I am attaching the forecast which lists each project and approx.. how much we are anticipating per location.  I understand some of these numbers will be different, but we need to collectively hit the goal.  Also, PLEASE BE SURE TO HELP EACH OTHER OUT.  If you can help a team member with submittal, or getting an LOI out, please do so. We need all hands on deck here over the next 30 days.  **Of course the projects that are currently running NEED to push as much COST into March as they can.  Meaning, if you have completed 50% of your units, make sure you sub is billing for 60%.  APM Team – PLEASE BE SURE ALL COSTS ARE IN.  We cannot afford to be overbilled on our subs.  They need to be up to date on all billings**."  (emphasis added).

406.    On March 17, 2020, Virani messaged Tolstyka the following: "Alan [Evans] is asking about Seaside Laguna for audit, had over $1M in Rev[enue] most of which hit in Dec[ember] but still no Billings to date.  **Are upfront costs still good as reason**?"  To which Tolstyka responded: "**I'll think of a reason**."  (emphasis added).  The next day, March 18, 2020, Tolstyka emailed Alan Evans and Virani writing "**We got started in 2019 then there was an issue associated with the plans we bid from and the correct plans were not used to make the estimate so the exact amount of the loss was unknown.  So we have held off on billing as that amount will change once we figure out the amount of loss**.  I believe that is complete and can find out exactly what that amount is and when we will bill."  (emphasis added).

407.     On April 16, 2020, after bringing to the attention of Daniel Coleman ("Coleman")
that there existed an outstanding issue with Katerra manipulating revenue on a Valpico project,
Coleman responded to Josephine Cheng ("Cheng") and Tachouet: "**This shows Katerra**
**recognizing [approximately] $1.4m of 2019 revenue that it didn't earn and then that**
**reversing in Jan**…so I think it's more than management reporting issue?  Did we leave as is and
it never made it to the attention of audit adjustments?" to which Cheng responded: "It never made
it to the attention of the auditors."  (emphasis added).

408.     On April 24, 2020, Tolstyka sent an email to Tachouet saying: "**We had one open**
**item that could've effected issuance of financial statements that was on the list deloitte sends**
**out and below is clearing that item pending partner review.  We accrued $250k on a job and**
**there was no 3rd party support for the accrual so they extrapolated that out but by reading**
**below it is non consequential and that item is now closed**.  Deloitte has no open requests."
(emphasis added).

409.     On April 29, 2020, Schick sent an email to several subordinates concerning a
meeting he had had with Softbank the day before to review the Renovations business unit.  Schick
reported: "Overall things went well, but the message from Softbank and the Board is pretty simple.
This is a good business, but if we want investment, we need to hit our numbers.  Obviously April
is closing now, so assuring we get every last $ of revenue pulled in is critical, then Q2/Q3 will
determine the investments we will get."

410.     On May 26, 2020, Mark Murphy ("Murphy") at Katerra's Financial Planning &
Analysis group at Renovations emailed a group of Renovation managers concerning Renovations
approved forecast.  Weaver, a recipient of that email responded to Murphy saying:  "Do you and/or
Robert have time for a call today?  **From what I can tell: 1. Our revenue seems to be artificially**
**inflated by $3.4M. . . . 2. Not sure how we plan on getting the revenue listed with the same**

69

**amount of staff we have now, when we clearly can't**.  Would like to understand this."  (emphasis added).

### 2. <u>Katerra West-related Emails</u>

411.    Maintaining the pressure of hitting forecasts at Katerra West, on February 23, 2020, Mike Hurst, Head of Construction at Katerra West ("Hurst") emailed several managers at Katerra West, including Coleman, Manager of Corporate Financial Planning and Analysis, Gary Brown, Head of US Construction, Finance, ("<u>Brown</u>"), Diana McPheeters, Vice President of Finance at Katerra West, ("<u>McPheeters</u>") and Corey Haygood, Regional Project Controller, ("<u>Haygood</u>") and advised the recipients "**Paal [Kibsgaard] made it clear the importance of the first few months meeting expected performance in [Katerra West] as work on the next round of funding for Katerra from our investment partners.  We need to make that a priority as we move costs around that have a negative impact on [Katerra West]**." (emphasis added).

412.    Certain insiders at Katerra were aware of accounting issues and related earning management at Katerra West as early as May 2020.  On May 15, 2020, Kibsgaard emailed Marsh asking:  "**Can we hold off with closing the 2019 Audit until we have reviewed this US Construction accounting issues we have been uncovering**." (emphasis added).  Marsh did not instruct Deloitte to hold off closing the 2019 Audit and the Audit Opinion was issued in the early morning hours of May 16, 2020.

413.    Later in the day on May 16, 2020, Mills, Head of Mergers and Acquisitions at Katerra, sent Marsh an email attaching a powerpoint presentation entitled "Finance & Accounting Challenges: Katerra West Projects."   In the cover email, Mills told Marsh: "Attached is the underlings presentation **Mollie put together and shared with Paal**.  Thought the content might be helpful.  **I don't expect anything in this will be new to you**." (emphasis added).

414.     It is noted in the Executive Summary of the presentation that "'Underbilling' has been an issue at Katerra for over a year and has been increasing with time.  In March 2020, Global company wide 'Underbillings' reached $186mm prompting an Executive level deep dive." Underbilling at Katerra was a direct consequence of the Company's inability to correctly estimate costs on projects and underestimating project costs, weak project management control and a history of unrecognized overbilling at the beginning of a project (leading to underbilling towards the end).

415.     The presentation also noted "Following a review led by US Construction, the 'underbilling' issue is actually attributable to understated cost to complete forecasts on the Legacy Katerra Jobs primarily due to:

- Lack of quality control with numerous mistakes in non-standardized excel reports

- Overly complicated accounting practices

- Lack of visibility into accounting accruals and forecasts by US Construction

- Project teams and regional leads (no one in US Construction operations reporting structure has access to the system)

- Intercompany activities lacking accountability resulting in inaccurate estimates and over-billing/allocation

- Inadequate Software Tools on the Legacy Katerra Jobs

416.     Renovations was at the time holding $42.1 million in underbillings as an asset on its balance sheet.

417.     The presentation concluded by showing Katerra's actual project costs to date were generally "untimely and inaccurate," the total project forecast costs were "inaccurate," and the tracking of total contract values including change orders were "erroneous."

418.     Separately, on June 4, 2020, McPheeters wrote to a number of others associated with Katerra West, including Hurst and Brown about the application of the executive contingency

reserve maintained at that business unit.  McPheeters admitted in the email that "**for 2020 each month we have 'applied' executive contingency to meet forecast**."  McPheeters showed that nine projects analyzed during April 2020 in which $8.5 million of the contingency reserve had been used to meet forecast.  McPheeters then wrote: "In discussing this, Gary [Brown, head of US Construction, who reported directly to Marsh] and I agreed that unless we want to take a hit in future months for these project overruns, that we should permanently apply contingency here in May." (emphasis added).

419.    Five days later, on June 9, 2020, Haygood emailed McPheeters saying: "**I am having ethical concerns completing close as currently requested**.  Please give me until lunch to compose my thoughts and seek additional advice."  McPheeters wrote back 13 minutes later and added several others associated with Katerra West saying: "**What specifically do you have issues with?  Is it the topside entry taking your regions to forecast?  Do you feel that this is deceptive reporting**?"  McPheeters continued:

> **It is no secret to anyone at this point that in June when we roll out the new margin analyses that not only will the original exec contingency be gone ($40MM) but that there will be more losses on top of that.**  I believe that the reason for the May topside entry (to take us to forecast) is that **we wanted to wait until we have final [margin analyses] for <u>all</u> projects, and to roll out the total (bad) news once (and not piecemeal.)**
>
> **I have already communicated to Gary, Mollie & Mike that all the original $40MM is gone.**
>
> **I don't believe that we intend to use the May financials for any external reporting purposes – we are not trying to 'pull the wool over anyone's eyes to my knowledge** (Gary, Mollie & Mike – perhaps you can chime in here.)

(emphasis added).

420.    Shortly afterward, on June 9, 2020, Haygood responded to McPheeters:

> **I think you have described the broad strokes of my ethical concerns.  We all know there is no contingency left. I believe that the use of non-existing contingency to cover up losses is deceptive.**

**Also, I believe the effort to show all losses at once is deceptive**. The losses we should be showing this month have nothing to do with the major, loss making projects. They reflect separate issues that need to be addressed – time card compliance, preconstruction expenses, warranty/end-of-project cost, to name a few.

After taking the bigger losses, these issues will not go away. We will continue to show monthly losses, if we remain honest with our accounting. By waiting to lump these in with the bigger losses, we lost sight to these other pressing issues.

Also I am glad to hear we aren't planning on reporting these results externally. Because, **in my opinion ('not a lawyer') that would cross the line from unethical to illegal.**

421.    Hurst, a high level representative at Katerra, jumped into the email discussion that same day to say: "Let us be clear, **the purpose of what is ongoing now is to completely clean up the books and report actual costs where they should be**. This is all about 'coming clean' and starting from a new baseline. May on the other hand is not the focus, June is. **We need June to be 100% accurate so when we do send it out to our partners it is our most honest, clear view of our true financial picture**." (emphasis added).

422.    With respect to the redistribution of losses, on June 11, 2020, Haygood emailed Mollie Fadule, Head of Affordable Housing Strategy, Malynda Dickinson, a controller at Katerra West, ("Dickinson") and Coleman with a subject line "Legacy UEB SAGE Job Questionable Accounting and wrote: "Another questionable accounting treatment came up that I think you should be aware of**. Apparently there is some internal shuffling of project costs from loss making projects to profitable ones. It appears to be another 'old school' way to hide losses**." (emphasis added). That same day, Dickinson emailed Brown: "I just got off a call with Corey [Haygood] and Ron Ensley regarding the forecast margin for Sage projects. One item came up related to the 'X' taking on an internal loss transfer of another project. This is quite surprising to me. The decision was made from above. I am not fan of this practice."

73

### C.   Katerra Self-Reports to SEC on Renovations

423.   On August 20, 2020, Katerra self-reported the wrongdoing at Renovations to the SEC and presented the SEC with a power-point describing an investigation undertaken at Renovations and the results of the investigation.   Katerra reported its findings to the SEC as follows:  "After conducting a thorough internal investigation, we found that Renovations business employees intentionally recognized costs prematurely in 2018, 2019 and the first quarter of 2020, thereby rendering the revenue and operating margin line items in the year-end 2018, year-end 2019, and Q1 2020 financial statements misstated."

424.   In its presentation to the SEC, Katerra informed the SEC that the cause of the misreporting at Renovations included the establishment of "unreasonable targets."   Specifically, Katerra disclosed to the SEC that "[i]n an effort to raise increasingly more critical capital at the end of 2019 and in Q1, Michael Marks (Chief Executive Officer) pressed his management team, including Trevor Schick (Head of Materials), to hit unreasonable financial targets.  Schick, in turn, increased Renovations' forecasts unreasonably, setting high and unrealistic expectations for his team to meet."

425.   Katerra further explained in its presentation that "Schick and his direct report, Steve Deleon (Managing Director, Renovations), then repeatedly told Robert Tolstyka (Vice President of Finance, Renovations) and Market Rate and Affordable Housing operational leaders that they must hit the unrealistic targets."

426.   Katerra admitted in the presentation that it did not have adequate directives and guidelines necessary to have been using the percentage of completion accounting method to recognize revenue at Renovations.

427.     Among the directives not implemented at the Company until June 2020 were directives prohibiting the recognition of subcontractor deposits as incurred costs and prohibiting the storage of construction materials for extended periods of time.

428.     The Company also disclosed to the SEC that it was not until June 2020 that the Company implemented guidelines for forecasting procedures, ordering materials, subcontractor invoicing, the requisite support for cost accruals and project tracking.

429.     Katerra also admitted that based on the investigation, the Company believed that a reasonable investor may view the misstatements in the Q1 2020 financial statements as material. Katerra added that in connection with the Company's Series F securities offering, potential investors received the misstated financial statements that included accelerated (front end loaded) revenue and operating margin numbers.

**D.      Katerra Self-Reports to SEC on Katerra West**

430.     On December 4, 2020, Katerra self-reported the wrongdoing at Katerra West to the SEC and presented the SEC with another power-point describing an investigation undertaken at Katerra West and the results of the investigation.  Katerra summarized its findings as follows:

- Katerra West business employees delayed recognition of losses by recording "topside," executive contingency-related journal entries to meet forecasted margins from January through May 2020, thereby rendering the financial statements for those periods, including for Q1 2020, misstated.

- The misstatements in the Q1 2020 financial statements, which took Katerra West's operating margin from a $8.68 million loss to a $1.17 million profit, could be viewed as material by a reasonable investor.  (emphasis in original).

431.     Katerra reported to the SEC that Katerra West's created and used a $40 million executive contingency (cookie jar reserve) to meet forecast.  Katerra West achieved this by

falsifying entries and delaying recognition of project losses, creating the false impression that the Company was meeting targets.

432.    As projects at Katerra West exceeded over budgeted amounts, the excess would be subtracted from the contingency.

433.    Use of the slush fund delayed recognition of project losses that were known and growing rapidly beyond forecast since the fund was established in September 2019.  Instead, Katerra West's adjusted financial results suggested the business unit continued to meet expectations until June 2020.

434.    In the presentation to the SEC, Katerra shared that the use of the slush fund at Katerra West improperly decreased 2019 earnings by $19.6 million.

435.    Katerra first recorded expected losses up-front in September 2019 by booking the $40 million contingency.

436.    The $40 million was then offset by $20.4 million of net increased project losses through December 2019.  Katerra West recorded a total of $14.3 million of topside (not project-specific) entries in 2020 to temporarily release executive contingency amounts and, therefore, increase margin, to make performance match forecast.

437.    Katerra also said Katerra West moved unexplained costs to a placeholder account so that the costs would not affect Katerra West's reported margin on its income statement and that Katerra West redistributed losses between projects to increase revenue and margin.

438.    Katerra West used a "Deferred COGS [Cost of Goods Sold] Account" to record the costs they wanted to temporarily avoid recognizing as a hit to margin.  This practice ended in May 2020.

439.    Finally, Katerra West's business unit redistributed project losses between other projects to conceal those losses.  One redistribution involved the redistribution of $1.5 million in losses from one project to two other projects.

440.    The redistribution had the impact of increasing revenue and margin, because they were moved from a project with negative margin (such that the project could not be used to recognize revenue) to projects with positive margin (where revenue could be and was recognized).

441.    These redistributions had the effect of increasing margin at Katerra West by at least $2.1 million in 2019.

442.    When the $1.5 million redistribution described above was reversed in June 2020, it had the net effect of reducing margin by $1.6 million.

443.    The Company disclosed to the SEC that under its analysis of the misstatement at Katerra West the misstatements in the first quarter 2020 financial statements were materially misleading because they reported a $1.17 million profit instead of the actual $8.68 million loss – a swing of approximately $9.85 million.

444.    As these inflated margins were incorporated into Katerra's Q1 2020 financial statements, those financials were rendered misstated with respect to operating margin.

445.    Katerra also reported some corporate governance reforms that had not been in place at Katerra West until earlier that year including reversing applications of the executive contingency in June 2020 and disciplining several employees including Brown, Hurst and McPheeters.

446.    The Company also disclosed that it had implemented guidelines at Katerra West for forecasting procedures, profit and loss reporting, use of contingencies and the reclassification of losses.

### E.   Fallout from Defendants' Faustian Deals: Defendants' Adverse Interests and Conflict Predominate

447.    By mid-May 2020, Marks and Marsh were not able to continue concealing the false and misleading financials and a process was put in place for their involuntary removal from the Company.

448.    As set forth below, in the background Marks was attempting to orchestrate his exit in a way that would allow him to usurp some of the Company's most valuable assets for his future ventures.

449.    On May 14, 2020, Marks cancelled executive staff meetings for the rest of the year.

450.    That same day, Marks surreptitiously emailed Teresa Smith ("Smith"), the CFO of his side venture capital firm, WRVI (later re-named Celesta), instructing her to put Marsh on WRVI's payroll at an annual salary of $100,000 taken from Marks' salary so as to not have an effect on WRVI's expenses.

451.    On May 19, 2020, Marks sent a mass Company email announcing his intention to step down July 1, 2020 and the Company issued a press release announcing Marks' departure and the elevation of Kibsgaard as the Company's next CEO.

452.    Marsh eventually left Katerra to work directly with Marks at his venture capital firm, later called Celesta, as its CFO.

453.    Marks attempted to take a parting gift from Katerra upon his exit from the Company.  On May 27, 2020, he sent emails to two separate individuals bragging that the best part of his leaving Katerra was that Marks was "taking out two pieces of Katerra that I really like into separate companies."

454.    Marks wrote in one of those emails: "In my opinion the best asset in Katerra" was the Apollo business ("Apollo") which Katerra was spinning out and Marks was to be the executive

chair of that company and Katerra will own less than half of that company while Marks' venture capital firm was putting in $7.5 million.

455. In the midst of Katerra's death spiral, Marks and Marsh ignored their fiduciary duties to the Company and dedicated themselves to shoring up their own, non-Katerra interests for the purpose of lining their own pockets.

456. Marks' self-interested conduct did not start for the first time in May 2020.

457. In fact, Marks had regularly engaged in his work for Paxion and WRVI and those firms other portfolio companies, like iFly and Maui Greens, during his tenure at Katerra. None of that work was for the benefit of or in the interest of Katerra. To the contrary, that work evidenced Marks' disregard for Katerra's business, especially at the most critical time of Katerra's business life.

458. When it became clear to Marks and other insiders in early 2020 that Katerra was in a freefall toward failure, Marks not only drew his attention away from Katerra and toward his other businesses and taking with him what he believed to be the best assets of Katerra in the process, but Marks enlisted others, especially Marsh, to betray Katerra. Marks accomplished this by secretly putting Marsh on the WRVI payroll, getting a WRVI email address for Marsh and involving Marsh in WRVI business – all the while the two owed Katerra fiduciary duties and were being paid by Katerra. Thus, at the most critical time for Katerra, the two most senior executives of Katerra, Marks (its CEO) and Marsh (its CFO) were protecting their own interests instead of the interests of Katerra.

### 1. Upon His Exit, Marks Attempted to Steal Katerra's Apollo Software Division For His Own Benefit

459. The same year that Marks founded Katerra and Paxion, his own venture capital firm, called Riverwood Capital Management at the time (later to become WRVI and then Celesta)

opened a software solutions development center in Russia through an entity called Riverwood Solutions, to expand its managed supply chain services and operations consulting.  During an interview on August 24, 2015, Marks stated that the software development was focused on helping "OEMs design and build-out optimized supply chain solutions that can also be codified to a great extent."  Marks continued, "And of course there is all of the proprietary supplier data that Riverwood possess, and our team in St. Petersburg has developed very powerful analytics tools for mining that data in novel ways to inform a whole new level of manufacturing and supply chain optimization."

460.    When asked what the software resources Marks developed through Riverwood would look like and how might a typical brand owner utilize them, Marks responded:

> Well Phil, I don't want to give away all of Riverwood's secrets just yet. But in the most basic terms we see two parallel paths for our software and solutions development efforts. There will be an entire suite of supply chain design, implementation, and ongoing supply chain management tools that will be completely captive and proprietary to Riverwood Solutions. This tool set should allow us to scale our existing consulting and managed services business much more aggressively as we become a bit less dependent upon very experienced high level operating executives, which as you well know, are pretty rare. We also plan to make available a version of many of these tools through a cloud-based SaaS offering. We expect that this may cannibalize a small portion of our existing service offering, but we fully expect that cannibalization to be on the low-end of our value-add. But the proprietary internal tools we are developing should allow us to replace that revenue perhaps 3 to 1 with much higher value- add advisory services and technically complex managed services.

461.    Therefore, at the same time that Marks was forming Katerra and beginning Katerra's operations, he was servicing his own venture capital needs.

462.    On December 17, 2019, the Katerra board of directors held a meeting in which Marks was in attendance with all other Board members, including Davidson, Housenbold, Kibsgaard, Mehta, Picard and Wilson. Marsh, Bhardwaj and Brathwaite were also in attendance.

Chen was the only director not present.  During the meeting, the Board approved engaging

McKinsey & Co. ("McKinsey") "to act as a services arm for the Apollo software business."

463.    On May 1, 2020, John Levene ("Levene"), a partner at McKinsey, sent an email to

Marks with the Subject line "Apollo spin-planning."  In the email, Levene tells Marks:

> Once you connect with the board I think it makes sense to start planning the spin in earnest.  Essentially, building out a plan across the major functions (including legal) so that we don't drop any balls (e.g. payroll, etc).
>
> I think we have made some progress already on shared services and starting to ramp-up insurance, but it may be prudent to wait until BOD approval.
>
> When do you think you will connect with the Board on separation plan?
>
> What materials can I provide that would be beneficial?
>
> Should we start thinking about governance?  For example, would you be chairman with Nic representing Katerra (and/or WRVI)?  I brought up the board seat with Bob and he thought that either he or Harry would be a good fit – let's discuss nuance of both.

464.    By early May 2020, McKinsey, had prepared a non-disclosure agreement

identifying the client as Katerra/Apollo and noting that McKinsey had been hired by

Katerra/Apollo to provide certain management consulting services in connection with "a potential

strategic business opportunity."  The non-disclosure agreements were signed on behalf of Katerra

by Marks.  Among those executing the agreement were representatives of WRVI.

465.    On May 13, 2020, John Levene emailed Marks and two McKinsey representatives

attaching a "draft Apollo spin checklist."  Marks then forwarded that email from his Katerra email

address to Marsh at Marsh's Katerra email address asking: "As my new friend at WRVI can you

help drive this?"  Marsh responded that same day saying, "Roger that."

466.    By the evening of May 13, 2020, Marsh started to appreciate the conflicts with his

being CFO of Katerra but doing work for WRVI and using his Katerra email address for WRVI

work being asked of him by Marks.

467.    Aware of the breaches he and Marks were committing to the Company, Marsh, using his Katerra email address, emailed Marks at Marks' WRVI email address saying: "With email traffic on WRVI topics picking up for me – which is great – let's get me a WRVI email asap. It will help keep everything segregated."  Marks quickly instructed that Marsh be given a WRVI email address that same day.

468.    On May 13, 2020, Marks, using his Katerra email address, emailed his executive assistant at Paxion, Allison Halen, asking her to add Marsh to a conference call about another portfolio company called Maui Greens and asking her to use Marsh's WRVI email address.  Marsh was copied on that email also using his Katerra email address.  Marsh followed with an email providing Marks and Allison his new WRVI email address.  Marsh had also created a signature block for his email showing just his WRVI email address and the website for WRVI.

469.    By the next day, May 14, 2020, Marsh had a WRVI email address.

470.    Also on May 14, 2020, Marks emailed Smith, WRVI's then-CFO with a copy to Marsh (using Marsh's Katerra email address) saying: "Teresa, meet Matt Marsh who is the CFO of Katerra and a good friend.  He is going to help out on some of the financing issues in our portfolio of WRVI.  I would like you to put him on the payroll at $100k annually, and deduct that from my salary.  So no additional cost to WRVI."

471.    By email dated May 13, 2020, Sriram Viswanathan, one of Marks' partners at WRVI, informed Marks that he was going to have WRVI create an investment note for the firm to approve the Apollo transaction.  When asked by Marks what he meant, Viswanathan responded: "Just a process thing.  Since we have to have good documentation.  Steve will send an [Investment Committee] note that all of us will just chime and say we approve… Just keeping our noses clean since it is a related party."  Still confused, Viswanathan expanded:  "I am just saying we should get formal IC approval.  So we just submit a formal WRVI IC note, before we submit a term sheet

and commit to other investors that we are leading with $7.5M.  Not to mention we have to Legal create legal docs etc."  To which Marks simply responded: "Let's talk tonight about this."

### 2.     The iFly Connection

472.    Ryan was the Head of Manufacturing at Katerra.  Ryan also had a relationship with Marks that pre-dated Katerra.  Ryan was also part of the fraternity to bail on Katerra and further his own business interests, mostly dealing with iFly, an indoor skydiving business that was and remains a portfolio company of Marks' venture capital firm, Celesta.  Ryan was formerly the Chief Operating Officer of iFly but was brought into Katerra in 2017.

473.    When it was clear to Marks that Katerra was failing, Ryan returned to iFly as the company's Chief Executive Officer in July 2020 while still working at Katerra.

474.    In early May 2020, Marks was engaging with a potential investor of iFly, Crestline Investors ("Crestline").  Marks brought Ryan into the discussions in a series of emails dated May 7, 2020 which culminated in Ryan providing Rahul Vaid ("Vaid") of Crestline with access to a data room.  Marks introduced Ryan to Vaid as the person "who used to run [the iFly] business." Ryan responded by emailing Vaid that it was his pleasure to work with Vaid "on this opportunity." Both Marks and Ryan used their Katerra email accounts for these communications.

475.    On or about May 12, 2020, Marks, as a representative of Paxion, co-signed a letter with David Tedesco ("Tedesco") on the letterhead of Tedesco's firm, Outlier, addressed to Bryan Slotkin ("Slotkin"), a partner with PJT Partners, a global advisory-focused investment bank, and a former managing director with Goldman Sachs, offering to acquire iFly for $25 million.  The offer letter begins by stating that Outlier "has been working with our long-time partner, Michael Marks (prior owner of iFly) and Matt Ryan (former COO of iFly) to provide this letter of intent for our proposed acquisition of [iFly]."  Tedesco continued in the letter by noting Outlier believes it can accomplish the acquisition in expedited time frame and minimal due diligence "due to our

partnership with Michael Marks and Matt Ryan" and its expertise in the industry. "We are thrilled to be working with Michael Marks, who has been an investor in Outlier and other affiliated businesses for over twenty years, and Matt Ryan, who has been a seasoned operator of [iFly]." The letter ended by offering Marks' Paxion email address and Ryan's personal email address for further information.

476.   In preparation for the Outlier offer letter to Slotkin, Marks sent an email dated May 12, 2020 to Marsh and Viswanathan, attaching a draft letter of intent addressed to Slotkin for iFly. Marks' draft cover letter of the iFly letter of intent (the "iFly LOI") to Slotkin stated: "Attached are the LOI we are submitting to acquire the iFly business.  You will note that we have accepted what we believe are all of the asks based on my discussions with you. . . You will also see bios on Matt Ryan and me.  The LOI comes from Outlier, which is an investment firm of which I am a significant investor.  In addition, I plan to be a significant personal investor in this transaction, and we have a variety of friends of the firm who will co-invest. . . . We are prepared to move expeditiously to complete and sign a definitive acquisition document, and are prepared to close by June 30."

477.   On the same day, May 12, 2020, Marks emailed Clewley, the Vice President for Marketing and Public Affairs at Katerra, asking her to prepare his bio for the iFly LOI addressed to Slotkin.  After Marks collapsed Katerra, he took Clewley, like he did Marsh, with him to Celesta in August 2020, where she became and remains the Chief Marketing Officer of Celesta.

478.   The following day, May 13, 2020, Marks emailed Slotkin from his Katerra email address (but carbon copying himself using his Paxion email address) attaching a signed copy of an iFly LOI.  Ryan and Marsh were both copied on that email using both of their Katerra email addresses.  In the email, Marks suggested to Slotkin that he and his group had sufficient funds to acquire iFly by writing:

In addition, let me provide you with some information on our capacity to fund.  We have five buckets of capital to provide assurance to you that we can close.

1.      Riverwood Capital.  This is the firm that originally invested in iFly.  The firm, of which I am a founder, has just completed a fund raise for fund 3, with available capital of $1.3B to invest.

2.      WRVI.  This is my venture capital firm, which is currently operating from fund 3 also, with $300m of committed capital and over $100m available to invest.

3.      Outlier.  This is a private holding company with approximately $1 Billion in revenue and Economic Value of $500 million.  The firm has a strong balance sheet with minimal debt.  The controlling shareholder is a single private person with substantial net worth.  Outlier makes regular acquisitions in this size range.  I am also a significant investor in the firm and have invested with the principal, David Tedesco, over the past 15 years.

4.      My family office is called Paxion, which has net assets of $1 billion plus, and regularly makes these kinds of investments.

5.      My personal net worth is quite substantial and I will be investing also from my personal account.  As we discussed by telephone, I am prepared to wire $1m from my personal account as a non-refundable earnest deposit, with the only contingency being accounting and legal diligence.  I would wire this upon being awarded exclusivity.

479.    Just as Marsh recognized the conflict in his using a Katerra email address for Katerra and WRVI business on May 13, 2020, Slotkin realized the potential conflict and emailed Marks on May 13, 2020:  "I responded to an email where you cc'd yourself not knowing which email you prefer, therefore you received two.  Please let us know your preferred email so we will make sure to use just one."

480.    Despite Marks telling Slotkin about the so-called "five buckets of capital," aimed to provide assurance Marks and his team could do the iFly deal quickly, on May 15, 2020, Marks emailed Lex Greensill of Greensill Capital telling him about the iFly deal and that Marsh was helping him with the finance.  Marks then asked Mr. Greensill "if there is a way to do this with you, which we'd love to do."  Marks sent the email from his Katerra email address, but copied Marsh on the email using Marsh's new WRVI email address.  After Mr. Greensill told Marks he

would review the deal, Marks added "Since we trust each other we can get a deal done more quickly than I can with any other bank, which is why I'm willing to share some of the juice."

481.    In addition to Greensill, Marks was trying to generate interest from Crestline on the iFly transaction.   On May 14, 2020, Marks (using his Katerra email address) confirmed a teleconference with Crestline for the following day to discuss the iFly transaction and copied Ryan and Marsh, using both of their Katerra email addresses.

482.    Marks and Marsh's efforts to close the iFly transaction clearly demonstrate that they were acting in their own best interests, and that of Celesta, rather than in the best interest of Katerra, where they were both still officers.

**F.    The Company's Impending Doom is Revealed**

**1.    Marsh and Marks Intentionally Tried to Push Through Deloitte Audit In Order To Hide The Financial Misreporting**

483.    By May 14, 2020, it was well known that Marks was stepping down from Katerra. On that date, Clewley emailed Marks a draft of the press release announcing his departure, a media FAQ, and an updated announcement plan.  Kibsgaard, who was to replace Marks as CEO, was copied on the email.  Clewley wrote Marks: "There is some messaging around you joining WRVI full-time which of course needs your blessing."  That same day, Marks also cancelled all executive staff meetings for the rest of the year.  Two days later, on May 16, 2020, while reviewing the draft announcement of his departure (which he would publicly disclose three days later, on May 19, 2020) Marks wrote: " I do think saying SVF [Softbank Vision Fund] didn't push this is a lie."

484.    On Friday, May 15, 2020, the same day that Katerra tapped the remaining money from Greensill's $440 facility created a mere five months earlier, a partner at Deloitte overseeing Katerra's annual audit for 2019 (as was done for prior years), emailed Marks with a copy to Tachouet telling Marks that the 2019 Management Representation Letter was available for his

signature and that it had been signed by Tachouet and Marsh.  Attached to the email was a copy

of the 2019 Management Representation Letter signed by Tachouet and Marsh on May 15, 2020.

485.   The 2019 Management Representation Letter required Marks, March and Tachouet

to affirm, *inter alia*, that:

We confirm that we are responsible for the following:

a. The preparation and fair presentation in the financial statements of financial position, results of operations, and cash flows in accordance with GAAP.
b. The design, implementation, and maintenance of internal control:

- Relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.
- To prevent and detect fraud.

9. We have no knowledge of any fraud or suspected fraud affecting the Company involving:

a. Management.
b. Employees who have significant roles in the Company's internal control.
c. Others, where the fraud could have a material effect on the financial statements.

10. We have no knowledge of any allegations of fraud or suspected fraud affecting the Company's financial statements communicated by employees, former employees, regulators, or others.

486.   Later in the day on Friday, May 15, 2020, Kibsgaard emailed Marsh using the

subject line, "2019 Audit," asking him "**Can we hold off with closing the 2019 Audit until we**

**have reviewed this US Construction accounting issues we have been uncovering.  We could**

**set something up on Monday where we/Emily brief you on what we have found so far.  If**

**these findings are correct, they need to be reviewed in the context of the 2019 Audit and also**

**in light of the job our auditor have done for us with the 2019 Audit.  I can schedule something**

**for Monday [May 18, 2020] if you are available**."  (emphasis added).

487.   Marsh emailed Kibsgaard back a few hours later on May 15, 2020 simply telling

him: "I called and missed you.  Feel free to call me anytime this weekend.  I'm available anytime

on Monday that works for you.  Let me know if you want me to organize something."  Notably,

Marsh did not tell Kibsgaard that he and Tachouet signed the management representation letter

earlier that day and did not answer the question Kibsgaard posed about holding off closing the

2019 Audit. At the time Kibsgaard asked Marsh this question, Deloitte had not yet issued the audit opinion for 2019 because the 2019 Management Representation Letter for the 2019 financial statements had not yet been fully executed – something Marsh knew at the time.

488.    Despite Kibsgaard's request that the 2019 Audit be delayed, in order to further investigate the material financial misstatement issues in the 2019 financial statements, later on the same day, May 15, 2020, a Deloitte employee sent an email to Tachouet and Marsh thanking them both for signing the 2019 Management Representation Letter needed to complete the 2019 Audit.

489.    The Deloitte employee told Marsh that Deloitte was still waiting on Marks to sign the management representation letter to issue the 2019 audit opinion letter to the Board.

490.    Marsh responded by stating that the 2019 Management Representation Letter should be sent to Marks' Katerra email address, not Marks' Paxion email address that Deloitte originally used to send Marks the management representation letter.

491.    Immediately after receiving Marks' signature on the management representation letter late on May 15, 2020, Deloitte issued the 2019 audited financials for Katerra.

492.    Marsh could have stopped Deloitte from finalizing the 2019 Audit by informing them of Kibsgaard's concern about the Renovations materially misstated financial statements.

493.    Instead, Marsh signed the 2019 Management Representation Letter, knowing that there was an ongoing investigation into the materially misstated financial statements of one of the Company's business units, and facilitated Marks' signature on the letter as well.

494.    The Board received the 2019 Audit, as they were copied on the fully-executed 2019 Management Representation Letter within the audit.

*Michael Marks*
_____
Michael Marks, Chairman of the Board

*Matthew Marsh*
_____
Matthew Marsh, Chief Financial Officer

*Matthew Tachouet*
_____
Matthew Tachouet, Global Corporate Controller

cc: Board of Directors of Katerra, Inc.

### 2. Marks Accelerates His Efforts To Improperly Extract Value from Katerra For His Personal Benefit

495. On Saturday, May 16, 2020, the day after Deloitte issued the 2019 audit, Mills emailed Marsh a powerpoint presentation entitled Finance & Accounting Challenges:  Katerra West Projects.  The Subject line of the email was "Underbillings presentation."  In the email, Mills wrote:

> **Attached is the under[billings] presentation Mollie [Fadule] put together and shared with Paal. Thought the context might be helpful.**
>
> **I don't expect anything in this will be new to you, but happy to discuss if you have questions.**
>
> **Paal would like to get the 4 of us together at 12:30PT on Monday.**

(emphasis added).

496. The 32-page powerpoint began by noting that "'Underbilling' has been an issue at Katerra for over a year and has been increasing with time.  In March 2020, Global company wide 'Underbillings' reached $186mm prompting an Executive level deep dive."

497. The executive summary concludes by recommending "a similar analysis be completed on the US Renovations business which is currently holding $42.1mm in 'underbillings' as an asset on the [Balance Sheet]."

89

498.    The presentation stated that Katerra had been improperly recognizing revenue as it was unable to timely and accurately track project costs, estimate future project costs and track total contract revenues.

499.    On Sunday, May 17, 2020, Kibsgaard emailed Marsh with a copy to Mollie Fadule asking Marsh to set up a teleconference for the afternoon of the next day, Monday, May 18, 2020 "to discuss what we have identified so far."

500.    On May 19, 2020, Marsh forwarded the Underbillings presentation to Tachouet adding:  "Here's the deck we just discussed."

501.    On May 19, 2020, Marks sent a mass email to many recipients internal and external to Katerra with the Subject line "View From Here #80" announcing he was stepping down as Katerra's CEO on July 1, 2020 and being replaced by Kibsgaard, then Katerra's COO.

502.    Later that same day, on May 19, 2020, Marsh forwarded Marks' "stepping down" email to Deloitte.

503.    Marks received many responses to his May 19, 2020 email.  A select number of people responding received similar replies from Marks – that he was taking what he felt were the two best assets of Katerra with him.  For example, Marks wrote to Raj Nooyi on May 19, 2020: "We didn't quite get it finished in time to announce, but we are spinning out the software business from Katerra [Apollo] and I'm going to be the exec chair of that business, and looking at spinning out another one also.  **Now that we had the economic slowdown, Katerra is going to be a slog for the next couple of years and I didn't want to work everyday grinding out cost.  I'm a growth guy and have a lots of cool stuff I'm working on,** including a stunning company doing indoor farming in a very low cost and automated way."  (emphasis added).  Marks also emailed William Abecassis on May 27, 2020 referring to Apollo as "the best asset in Katerra."  Marks added:   "We're spinning it out.  I will be the executive chair.  Katerra will own less than half.

90

WRVI doing $7.5m."  Marks also emailed Bob Zapotosky on May 27, 2020 saying: "Best part is I'm taking out 2 pieces of Katerra that I really like into separate companies."

504.    Also on May 19, 2020, Marks sent an email to WRVI's CFO, Smith, with a Subject line "Matt Marsh": "Forgot to talk to you about him.  Current CFO of Katerra.  In a bit of tough shape financially so I'm giving him $100k of my salary from WRVI, I sent you a note about that. Using him to help me with Bossa Nova and others on lining up debt players."

505.    During the evening of May 20, 2020, Marks, Marsh, Ryan, and Schick met at Ryan's home.  While it is not known what was discussed at that meeting, those individuals were in the thick of the impending downfall of Katerra while also working on their respective personal escapes to the detriment of Katerra.

506.    Also on May 20, 2020, WRVI finalized the term sheet for the sale of Series A preferred stock of Apollo, Inc.

507.    On May 22, 2020, after the April 2020 financial results for Katerra had been completed, Marsh emailed Marks and Kibsgaard asking if the April results should be sent to Softbank.  Marks responded to Marsh only writing: "I would, but you said you weren't sure they are accurate.  I'd send them to the whole board."

508.    On May 22, 2020 a meeting of the Board took place.  Present at the meeting were all directors, including Marks, Davidson, Picard, Housenbold, Kibsgaard, Wilson, and Yeung, Marsh and Franich, a director and Katerra's VP of Legal.

509.    During the meeting, Marsh presented the Board with the report on the Company's on-going investigation of its "accounting systems and processes in respect of project accounting." According to meeting minutes:

> Mr. Marsh noted that as part of such review, the Company had recently identified a growth trend in underbillings in certain business units (the "Underbillings Issue"), and  recommended  that  a  specialist  accounting  firm  be  engaged  to  assist  the

Company in analyzing such issue.  Mr. Marsh also informed the Board that the Company had recently become aware of certain potential issues related to financial reporting practices in one of the Company's business units related to the timing of certain costs incurred by the Renovations business in December 2019 and March 2020 (the "Renovations Matter").

510.     Marks, Marsh and Kibsgaard (the management directors) then left the meeting and the remaining directors held a closed session with Franich.  Those directors thereafter approved the hiring of a specialist accounting firm and the formation of a special committee with Housenbold and Davidson as the initial members.  The next Board meeting was not until August 7, 2020.

511.     By May 23, 2020, Marks had nearly developed the plan to spin out MaterialsCo. ("MatCo"), a second business from Katerra for his own taking, in addition to Apollo.  Marks limited those involved in the discussions to a small group that involved Katerra executives linked with Marks' side venture work at WRVI: Marsh, Ryan, Schick and Brathwaite.

512.     In an email dated May 23, 2020, using the Subject line "Materials NewCo" to Marsh (using a WRVI email address), Ryan (using a WRVI email address) Schick (using his Katerra email address) and Brathwaite (using a WRVI email address), Marks laid further evidence of his and each of the recipients' continued efforts to pursue self-interested transactions for their benefit and to the detriment of Katerra.

513.     Marks intentionally used the recipients' WRVI email addresses even though they were full time management of Katerra.  Marks wrote:

All, I've talked with each of you today so I'd like to outline the required efforts. Matt M [Marsh], update is that this might be done for very little money.

If you go through the memo, you'll see Trevor's [Schick's] recommendations which I totally agree with.  We set up MatCo (Materials Company), which includes lighting, Kova (windows, cabinets, appliances, finishes), Commercial Glass, and HVAC.

Trevor is working on the revenue plan for remainder of 2020 and all of 2021 (an update of what is included here).  Trevor to prepare a budget for sales and

operations (procurement, customer management, billing).  Trevor also to outline any people in his organization that wouldn't come over so I can show those savings to Paal.

Nic is to prepare an R&D budget, including travel, lab rental, etc.  A full R&D costed budget.

Matt M to prepare a budget for corporate expense, so legal, HR, IT, Finance, including rent, travel, etc.  We can assume outsourcing most, work from home for most, etc.

Then we can roll this up and have a look at what will reasonably cost us to run the business, including working capital (Matt M and Trevor).

Then I'd like to get a zoom with all five of us to talk through the numbers and the options of how to propose.  Can be cash for the entire business, can be almost no cash, leaving K [Katerra] with 20%, possibly royalties (2% on all but light bulbs?), could include the purchase of the window line ($5m) and so on.  Need to have incentive for K [Katerra] to buy from M (maybe a minimum per year to get the royalties), or some other approach.

I'm seeing Paal in Houston Thursday afternoon, so this has to be baked by Wednesday.  You may have other ideas here.  I'll be talking to each of you everyday.  I know it's a holiday weekend (what's that), but this is a huge opportunity that is time sensitive.  As soon as we are ready, even preliminarily, let's get on a call.

Have fun putting this together.  This is ifly2.

514.    Schick responded to Marks' email providing an analysis of financials relevant to

the spinning off of MatCo.

515.    Ryan also responded writing:

My view is that we should staff the business as lean as possible given uncertainty in a post Covid economy.

Let Katerra deal with furlough and or RIF of non critical resources.  Bring across to MaterialsCo only critical team members to keep current operate with min amount of cash.

I think Paal will let the material business go for nothing.  His upside is incurring zero cost to off load the team without the burden of a RIF or short term furlough that will result in a severance cash drain later in the year.

The exit of the business as a spin off will also help him message his view of focusing on only critical business lines to support his go forward vision.

516.    By May 25, 2020, Marks had the terms he was going to propose to Katerra to spin off MatCo in an email to his group identified above, including an offer to Kibsgaard to have a seat on the board of the new company, under the Subject line "Straw man":

I need your numbers.  But, here's a strawman proposal.

Terms:

Katerra gets 20% of Matco (now called Kova)

We buy the window line for $6.4m, monthly over three years.  We pay Katerra a monthly overhead fee plus a service fee on the line.

We buy the inventory for cash, 12/31/20 (guessing $5m)

We take over Lighting, Commercial Glass, Kova, Energy systems

We jointly buy off contracts that we put together, for finishes and appliances

Anything we manufacture, Katerra gets 5% off MFN pricing, we get rofr

Any product that is designed into platform products (lighting fixtures, KTAC, wireless light switches, windows), Katerra get a 1.5% royalty on all third party sales

Trevor and Robin get 3 months pay, then we take them over.  Nic to be sorted with a package hopefully.  Same for Matt Ryan

We take over, obviously, the staff to be sorted out who

Katerra saves a bunch of severance

CLT looking for ideas.  I'm thinking that we take over the factory and MGA and Equilibrium, we give Katerra an option to buy an additional 20% of Kova for xxx.  Needs lots of discussion.

Paal takes a board seat at Kova, but Katerra doesn't have the right to a board seat, just Paal.

Katerra issues a press release.  Along the following lines.  Katerra partners with Michael Marks, Founder of Katerra, with two joint ventures, one for software development, a second one for vertical integration of materials.  Katerra gets best in class pricing, doesn't have to invest, gets equity upside.

Future stuff includes purchase of cabinet lines, and potentially the Tracy factory.

94

517.    On May 28, 2020, Marks sent an email to Alfred Lin at Sequoia Capital ("Sequoia") trying to get Sequoia to invest in Apollo along with WRVI.  Marks wrote in that email: "I'm in the process of spinning out the software business I created inside Katerra.  Katerra will continue to own about half of the business (a little less), and my venture fund WRVI is investing $7.5m, and we're looking for a partner for another $7.5m. We have a stunning arrangement with McKinsey who has invested in the business, and they will take the software to market with their consulting services for their capital project improvement business, which is huge for us. . . . We have about $1B of projects using the software and over 3000 users at Katerra, and have tremendous inbound interest."

518.    Though ultimately the Apollo sale did not close, Marks' efforts to take Apollo, one of the "best assets" of Katerra, with him to WRVI demonstrates that he was acting in his own best interests to the detriment of the Company. The attempted spin-off evidenced the disregard of fiduciary duties owed to Katerra by Marks, Marsh the rest of the small group of fellow Katerra executives who were also acting on behalf of WRVI to benefit their own interests and that of WRVI to the detriment of Katerra.  The spin-off plan also included personally offering Kibsgaard a seat on the board of the spun off company.  Worse, Marks, Marsh and the others were working to benefit their own interests at Katerra's expense instead of working to safeguard Katerra during its gravest corporate crisis since the inception of the Company.

519.    Ignoring all corporate formalities and fiduciary duties, Marks pitched his spinning off of MatCo in an email to Kibsgaard (who was to be given a board seat in the spun off entity) dated May 30, 2020:

> Before getting to a revised offer, I thought it would be useful to write down what is a pretty extensive list of business considerations which are only partly monetary. Keep in mind that this is a hard deal to get done in these times and in a hurry.
>
> Lighting:

This is a mediocre business, which about breaks even when corporate expenses are taken into account. These include the management of the manufacturing JV, which requires quarterly visits to China, now handled by Trevor. Activities currently underway from corporate are moving parts of the supply chain to Vietnam and Indonesia, some Mexico investigations also.

Business transitioning to fixtures, as bulbs are a race to the bottom with little to no margin. This requires additional R&D as well as likely some capex.

Home Depot is 70% of the revenue today, if they pull out the business tanks. They also pay slowly.

Active sales efforts underway to bring in additional customers.

Value to Katerra is in the fixtures, which will go into Products, at below market costs.

KTAC:

There has been about $3m of investment in this product. The ongoing investment required is at a minimum $2m per year. No commercial revenue until second half of 2021.

Value to Katerra is being a leader in the use of leading edge HVAC products. Also savings of about $40,000 per building on K3s.

Royalties at 3% of sales for ten years could be several million dollars per year in the later years.

Keeping this activity alive will lead to product extensions that will also save Katerra money.

Windows:

R&D costs are estimated at $1m per year. Without this R&D, Katerra won't get product savings on new, lower cost products, for example vinyl windows.

Windows line will continue to be depreciated if not taken over by Newco. Plus factory overhead won't be reimbursed.

Sale of windows line will likely result in a loss of $3-4m. There is no market for used equipment today, as shown by our attempt to sell Phoenix equipment.

Without investing in windows R&D and manufacturing, Katerra won't get the 12% reduction to market costs in the offer.

Commercial Glass:

Margins for the use of product in Katerra projects are not in US Construction numbers, but in Materials numbers, and with this the materials organization is still at a loss. Moving those margins make the business untenable in the near term.

This is not just a purchased product like sinks and toilets. These are products that require design for each building, supplier engagement and quality monitoring at the factory. The business is notorious for poor quality and performance (ask Swinerton who has used everyone).

The prices Materials provided to US Construction are already at 5% below market price, they were competitively bid.

Without third party sales, these prices don't continue because the supplier is betting on Materials (and then Newco) to develop a larger market for them. Otherwise factory direct pricing is less likely and certainly a higher prices.

Overall business considerations that matter:

At the highest level, not having third party sales to build volume will result in higher prices for materials at Katerra across the board. Many of these Kova parts won't be able to be bought at factory direct prices because the internal volumes are too low for at least the next few years. This will raise the costs of K3 and other Products.

Without third party sales, the factory underabsorption at Tracy will go up pretty substantially in the near term. Right now cabinets and third party sales make up a lot of the factory volume. Windows will begin to help.

If Newco doesn't happen, another 100 or so people will be RIFed costing several million.

Reputationally, the shutdown and great reduction of Kova and third party sales will suggest that Katerra is in financial trouble or is dedicated to becoming a construction company, which will affect fundraising and valuation. These RIFed employees will mostly wind up in other construction related businesses which will also add to the reputational issues.

In conclusion, it's important that we get this deal done for the health and ongoing cost reductions for Katerra, in addition to the cash inflow.

My original offer:

$20m in cash, $10m at closing, $5m six and twelve months out. Newco takes over 100 employees. We pay factory overhead for the windows line. We provide savings of 2.5%, 5%, and 7% for various products and project types. Total value of $26m in cash, plus go forward savings over four years of about $35m (in the spreadsheet I sent).

Your additional asks:

3% royalty on KTACs for 10 years (call that $5m+ of additional value)

Half of the losses on Stockton (call that $500k)

The working capital kept with the business (call that $3-5 million)

Potentially keeping the commercial glass business.

I'm completely stretched here getting this done.  I'm really trying to do the fair thing.  I anticipated Softbank guys niggling over everything and already tried to get to a fair place.  I am 100% certain that I could have driven a much better deal on the software business but I didn't to be fair.  The same thing here.  This is an important transaction for Katerra to get done for cash flow, cost reductions, and reputation.  I want to help, but I have a deal that I can raise money on, and I don't have much time.

My revised offer:

In addition to agreeing to the 3% royalty on KTACs for ten years, plus half of the losses on Stockton, I will do the following:

Newco will provide a further 5% cost reduction on the existing Katerra glazing projects, which adds $1.7m of margin to Katerra over transfers at close to Newco.

I will add to the overall cash considerations, $2m more for working capital considerations, added to the last payment.  Working capital transfers at close to Newco.

I will add to the value no financial consideration for Trevor other than the vesting of his options, adds $500k to the value (or so, depending on your policies).

This adds total value to the deal of just about $10m.

Small issue, but no more bonding starting now.

In return, I ask to revise the payment schedule as follows:

$5m at closing

$5m at 6 months

$5m at 12 months

$7m at 18 months

Closing this by the end of June is not practical, given that Newco doesn't exist. Nonetheless, to show my good faith, I will make a Non-Refundable deposit of $2m to Katerra at the end of June.  We'll close end of July.   This deposit will cover costs during that month.  If at all possible I'll get it done by the end of June, as that

makes it easier to cut off sales, working capital, etc but I need to go really, really fast to make that happen.

Here's a further really important consideration, and that is that receivables in this business are part of the Greensill line.  So that collateral goes away in this deal.  If we don't do it, you will still have the collateral but it declines as the third party sales decline.

I'm pretty sure that you can replace that collateral with the payments above, which Greensill will consider as receivables, which is actually pretty elegant.  I can help with that but I know how they view receivables and they'll consider these to be good.

Finally, assuming this gets done, I'll next work on helping with the cabinet issue at Tracy and the CLT issue for Spokane.  And I think join PR about how this partnership allows Katerra to maintain its long term value creation from global supply chain and R&D is critical to the perception of Katerra.

We are working on the list of people who stay and go, as we speak.

I'll call you at 1:00.

520.    Marks later forwarded the above email to his group of Katerra insiders (Schick, Marsh, Ryan, Brathwaite and Clewley) in an email dated May 30, 2020, saying:

Here's what I sent to Paal yesterday, and just got off the phone with him.  Short answer is we have a deal.  While a little more expensive for us, but manageable, the lower up front payment is a really big deal, that's manageable with just me, WRVI and friends.

Paal will seek board approval on Tuesday but he promises not to come back and ask for anything more.  So, let's get cranking.  The first issue for the group is a list of people we are keeping and ones that need to be in the RIF.  I promised that by Wednesday.  Should be a complete list of all your people involved in these activities (so not everyone from your side, Nic).  Matt M owes us the list of dedicated or semi-dedicated staff.

521.    Ultimately, the MatCo transaction did not close, but not because the Board determined that it was against Katerra's best interests.  There is no evidence that the Board considered the spin-off or that an independent opinion concerning the fairness of the transaction to Katerra was obtained.  The spin-off of MatCo, just like Apollo, was not entirely fair to Katerra

and was masterminded by Marks and his small group of fellow Katerra executives who were also acting on behalf of WRVI to benefit each of their own interests and to the detriment of Katerra.

**G.**   **Marsh Is Required To Pay Back $1 Million Signing Bonus Back to the Company**

522.   On September 20, 2020, Housenbold, as the sole member of the Compensation Committee of the Board signed a resolution (the "Marsh Resolution") requiring Marsh to return a $1 million signing bonus (the "Marsh Signing Bonus") that Marsh received on or about September 21, 2019.

523.   The Marsh Resolution states that "based on [the Compensation Committee's] review of Mr. Marsh was fired for "Cause," defined as:

> (i) your commission, conviction for, or guilty plea to, a felony or to any crime involving moral turpitude; (ii) a willful refusal by you to comply with the lawful and reasonable instructions of the Company, or to otherwise perform your duties as lawfully and reasonably determined by the Company, in each case that is not cured by you (if such refusal is of a type that is capable of being cured) within 15 days of written notice; (iii) your engaging in misconduct or your violation of any of the Company's written policies, including any and all harassment policies; (iv) you engaged in gross negligence in the performance of your duties; (v) you breached the Company's employee nondisclosure or assignment agreements; (vi) you committed any act of fraud, theft, embezzlement, misappropriation of funds, breach of fiduciary duty; (vii) any willful act or acts of material dishonesty against the Company that results in economic or reputational harm; or (viii) any willful act of gross misconduct by you which is injurious to the Company.

524.   Under the terms of the Marsh Employment Letter, if the Company terminated Marsh for "Cause" within the first 12 months of his start date, then he was required to pay back the Marsh Signing Bonus in full.

525.   According to the Marsh Resolution, Marsh started employment on September 21, 2019 and was terminated effective immediately on September 20, 2020.

526.   Marsh has not returned the Marsh Signing Bonus in any part.

**IX.    Katerra Was Insolvent During the Relevant Period**

527.    At the time that Katerra entered into all of the transactions set forth herein and while the Defendants engaged in wrongful acts, Katerra was insolvent in that its total liabilities exceeded the fair value of its assets and/or was rendered insolvent as a result of these transactions.

528.    At the time that the Company entered into all of the transactions set forth in this Complaint, it was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with Katerra was an unreasonably small amount of capital.

529.    At the time that the Company entered into all of the transactions set forth in this Complaint, Katerra intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured.

530.    As a direct result of Defendants' mismanagement and self-interested conduct, the Company was never profitable and experienced consistent net losses.

531.    The Company's project backlog consisted of 147 unprofitable projects out of 428 active jobs as of April 30, 2021.

532.    As shown below, Katerra's operating losses grow from approximately $141 million to $769 million from 2017 to 2019.

<u>2017 – 2019 Recurring Losses</u>

**I - Excerpted Statement of Operations**

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
|  | (000s) | | |
| Sales | $ 1,633,369 | $ 770,515 | $ 307,521 |
| Cost of sales | 1,841,420 | 983,576 | 293,685 |
| Gross (loss) profit | (208,051) | (213,061) | 13,836 |
|  |  |  |  |
| Total operating expenses | 562,121 | 333,101 | 155,537 |
| Earnings from equity method investment | 779 | 400 | 697 |
|  |  |  |  |
| Loss from operations | $ (769,393) | $ (545,762) | $(141,004) |

533.     In fact, the Company experienced a total of approximately $2.78 billion in financial losses in 2018, 2019 and 2020.

## REQUEST FOR RELIEF

534.     Plaintiff's investigation is ongoing and therefore Plaintiff reserves all rights to: (i) supplement this Complaint with information and causes of action that may become known as a result of further investigation; and (ii) seek recovery of additional claims, causes of action and/or transfers that are uncovered as a result of further investigation in this adversary proceeding or another action.

535.     As a result of Defendants' wrongful conduct, as alleged herein, Plaintiff seeks compensatory damages in the amount of approximately $1 billion as against each of the Defendants in an amount to be determined at trial.

## COUNT ONE
### Breach of Fiduciary Duties
### (Against the Defendants)

536.     The Plaintiff repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

537.     A claim for breach of fiduciary duty requires proof of two elements: (i) that a fiduciary duty existed and (ii) that a defendant breached that duty.

102

538.    At all relevant times, each of the Defendants was an officer, director and/or person in control of Katerra.

539.    As directors, officers and/or persons in control of Katerra, the Defendants each owed fiduciary duties of care and loyalty to Katerra and its creditors.  Those duties required the Defendants to act in good faith in a manner reasonably believed to be in the best interests of Katerra.

540.    Each director and officer of Katerra owed Katerra the fiduciary duty to exercise good faith and diligence in the administration of Katerra's affairs and in the use and preservation of its property and assets and the highest obligations of fair dealing.

541.    The Defendants, because of their positions of control and authority as directors and/or officers of Katerra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

542.    The Defendants repeatedly abdicated their duties and responsibilities owed to Katerra when they put their own financial interests ahead of Katerra, and acted in bad faith and failed to act in the best interests of Katerra by engaging in, *inter alia*, the above-described conduct.

543.    The Defendants approved and engaged in self-dealing and self-interested transactions that benefitted themselves and/or their fellow board members or officers, which resulted in transactions that were unfair to Katerra and harmed Katerra.

544.    Each of the Defendants knew or should have known that the Director Defendants were engaging in self-interested and self-dealing transactions for the benefit of the Company and yet allowed these transactions to continue and/or failed to adequately inform themselves of such decisions and transactions, acting with gross negligence in doing so. Thus, the Director Defendants engaged in gross negligence and failed to act on an informed basis.

545.    Further reflective of the Director Defendants' failures to act in the best interests of Katerra, they failed to put into place, implement or enforce meaningful controls related to the actions taken by the Director Defendants for the benefit of the Company.

546.    These breaches of fiduciary duties resulted in millions of dollars in damages to the Wind-Down Debtors, significantly contributed to the Wind-Down Debtors' insolvency, and constituted actions well below the care an ordinarily prudent person in a like position would exercise under similar circumstances.

547.    As detailed herein, the Defendants repeatedly and continuously breached their duties to Katerra.

548.    The Defendants breached their duties including, but not limited, by:

(a)    Failing to implement internal controls and mechanisms to keep themselves reasonably informed about the expenditures of the Company, how construction contracts were entered into by the Company, the acquisitions made by the Company, transactions that benefitted insiders to the detriment of Katerra, including but not limited to the Insider Transactions, and the accuracy of the Company's financial statements;

(b)    Failing to put in place, implement and/or enforce meaningful controls and procedures to monitor and control the expenditures, related party and affiliate transactions between Katerra, its affiliates as well as insiders at Katerra.

(c)    The failure of the Officer Defendants to keep the Director Defendants fully informed regarding the financial affairs of Katerra, its acquisitions, expenditures and related party transactions;

(d)     Failing to act in the Company's interest when they became aware of the misconduct described herein and acting with gross negligence in closing their eyes to the misconduct;

(e)     Failing to perform adequate due diligence before committing the Company to construction contracts and business acquisitions;

(f)     Entering into the Greensill Receivables Facility which guaranteed losses for Katerra;

(g)     Taking virtually no action to save the Company after Greensill declared bankruptcy and falsely and publicly claimed that Katerra owed it $440 million, which claim the Defendants knew caused sureties and business partners to refuse to continue to do business with Katerra; and

(h)     Deciding to forward approximately $23 million dollars to KSA on or about February 2021 when the Company was insolvent and received no reasonable equivalent value for that transfer;[2]

549.    Each of the Defendants knew or should have known of the impact of these wrongful acts and omissions that were not in the best interests of the Company and which were unfair to the Company.

550.    Each of the Defendants engaged in and/or allowed the Company to engage in a variety of self-dealing and self-interested activities and transactions that benefitted the D&O Defendants and which were unfair to the Company.

---

[2] This list is a summary and provides example of the Defendants breaches, which are set forth in detail in the specific allegations asserted in the Complaint above.

551.    Each of the Defendants, as directors or officers of Katerra, approved the wrongful acts and/or allowed such wrongful acts to continue, failed to reasonably inform themselves with respect to such wrongful acts, and rubberstamped transactions and activities for themselves.

552.    Each of the Defendants acted in bad faith and/or engaged in gross negligence with respect to the wrongful acts.

553.    Each of the Defendants failed to act with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

554.    Each of the Defendants' breaches of their fiduciary duties, including their duties of loyalty and care, directly and proximately caused the unnecessary dissipation of Katerra's assets and multiple millions of dollars of damages to be incurred by the Company.

555.    Each of the Defendants' breaches of their fiduciary duties to Katerra directly and proximately caused Katerra's creditors to be deprived of assets that would have otherwise been available in the underlying bankruptcy case.

556.    As such, Plaintiff seeks compensatory damages as against each of the Defendants in an amount to be determined at trial.

**COUNT TWO**
**Breach of Duty to Creditors**
**(Against the Defendants)**

557.    Plaintiff repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

558.    During all times that Katerra was insolvent, the Defendants owed fiduciary duties of good faith, loyalty and care to all of Katerra's creditors in addition to those duties owed to Katerra itself.

559.    The Defendants breached their fiduciary duties to Katerra's creditors as more fully described above by failing to exercise the care that an ordinary person would use under similar

circumstances when the Defendants caused and/or allowed Katerra to engage in the wrongful acts despite that they were not in Katerra's best interests or the interests of its creditors.

560.    As a result of the foregoing breaches, Katerra's creditors suffered significant injury in the loss of assets which should have been available for distribution to unsecured creditors.

561.    Accordingly, Plaintiff, on behalf of Katerra's estate and its creditors seeks damages in an amount to be determined at trial.

### COUNT THREE
**Waste of Corporate Assets**
**(Against the Defendants)**

562.    Plaintiff repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

563.    As more fully described above, the Defendants caused Katerra to engage in the above-described acts, resulting in the loss of billions of dollars by Katerra.

564.    The Defendants wasted cash and valuable assets of Katerra to the detriment of Katerra and its creditors and for the benefit of the Defendants.

565.    An example of this waste is the $23 million forwarded to KSA when Katerra was insolvent and received no value for that transfer.

566.    As detailed herein, the Defendants were aware of, should have been aware of and/or allowed and caused Katerra to engage in the wrongful acts despite that such acts were unfair to the Wind-Down Debtors.

567.    The wrongful acts served no corporate purpose and no ordinary, reasonably prudent person would have permitted them.

568.    Moreover, the Defendants engaged in self-dealing and/or allowed the self-dealing and one-sided transactions described herein for the benefit of themselves that resulted in Katerra's loss of substantial sums of capital and corporate waste.

569.   As a result of the misconduct described herein, the Defendants wasted corporate assets, namely funds, by failing to properly consider the best interests of Katerra.

570.   Accordingly, the Defendants are liable to Katerra for waste of corporate assets in an amount to be determined at trial.

## COUNT FOUR
### Unjust Enrichment
### (Against the Defendants)

571.   Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

572.   As detailed above, Defendants received debt forgiveness, excessive compensation payments, transfers, raises, bonuses and other benefits as a result of their positions on the Board or as appointed officers of Katerra.

573.   By their wrongful acts and omissions, these Defendants were unjustly enriched at the expense of and to the detriment of Katerra by virtue of the debt forgiveness, excessive compensation payments, raises, bonuses and other benefits paid to them.

574.   Accordingly, the Defendants are liable to Katerra for unjust enrichment in an amount to be determined at trial.

## COUNT FIVE
### In the Alternative, Aiding and Abetting Breach of Fiduciary Duty
### (Against the Director Defendants)

575.   Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

576.   To the extent any named Defendant claims or asserts that she or he was not a director or officer of Katerra, such named Defendant took numerous actions as detailed above that enabled other Defendants to breach their fiduciary duties.

577.    The Defendants enabled the breach of fiduciary duties owed to Katerra by other Defendants, for example, each time they approved an improper insider transaction, failed to take action to stop the creation and distribution of false financial statements, failed to fully inform other Defendants of knowledge they had with regard to the wrongful conduct detailed in this Complaint and acted in their own personal interest to the detriment of Katerra.

578.    By their wrongful acts and omissions, these Defendants caused harm to Katerra and its creditors.

579.    Accordingly, such Defendants are liable to Katerra for aiding and abetting the breach of fiduciary duties by the Officer Defendants, including Marks, Marsh and Solomon, and other Defendants in an amount to be determined at trial.

580.    Accordingly, the Defendants are liable to Katerra for aiding and abetting the breach of fiduciary duty by other Defendants in an amount to be determined at trial.

Dated:  February 28, 2022

**FOX ROTHSCHILD LLP**

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman, Esquire (No. 3702)
E. Chaney Hall, Esquire (No. 5491)
Kasey DeSantis, Esquire (No. 5882)
919 North Market Street, Suite 300
Wilmington, DE 19899
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
sliebesman@foxrothschild.com
chall@foxrothschild.com
kdesantis@foxrothschild.com

*Of Counsel:*

William H. Stassen, Esquire
2000 Market St., 20th Floor
Philadelphia, PA 19103
Telephone: (215) 299-2853
Facsimile: (215) 299-2150
wstassen@foxrothschild.com

Elizabeth C. Viele, Esquire
101 Park Avenue, Suite 1700
New York, NY 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
eviele@foxrothschild.com

Michael A. Sweet, Esquire
345 California Street, Suite 2200
San Francisco, CA 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
msweet@foxrothschild.com

*Counsel to Katerra Inc., by and through Daniel
R. Williams, as Plan Administrator on behalf of
Katerra Inc. and related debtors, except with
respect to matters involving the following
insurers: ACE American Insurance Company
and Chubb Ltd; Starr Indemnity & Liability
Company; Allied World Specialty Insurance
Company; Markel American Insurance
Company; and Argonaut Insurance Company*

**DLA PIPER LLP (US)**

*/s/ Matthew P. Denn*
Matthew P. Denn, Esquire
1201 North Market Street
Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
matthew.denn@dlapiper.com

*Of Counsel:*

Brett Ingerman, Esquire
The Marbury Building
6225 Smith Avenue
Baltimore, MD  21209-3600
Telephone: (410) 580-4177
Facsimile: (410) 580-3177
brett.ingerman@dlapiper.com

*Counsel to Katerra Inc., by and through Daniel R.
Williams, as Plan Administrator on behalf of Katerra Inc.
and related debtors*

110