## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KATERRA INC., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors, | ) ) ) ) |
|  | ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MICHAEL E. MARKS, *et al.*, | ) ) |
| Defendants. | ) ) ) |

Case No. 22-cv-00271-CJB

## PLAINTIFF KATERRA INC.'S OMNIBUS BRIEF IN
## <u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

**FOX ROTHSCHILD LLP**
Sidney S. Liebesman (No. 3702)
E. Chaney Hall (No. 5491)
Kasey DeSantis (No. 5882)
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
sliebesman@foxrothschild.com
chall@foxrothschild.com
kdesantis@foxrothschild.com

*Counsel to Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors, except with respect to matters involving the following insurers: ACE American Insurance Company and Chubb Ltd; Starr Indemnity & Liability Company; Allied World Specialty Insurance Company; Markel American Insurance Company; and Argonaut Insurance Company*

**DLA PIPER LLP (US)**
Matthew P. Denn (No. 2985)
1201 North Market Street
Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
matthew.denn@dlapiper.com

*Counsel to Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

NATURE AND STAGE OF PROCEEDINGS .......................................................... 2

SUMMARY OF THE ARGUMENT .......................................................................... 2

FACTUAL BACKGROUND ....................................................................................... 3

ARGUMENT .................................................................................................................. 8

I.      STANDARD OF REVIEW ........................................................................ 8

II.    THIS COURT HAS PROPER JURISDICTION OVER THIS ACTIOn. .............. 9

      A.    Subject Matter Jurisdiction Exists Because Plaintiff Is Only a Citizen of Delaware and All Defendants Are Diverse. ........................................... 9

      B.    Delaware has Personal Jurisdiction Over Katerra Cayman and Defendants. ........................................................................................... 11

           1.    Katerra Cayman's and the Director Defendants' Actions Taken Through Plaintiff Establish Minimum Contacts with the State of Delaware. ....................................................................................... 12

           2.    Katerra Cayman Is the Alter Ego of Plaintiff. ............................. 14

           3.    Plaintiff Was an Agent of Katerra Cayman. ................................ 16

      C.    Schick Is Subject to Personal Jurisdiction in Delaware Because He is Considered An Officer Under Delaware's Consent Statute. ................... 17

III.   PLAINTIFF SUFFICIENTLY PLEADS DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES. ........................................................................... 18

      A.    The Complaint Does Not Contain Improper Group Allegations. ............. 18

      B.    Defendants' Exculpation Clause Argument Fails. ..................................... 24

           1.    The Existence of Exculpatory Language is an Affirmative Defense Not Available at 12(b)(6) Stage. ................................................... 25

           2.    Article VII Does Not Apply to Officers by Plain Language. ....... 26

           3.    Article VII Does Not Limit the Director Defendants' Liability. .. 27

      C.    Defendants Breached their Duties of Loyalty. .......................................... 27

           1.    Plaintiff Sufficiently Pleads That the Board Was Interested and Is

Subject to the Entire Fairness Standard. ....................................... 27

2.  Plaintiff Sufficiently Pleads That the Directors and Officers Breached their Fiduciary Duties and Created Waste When They Paid Out Numerous Unreasonable and Unwarranted Compensations Packages and Perks. ............................................. 33

3.  The Complaint Adequately Alleges a *Caremark* Claim. .............. 36

D.  Plaintiff Has Sufficiently Alleged Breach of Duty of Care. .................... 41

1.  Failure to Keep Informed About Katerra's Financial Condition. . 43

2.  Failure to Recognize and Correct Egregious Estimating and Bidding Problems That Cause Severe Financial Losses. ............. 45

3.  Failure to Perform Due Diligence Prior to Acquisitions and Entry into the Greensill Receivables Facility. ........................................ 46

E.  Tachouet Owes Fiduciary Duties to Katerra as its Controller. ................ 48

F.  Plaintiff Successfully Pleads Corporate Waste. ......................................... 49

IV.  Plaintiff Sufficiently Pleads that Defendants Breached Their Fiduciary Duties Based on Defendants' Accounting FailureS. ...................................................... 50

V.  Plaintiff's Complaint Adequately States A Claim for Breach of Fiduciary Duty to Creditors ................................................................................................... 54

VI.  The Complaint States A Claim for Aiding and Abetting Breach of Fiduciary Duty ................................................................................................................... 63

A.  This Court has Personal Jurisdiction Over the Aiding & Abetting Defendants. .......................................................................................... 63

B.  Plaintiff's Complaint Adequately States a Claim for Aiding and Abetting Breach of Fiduciary Duty .......................................................... 64

VII.  Plaintiff Is Not Required to Arbitrate Against Marsh and Schick. ....................... 71

VIII.  Plaintiff Has Stated a Claim for Unjust Enrichment. ............................................. 73

A.  Plaintiff Has Stated a Claim for Unjust Enrichment Against Marks. ........ 74

B.  Plaintiff Has Stated a Claim for Unjust Enrichment Against Solomon. .... 75

C.  Plaintiff Has Stated a Claim for Unjust Enrichment Against Kibsgaard. ............................................................................................. 76

136824253.1

D.      Plaintiff Has Stated a Claim for Unjust Enrichment Against Schick. ...... 77

E.      Plaintiff Has Stated a Claim for Unjust Enrichment Against Marsh. ....... 77

F.      Plaintiff Is Entitled to Plead Unjust Enrichment and Breach of Fiduciary Duty Theories in the Alternative at the Pleading Stage............ 78

IX.     Katerra May Maintain Claims Against Schick Relating to His Role in the Financial Misreporting Scheme Orchestrated by the Officer Defendants. ........... 79

X.      None Of Plaintiff's Claims Are Time-Barred, In Light Of Defendants' Fraudulent Concealment And Status As Fiduciaries. .......................................... 80

A.      Defendants Fraudulently Concealed the Basis for Plaintiff's Claims. ..... 82

B.      Plaintiff Reasonably Relied on the Competence and Good Faith of the Defendant Fiduciaries. ............................................................................. 86

CONCLUSION.................................................................................................................. 88

136824253.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
 554 F. Supp. 2d 538 (D. Del. 2008)........................................................................25

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
 125 F. Supp. 3d 945 (N.D. Cal. 2015) ...................................................................19

*Aeroglobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*,
 871 A. 2d 428 (Del. 2005) ....................................................................................13

*AG Res. Holdings, LLC v. Terral*,
 2021 WL 486831 (Del. Ch. Feb. 10, 2021) ..........................................................13

*Akzona Inc. v. E.I. Du Pont De Nemours & Co.*,
 607 F. Supp. 227 (D. Del. 1984)............................................................................15

*In re AMC Inv'rs, LLC*,
 637 B.R. 43 (Bankr. D. Del. 2022) ........................................................................80

*In re American Intern. Group, Inc.*,
 965 A. 2d 763 (Del. Ch. 2009)...............................................................................37

*Applied Biosystems v. Cruachem, Ltd.*,
 772 F. Supp. 1458 (D. Del. 1991)..........................................................................17

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
 1995 WL 376919 (Del. Ch. June 15, 1995)...........................................................70

*Assured Partners of Virginia, LLC v. Sheehan*,
 2020 WL 2789706 (Del. Super. Ct. May 29, 2020) ..............................................84

*Ausco Prods., Inc. v. Axle, Inc.*,
 2020 WL 7028521 (W.D.N.Y. Nov. 30, 2020) .....................................................19

*In re Autobacs Strauss, Inc.*,
 473 B.R. 525 (Bankr. D. Del. 2012) ................................................................27, 45

*Balin v. Amerimar Realty Co.*,
 1993 WL 542452 (Del. Ch. Dec. 23, 1993)...........................................................76

*Behrmann v. Brandt*,
 2020 WL 4432536 (D. Del. July 31, 2020) ...........................................................75

iv

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................8

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
   891 A.2d 150 (Del. Ch. 2005)........................................................................43

*Bethel v. Jendoco Const. Corp.*,
   570 F.2d 1168 (3d Cir. 1978)........................................................................80

*Blair v. Infineon Technologies AG*,
   720 F. Supp.2d 462 (D. Del. 2010)................................................................15

*Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*,
   388 B.R. 548 (Bankr. D. Del. 2008) .............................................................41

*BTIG, LLC v. Palantir Techs., Inc.*,
   2020 WL 95660 (Del. Super. Ct. Jan. 3, 2020) ............................................84

*In re Buckhead America Corp.*,
   178 B.R. 956 (D. Del. 1994)..........................................................................15

*Buckley v. O'Hanlon*,
   2007 WL 956947 (D. Del. Mar. 28, 2007) ...................................................41

*In re Burlington Coat Factory Sec. Lit.*,
   114 F.3d 1410 (3d Cir. 1997).....................................................................8, 49

*Butorin v. Blount*,
   2018 WL 4700217 (D. Del. 2018) .................................................................54

*In re Caremark Int'l Inc. Deriv. Litig.*,
   698 A.2d 959 (Del. Ch. 1996)................................................................ passim

*C.R. Bard, Inc. v. Guidant Corp.*,
   997 F. Supp. 556 (D. Del. 1998)...............................................................15, 16

*Calma on Behalf of Citrix Sys., Inc. v. Templeton*,
   114 A.3d 563 (Del. Ch. 2015)........................................................................75

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1993) ..............................................................................43

*In re CBS Corp. S'holder Class Action & Derivative Litig.*,
   2021 WL 268779 (Del. Ch. Jan. 27, 2021), ..................................................28

*In re Celera Corp. S'holder Litig.*,
   2012 WL 1020471 (Del. Ch. Mar. 23, 2012)................................................70

136824253.1

*Chertok v. Zillow, Inc.*,
   2021 WL 4851816 (Del. Ch. Oct. 18, 2021) .......................................................80

*In re China Agritech, Inc. S'holder Deriv. Litig.*,
   2013 WL 2181514 (Del. Ch. May 21, 2013) ...............................................38, 39

*Circle Indus. USA v. Parke Contr. Grp., Inc.*,
   183 F.3d 105 (2d. Cir. 1999)..........................................................................11

*In re Citigroup Inc. S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009)........................................................................42

*Citron v. EZTD Inc.*,
   2020 WL 3542332 (D. Del. June 30, 2020)...................................................11

*Cooke v. Oolie*,
   2000 WL 710199 (Del. Ch. May 24, 2000)..............................................53, 54

*David B. Shaev Profit Sharing Acct. v. Armstrong*,
   2006 WL 391931 (Del. Ch. Feb. 13, 2006) ..................................................38

*In re DBSI, Inc.*,
   445 B.R. 344 (Bankr. D. Del. 2011) ............................................................56

*In re Dean Witter P'ship Litig.*,
   1998 WL 442456 (Del. Ch. July 17, 1998)...................................................82

*In re Draw Another Circle*,
   602 B.R. 878 (Bankr. Del. 2019) .......................................................55, 57, 58

*Dubroff v. Wren Hldgs., LLC*,
   2011 WL 5137175 (Del. Ch. Oct. 28, 2011) ................................................78

*Edwards v. A.H. Cornell & Son, Inc.*,
   610 F.3d 217 (3d Cir. 2010)............................................................................8

*El-Hewie v. Bergen Cty.*,
   348 F.App'x. 790 (3d Cir. 2009) ....................................................................9

*In re Essar Steel Minn. LLC*,
   2019 WL 2246712 (Bankr. D. Del. May 23, 2019).................................25, 55

*In re Evergreen Energy, Inc.*,
   546 B.R. 549 (Bankr. D. Del. 2016)..............................................................27

*Falco v. Alpha Affiliates, Inc.*,
   1997 WL 782011 (D. Del. Dec. 10, 1997)....................................................57

*In re Fedders*,
  405 B.R. 527 (Bankr. D. Del 2009) ..............................................................43, 47

*Firefighters' Pension System of City of Kansas City, Missouri Trust v. Presidio, Inc.*,
  251 A.3d 212 (Del. Ch. 2021) .........................................................................65

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ..............................................................................8

*Frank v. Elgamal*,
  2012 WL 1096090 (Del. Ch. Mar. 30, 2012) ....................................................78

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
  2017 WL 1437308 (Del. Ch. Apr. 14, 2017) .....................................................78

*Freedman v. Beneficial Corp.*,
  406 F. Supp. 917 (D. Del. 1975) ......................................................................84

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
  66 A.3d 963 (Del. Ch. 2013)..............................................................37, 38, 39

*Gantler v. Stephens*,
  2008 WL 401124 (Del. Ch. Feb. 14, 2008) ................................................17, 18

*Garfield on behalf of ODP Corp. v. Allen*,
  2022 WL 1641802 (Del. Ch. May 24, 2022)..............................................73, 74, 75

*Gavin v. Read Corp.*,
  356 F. Supp. 483 (E.D. Pa 1973) .....................................................................10

*Giordano v. Czerwinski*,
  Del. Super., 216 A.2d 874 (Del. Super 1966) ..................................................82

*Glazer v. Zapata Corp.*,
  658 A.2d 176 (Del. Ch. 1993)..........................................................................49

*Grand Union Supermarkets of Virgin Islands, Inc. v. H.E Lockhart Mgmt., Inc.*,
  316 F.3d 408 (3rd Cir. 2003) ......................................................................10, 11

*Groove Digit., Inc. v. King.com, Ltd.*,
  2018 WL 6168615 (D. Del. Nov. 26, 2018) ......................................................19

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003).........................................................................38

*Halpern v. Barran*,
  313 A.2d 139 (Del. Ch. 1973).........................................................................82

136824253.1

*Hamilton Partners L.P. v. Highland Cap. Mgmt., L.P.*,
    2014 WL 1813340 (Del. Ch. May 7, 2014) .................................................................28

*In re Hansen Med., Inc. S'holders Litig.*,
    2018 WL 3030808 (Del. Ch. June 18, 2018) ...........................................................27

*Harris v. Black Clawson Co.*,
    961 F.2d 547 (5th Cir. 1992) ..................................................................................11

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010) ...................................................................................................11

*In re HH Liquidation LLC*,
    590 B.R. 211, 280 (Bankr. D. Del. 2018) ..............................................................45

*Highland Capital Mgmt. v. Dondero (In re Highland Capital Mgmt.)*,
    2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021) .............................................72

*Hughes v. Xiaoming Hu*,
    2020 WL 1987029 (Del. Ch. Apr. 27 2020) ..........................................................38

*Hydrogen Master Rights, Ltd. v. Weston*,
    228 F. Supp. 3d 320 (D. Del. 2017) .......................................................................57

*Intellectual Ventures I LLC v. Toshiba Corp.*,
    66 F.Supp.3d 495 (D. Del. 2014) ...........................................................................17

*In re Investors Bancorp, Inc. Stockholder Litigation*,
    177 A.3d. 1208 (Del. 2017) ....................................................................................34

*Janvey v. Alguire*,
    2014 WL 12654910 (N.D. Tex. July 20, 2014) .....................................................72

*Jordan v. Mirra*,
    2017 WL 4070646 (D. Del. Sept. 14, 2017) .........................................................79

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
    65 F. App'x 803 (3d Cir. 2003) .............................................................................17

*Klein v. H.I.G. Cap., LLC*,
    2018 WL 6719717 (Del. Ch. Dec. 19, 2018) ........................................................28

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993) .........................................................................................8

*Lake v. Arnold*,
    232 F.3d 360 (3d Cir. 2000) ...................................................................................81

136824253.1

*LaNuova D & B, S.p.A v. Bowe Co.*,
    513 A.2d 764 (Del. 1986) ....................................................................................12

*In re Liquid Holdings Grp., Inc.*,
    2018 WL 2759301 (Bankr. D. Del. June 6, 2018) ................................................82

*LivePerson, Inc. v. NextCard, LLC*,
    2009 WL 742617 (D. Del. Mar. 20, 2009) ..........................................................14

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    363 F. Supp. 3d 476 (D. Del. 2019)....................................................................48

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ............................................................................64, 65

*Manuel v. Mears*,
    947 F. Supp. 2d 426 (D. Del. 2013)....................................................................80

*Marchand v. Barnhill*,
    212 A.3d 805 (Del. 2019) ...................................................................................37

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010).................................................................................8

*Mervyn's LLC v. Lubert–Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
    426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................25

*Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*,
    2012 WL 6632681 (Del. Ch. Dec. 20, 2012)......................................................47

*Michelson v. Duncan*,
    407 A.2d 211 (Del. 1979) ..............................................................................49, 50

*Microsoft Corp. v. Amphus, Inc.*,
    2013 WL 5899003 (Del. Ch. Oct. 31, 2013) ......................................................86

*Microsoft Corp. v. Vadem, Ltd.*,
    2012 WL 1564155 (Del. Ch. Apr. 27, 2012) ......................................................13

*Midlantic Nat. Bank v. Hansen*,
    48 F.3d 693 (3rd Cir. 1995) ............................................................................9, 11

*Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*,
    2021 WL 2036671 (D. Del. May 20, 2021)...................................................19, 20

*Mobil Oil Corp. v. Linear Films, Inc.*,
    718 F.Supp. 260 (D. Del. 1989).........................................................................15

136824253.1

*N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*,
  930 A.2d 92 (Del. 2007) ........................................................................................55

*Navigant Consulting, Inc. v. Kostakis*,
  2007 WL 2907330 (E.D.N.Y. Oct. 4, 2007)........................................................73

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) ..................................................................................73

*Nicholas v. Nat'l Union Fire Ins. Co.*,
  2013 WL 1143514 (Del. Super. Ct. Mar. 19, 2013) ...........................................10

*In re Nine Sys. Corp. S'holders Litig.*,
  2013 WL 4013306 (Del. Ch. July 31, 2013)........................................................84

*Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v.
  Elkins*,
  2004 WL 1949290 (Del.Ch. Aug. 24, 2004) .......................................................41

*In Re OPP Liquidating Company, Inc.*,
  2022 WL 774063 (Bankr. D. Del. Mar. 14, 2022)...............................................42

*Orman v. Cullman*,
  794 A.2d 5 (Del. Ch. 2002)......................................................................27, 28, 32

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
  38 F.3d 1380 (3d Cir. 1994) ................................................................................80

*Papendick v. Bosch*,
  410 A.2d 148 (Del. 1979) ....................................................................................13

*In re Pennsaver USA Publ'g, LLC*,
  587 B.R. 445 (Bankr. D. Del. 2018) ....................................................................55

*Pfeiffer v. Leedle*,
  2013 WL 5988416 (Del. Ch. Nov. 8, 2013) ...........................................76, 77, 78

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
  842 F.2d 1466 (3d Cir. 1988)...............................................................................15

*Pomeranz v. Museum P'rs, L.P.*,
  2005 WL 217039 (Del. Ch. Jan. 24, 2005)..........................................................86

*Quadrant Structured Prods. Co. v. Vertin*,
  102 A.3d 155 (Del. Ch. 2014)........................................................................55, 62

*D.M. ex rel. Ray v. Phila. Housing Auth.*,
  613 F.App'x. 187 (3d Cir. 2015) ...........................................................................9

x

*Rabkin v. Philip A. Hunt Chemical Corp.*,
547 A.2d 963 (Del. Ch. 1986) ..................................................................13, 14

*RBC Cap. Mkts, LLC v. Jervis*,
120 A.3d 816 (Del. 2015) .................................................................................65

*Resnik v. Woertz*,
774 F.Supp.2d 614 (D. Del. 2011)....................................................................49

*Rudd v. Brown*,
2020 WL 549526 (Del. Ch. Sept. 11, 2020) .....................................................31

*Ryan v. Gifford*,
918 A.2d 341 (Del. Ch. 2007)..........................................................................84

*Salladay v. Lev*,
2020 WL 954032 (Del. Ch. Feb. 27, 2020) ......................................................28

*Schock v. Nash*,
732 A.2d 217 (Del. 1999) .................................................................................79

*Schuss v. Penfield Partners, L.P.*,
2008 WL 2433842 (Del. Ch. June 13, 2008) ....................................................73

*Shaev v. Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) ....................................................21

*Shamrock Holdings, Inc. v. Arenson*,
456 F. Supp.2d 599 (D. Del. 2006)...................................................................42

*In re Shoe-Town Inc. S'holders Litig.*,
1990 WL 13475 (Del. Ch. Feb. 12, 1990) ...................................................70, 71

*Shoemaker v. Cardiovascular Sys., Inc.*,
2017 WL 1180444 (D. Minn. Mar. 29, 2017) ..................................................48

*In re Solutions Liquidation LLC*,
608 B.R. 384 (Bankr. D. Del. 2019) ...........................................................26, 45

*In re Sportco Holdings, Inc.*,
2021 WL 4823513 (D. Del. Oct. 14, 2021) ......................................................25

*Sternberg v. O'Neill*,
550 A.2d 1105 (Del. 1988) ...............................................................................13

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
911 A.2d 362, 370 (Del. 2006). .......................................................................37

136824253.1

*T-Jat Sys. 2006 Ltd. v. Expedia, Inc.*,
    2017 WL 896988 (D. Del. Mar. 7, 2017) ...........................................................................17

*Terramar Retail Centers, LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*,
    2017 WL 3575712 (Del. Ch. Aug. 18, 2017) .....................................................................13

*The Litigation Trust of MDIP, Inc. v. Rapoport*,
    2004 WL 3101575 (D. Del. Nov. 29, 2004) .......................................................................44

*Tornetta v. Musk*,
    250 A. 3d 793 (Del. Ch. 2019).................................................................................33, 34

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005).............................................................................................25

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006)..................................................................47, 54, 55, 59

*TriDiNetworks Ltd. v. NXP-USA, Inc.*,
    2020 WL 2514086 (D. Del. May 15, 2020)......................................................................18

*In re Troll Communications, LLC*,
    385 B.R. 110 (Bankr. D. Del 2014) ..........................................................................29, 42

*In re Tropicana Ent., LLC*,
    520 B.R. 455 (Bankr. D. Del. 2014) ......................................................................55, 56, 57

*In re Tyson Foods, Inc.*,
    919 A.2d 563 (Del. Ch. Feb. 6, 2007)..................................................................79, 83, 86

*Upjohn Co. v. Syntro Corp.*,
    1990 WL 79232 (D. Del. Mar. 9, 1990) ...........................................................................15

*In re USA Detergents, Inc.*,
    418 B.R. 533 (Bankr. D. Del. 2009) .................................................................................43

*In re USACafes, L.P. Litig.*,
    600 A.2d 43 (Del. Ch. 1991)...........................................................................................13

*In re W.J. Bradley Mortg. Cap., LLC*,
    598 B.R. 150 (Bankr. D. Del. 2019) ...........................................................................42, 71

*In re The Walt Disney Company Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005)..........................................................................................41

*In re: Wayport, Inc. Litig.*,
    76 A.3d 296 (Del. Ch. 2013)............................................................................................70

136824253.1

*Weiss v. Swanson,*
   948 A.2d 433 (Del. Ch. 2008)...................................................................50, 84, 86

*Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC,*
   2020 WL 5054791 (Del. Super. Ct. Aug. 17, 2020)..................................................82

*Wolman v. Petro Technik, Inc.,*
   2011 WL 5082237 (D.NJ. Sept. 16, 2011) ...........................................................11

*Xura, Inc. S'holder Litig,*
   2019 WL 3063599 (Del. Ch. July 12, 2019)......................................................69, 70

## Statutes and Rules

10 Del. C. § 3104(c)......................................................................................12

10 Del. C. § 3114 ..................................................................................12, 18, 49

10 Del. C. § 8112 ......................................................................................80

11 U.S.C. § 365..................................................................................71, 72

11 U.S.C. §1123 ........................................................................................71

Fed. R. Civ. P. 8.....................................................................................18, 44

Fed. R. Civ. P. 12(b)(6)....................................................................... *passim*

## Other Authorities

Restatement of Unjust Enrichment § 1 cmt. a ..........................................................73

Wolfe & Pittinger, §3.04[c][4].........................................................................13

136824253.1

Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and its related debtors,[1] ("Plaintiff," "Katerra" or the "Company") by and through its undersigned counsel, hereby files its Omnibus Brief in Opposition to the Motions to Dismiss (the "Motions to Dismiss") filed by Michael E. Marks ("Marks"), Matthew M. Marsh ("Marsh"), Ga-Lane Chen ("Chen"), Adam Fisher ("Fisher"), Jeff Hoopes ("Hoopes"), John Hui ("Hui"), Paal Kibsgaard ("Kibsgaard"), Neil Mehta ("Mehta"), Lisa Picard ("Picard"), Trevor Schick ("Schick"), Krishna Shivram ("Shivram"), Joanne Solomon ("Solomon"), Matt Tachouet ("Tachouet"), and Alan Yeung ("Yeung") (collectively, "Defendants").

## INTRODUCTION

In the six years that Katerra was in business, the Company[2] was able to raise almost $3 billion of investments.  However, Katerra never made a profit and in 2021, filed for bankruptcy. Katerra's swift plummet was not the product of a risky business venture in the construction industry that did not materialize as expected, but rather, the direct result of Defendants' borderline fraudulent, grossly negligent and self-dealing behavior, including breaches of their fiduciary duties to the Company and its creditors as detailed in the Complaint.  Each of the Defendants played a

---

[1] Katerra Inc., a Delaware corporation ("Katerra Delaware"), sought Chapter 11 bankruptcy protection on June 6, 2021 in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). (Case No. 21-31861(DRJ)). Katerra Inc.'s related debtor entities are Katerra Inc. (Cayman) ("Katerra Cayman"), Kirkland 1 Project LLC, Kirkland 2 Project LLC, Hillsboro 1 Project LLC, Hillsboro 2 Project LLC, Dangoo Electronics (USA) Co, Ltd., CAPGro Construction Management, LLC, UEB Builders, Inc., WM Aviation, LLC, Roots Software, LLC, Valpico Glenbriar Apartments, LLC, Katerra Pegasus RiNo Investment LLC, Katerra XSC Houston Investment LLC, Katerra RO2 Knipe Village Investment, LLC, Katerra Construction LLC, Kirkland 1 Project MM LLC, Kirkland 2 Project MM LLC, Hillsboro 1 Project MM LLC, Hillsboro 2 Project MM LLC, Construction Assurance, Ltd., Apollo Technologies, Inc., Katerra Affordable Housing LLC, Bristlecone 28th Ave, LLC, Bristlecone Residential LLC, Edge @ LoHi, LLC, Perimeter Building Services LLC, Katerra Pearson Ranch Investment LLC, AlgoSquare Inc., Katerra Engineering LLC, Katerra Architecture LLC, Lord, Aeck & Sargent, Inc., and Skyview Concrete LLC (together with Katerra Inc., the "Wind-Down Debtors").
[2] All capitalized terms not defined herein shall have the meaning sent forth in the Complaint.

1

significant role in Katerra's demise.  The drive to meet financial targets through the management of earnings and multiple violations of Generally Accepted Accounting Principles (GAAP) was overwhelming such that Katerra twice self-reported to the Securities and Exchange Commission when the misconduct could no longer be hidden.  Defendants knowingly disregarded red flags, which had they heeded, Katerra could still be operating today.

Defendants filed multiple motions to dismiss seemingly more designed to inform the court of "their side of the story" than to meet the standard of review applicable to such motions.  They ask this Court to ignore Third Circuit precedent and repeatedly reference alleged facts that are not in the Complaint and are not supported by any document or reference.  For all the reasons set forth herein, the Court should deny the motions so this case may move forward.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff filed its Complaint on February 28, 2022.  On June 10, 2022, Defendants filed their Motions to Dismiss.  The Motions to Dismiss were filed as follows: Marks (D.I. 50-51), Fisher and Mehta (D.I. 52, 54 and 57), Solomon (D.I. 53 and 55), Chen, Hui and Yeung (D.I. 56, 58 and 63), Randall (Dkt. 59, 62), Hoopes, Knight, Marsh, Schick and Tachouet (D.I. 60-61, 65), Picard (D.I. 64 and 66-67), Shivram (D.I. 68-70), Kibsgaard (D.I. 71-73).   On June 28, 2022 Plaintiff voluntarily dismissed Defendants Brad Knight and Mark Randall (D.I. 82).

## SUMMARY OF THE ARGUMENT

This Court has personal jurisdiction over each of the Defendants.  First, as an inactive Delaware corporation, Plaintiff is only a citizen of Delaware while all Defendants are domiciled elsewhere.  Additionally, the Defendants who purport to only be directors or officers of Katerra Cayman are also subject to personal jurisdiction in Delaware because Katerra Cayman is the alter ego of Katerra Delaware.  Defendants' attempts to hide from Delaware fail as they have purposefully availed themselves of the State of Delaware by directly controlling Katerra Delaware.

136824253.1

Defendants cannot use the Delaware corporate form to receive the benefits of Delaware law without subjecting themselves to the jurisdiction of the Delaware Courts.

As to the merits, the Complaint sufficiently asserts that Defendants breached their fiduciary duties owed to Plaintiff. While the Director Defendants claim they are insulated by an exculpation clause, the clause does not apply to duty of loyalty claims, does not insulate officers, and is not an appropriate defense at the Rule 12(b)(6) stage. Defendants' breach of their duty of loyalty is evident from the Board's conflicted status under the control of Marks when entering into favorable agreements with a company owned by Marks and two other directors.

The conflicted transactions, reckless acquisitions, and a failure to institute adequate accounting controls resulted in Katerra's insolvency. These allegations directly support Plaintiff's claims for breach of the duty of care, *Caremark* violations, and corporate waste. Because of Katerra's insolvency, Plaintiff's creditors have a right to bring claims against Defendants.

As a result of Defendants' self-dealing and Katerra's lack of adequate oversight and controls, numerous Defendants were unjustly enriched when they granted themselves large raises, stock options, signing bonuses, and exorbitant perks. Directors cannot set their own compensation when a Board is conflicted, and Officers cannot accept egregious compensation that breaches their duty of loyalty.

Lastly, none of Plaintiff's claims are time barred. Regardless of the timing of the allegations, Plaintiff's claims were tolled due to the Board's fraudulent concealment of its own wrongdoing. Plaintiff should not be penalized for failing to bring claims against Directors who hid their own wrongdoing.

## **FACTUAL BACKGROUND**

**Gross Mismanagement of Construction Projects**: A fundamental problem for Katerra was its lack of controls and procedures to obtain profitable construction jobs. Katerra sales teams

were directed to bid for new construction agreements at up to 40% below market pricing when the Company and Defendants had no idea how much the projects would actually cost to complete. *See* Complaint ¶¶ 73-104. Katerra salespeople allowed customers to name their price and then committed to that price, without having first conducted an analysis to determine if Katerra could perform the work for the negotiated amount. *See id.* ¶¶ 77, 85. Defendants knew that the Company had woefully inadequate bidding and estimating procedures (to the extent they even existed), as evidenced by internal memos documenting the "poor job" the Company was doing in this area and identifying it as a driver of the Company's financial losses. *See id.* ¶¶ 93-94, 102, 104. Defendants failed to implement adequate internal estimating and bidding procedures, despite being aware that the free-for-all approach to project bidding and project management was causing increasing losses to the Company. *See id.* ¶ 100.

Further, Katerra lacked construction expertise and the required procedures to act as both the general contractor and to minimize the subcontractors on jobsites, one of the key promises Defendants made to customers as an alleged means to cut costs and increase efficiencies. *See* Complaint ¶¶ 105-114. Defendants did not understand the construction industry, did not employ onsite managers with the necessary skills, did not vet subcontractors when subcontractors were needed, and ultimately failed to ensure that there were processes in place to manage the enormous costs, risks, and expertise necessary to self-perform construction projects. *See id.* ¶¶ 108, 112-113.

**Failure to Ensure Timely and Accurate Review of Financial Information**: Defendants are liable not only for merely misinterpreting financial information or for making good faith errors in their financial forecasting, but for being aware that there were no meaningful controls in place to curb the Company's reckless financial practices and failing to take corrective action. *See id.* ¶¶

114, 136-139.  For example, Director Defendants appointed co-founder Jim Davidson as chair of the Audit Committee in February 2018, yet the committee never met.  *See id*. ¶¶ 141, 144-145, 148, 151.  Marks was aware of Davidson's dereliction of his duties but did nothing to address it for years, only raising it to the Board in March 2020.  *See id.* ¶¶ 150-152.  The Director Defendants did not re-constitute the Audit Committee even after they knew it was not functioning.  *See id*. ¶ 153.

In addition, Defendants failed to ensure that they understood the Company's financial information or that such information was accurate and timely-produced.  *See id*. ¶¶ 149, 156-73.

**<u>Failure to Perform Due Diligence Prior to Acquisitions and the Greensill Receivables Facility:</u>**  Defendants failed to conduct due diligence on acquired companies, leading Katerra to significantly overpay for acquisitions.  *See id*. ¶¶ 189-219.  The Company had a head of Mergers & Acquisitions, but she was not permitted to negotiate pricing or to perform discounted cash flow analyses, as the prices were predetermined, and her only job was to rubber stamp the deals.  *See id*. ¶¶ 197-198.  Defendants' intentional carelessness caused the Company to overlook blatant red flags in the acquisition targets' financial profiles such as their liabilities in excess of assets, negative net working capital and active projects operating at a loss.  *See id*. ¶¶ 203-204.  This was not a matter of Defendants choosing to approve the acquisitions for strategic, non-financial reasons.  Instead, Defendants intentionally failed to perform fundamentally basic due diligence on acquisition targets – a key role all Defendants needed to perform to protect Katerra.

Similarly, the Director Defendants approved Katerra's entry into an agreement to sell its receivables to Greensill.  *See id*. ¶ 316.  Katerra's directors did not adequately review the terms of the Greensill Receivables facility, which caused the Company to draw down $440 million in a matter of months and, in turn, placed a severe, ongoing financial burden on the Company.  *See id*.

¶¶ 318-37.

**Self-Dealing Transactions Benefitted Defendants to the Company's Detriment**:
Defendants, and Marks in particular, rewarded themselves with raises, bonuses, and other lucrative deals at the same time that the Company was continuing to suffer from staggering financial losses. *See id*. ¶¶ 220-314.  These self-dealing benefits included excess compensation, private jet perks, favorable loan deals (*see id.* ¶¶ 220-49) and related-party transactions in which top Company executives had a personal interest (*see id.* ¶¶ 250-314).

Katerra's largest customer, the Wolff Company, which accounted for almost 40% of its sales as of November 2017, was 100% owned by Paxion, a venture capital company owned by Marks, Davidson and Wolff, the three founders of Katerra.  *See id*. ¶¶ 254-57.  The Director Defendants approved the Most Favored Nation Pricing Agreement between Katerra and the Wolff Company.  The Most Favored Nation Agreement awarded Wolff Entities up to 15% pricing discounts and forced the Company to complete projects with Wolff at a guaranteed loss for Katerra. *See id*. ¶¶ 282-88.  In addition, the Director Defendants approved the Lifebridge and Amberglen transactions, in which the Company took on $425 million in development costs for an unprofitable group of multi-family and senior independent living projects from one of the Wolff Entities.  *See id*,¶¶ 292-318.  Marks, Wolff, and Davidson personally benefitted from the transaction.  Marks and Davidson voted to approve the transaction on behalf of Katerra, despite the fact that they stood on both sides of the deal through their ownership of Paxion and their interest in the Wolff Company.  *See id*. ¶¶ 296-303.

**Creation of Misleading Financial Statements**:  The Officer Defendants, in particular Marks and Marsh, intentionally pressured subordinates to manipulate financial information to create the false impression that Katerra was a successful and financially-stable company.  *See id.*

6

¶¶ 352-446.  The Officer Defendants falsely represented to the Company's auditor, Deloitte, that the Company had complied with GAAP in preparing its financial statements.  *See id.* ¶ 376. Katerra employees in the Renovations business unit, under the oversight of the Officer Defendants, intentionally manipulated and front-loaded costs to create artificially inflated revenue, contrary to principles of construction accounting and revenue recognition. *See id.* ¶ 373.  Around the same time in the Katerra West business unit, the Officer Defendants established a $40 million slush fund to conceal losing contracts and artificially inflate earnings.  *See id.* ¶ 375.

Further, Marks, Marsh, and Tachouet purposefully failed to disclose to Katerra's auditing firm that they were aware of financial misreporting at the Company.  *See id.* ¶¶ 486-93.  Despite knowing that there was an open investigation regarding false financial statements, Marks, Marsh, and Tachouet all signed the management representation letter, confirming that Katerra prepared financial statements fairly and in accordance with GAAP and that they had no knowledge of any fraud at the Company.  *See id.* ¶¶ 484-93.  Kibsgaard emailed Marsh requesting that the Company "hold off" from closing the pending audit because of the "accounting issues we have been uncovering." *Id.* ¶ 486.  Instead, Marsh actively worked with Deloitte employees to get Marks' signature on the management representation letter, the final signature required to complete the audit, never mentioning the open investigation or Kibsgaard's request to delay its issuance.  *See id.* ¶¶ 490, 493.

As set forth above, the Complaint alleges facts against Defendants which state claims for breach of fiduciary duty, breach of duty to creditors, corporate waste, and unjust enrichment. Contrary to the arguments in their motions to dismiss, Defendants may each be held liable for the conduct alleged in the Complaint based on their positions as officers and directors of Katerra

Delaware, the operating subsidiary of Katerra Cayman, the holding company.[3]

## ARGUMENT

## I.      STANDARD OF REVIEW

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)).

Courts in the Third Circuit engage in a two-part analysis when reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court should separate the factual and legal elements of the claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d at 210–11. Second, the court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a plausible claim for relief." *Id.* at 211. A motion to dismiss for failure to state the claim, pursuant to Rule 12(b)(6), should be granted only if, accepting all allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the plaintiff is not entitled to relief as a matter of law. *See In re Burlington Coat Factory Sec. Lit.*, 114 F.3d 1410, 1420 (3d Cir. 1997).

On a motion to dismiss, the Court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, items subject to judicial notice, and matters of the public record. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir.

---

[3] In the event that the Court determines that the Complaint does not sufficiently state certain of Plaintiff's claims, Plaintiff respectfully requests leave to amend.

2010); *D.M. ex rel. Ray v. Phila. Housing Auth.*, 613 Fed.Appx. 187, 189 (3d Cir. 2015); *El-Hewie v. Bergen Cty.*, 348 Fed.Appx. 790, 794 (3d Cir. 2009).

## II.   **THIS COURT HAS PROPER JURISDICTION OVER THIS ACTION.**

Plaintiff is a Delaware corporation for which each Defendant served as an officer and/or director.  Defendants knowingly participated in their employment and roles at the Company, which conducted all business on behalf of its parent company, Katerra Cayman.  Any after-the-fact attempt by Defendants to disassociate themselves with Plaintiff and to hide behind the corporate structure of an off-shore shell entity, Katerra Cayman, should be rejected by this Court.

### A.   **Subject Matter Jurisdiction Exists Because Plaintiff Is Only a Citizen of Delaware and All Defendants Are Diverse.**

Plaintiff sufficiently pleads that diversity jurisdiction exists between Plaintiff, a Delaware citizen, and the Defendants who are all domiciled outside the State of Delaware.  *See* Complaint ¶21.  Disregarding Third Circuit precedent, Defendants argue that this Court lacks subject matter jurisdiction over these claims.  Defendants, joining Marks' brief, argue that Plaintiff is not diverse from all of the Defendants because Plaintiff had its principal place of business in Texas before its bankruptcy and is, therefore, a citizen of Texas.  *See* D.I. 51 at 6.  However, this contention is false. As alleged in the Complaint, Plaintiff is and was, at the time the Complaint was filed, only a citizen of Delaware.

Katerra is an inactive corporation and, applying the standard determined by the Third Circuit, it is a citizen only of the state of Delaware, the state where it was formed when it filed its Articles of Incorporation on January 12, 2015.  *See* Complaint ¶ 21.  In *Midlantic Nat. Bank v. Hansen*, the Third Circuit held that a corporation conducting no business activities "has no principal place of business, and is instead a citizen of its state of incorporation only," specifically rejecting the Second and Fifth Circuits' findings that an inactive corporation retained its previous

principal place of business.  48 F.3d 693, 696 (3rd Cir. 1995).  The Third Circuit has stated that its standard "comport[s] with Congressional intent that courts not 'strain to locate a principal place of business when no such place in reality exists,' and that [its] 'bright-line' approach provided for certainty and clarity."  *Grand Union Supermarkets of Virgin Islands, Inc. v. H.E Lockhart Mgmt., Inc.*, 316 F.3d 408, 411 (3rd Cir. 2003) (internal citations omitted).

Merely "[m]aintaining corporate trappings or the qualifications required to potentially conduct business in the future is not enough; a corporation must **actually conduct business** for it to have a principal place of business."  *Grand Union*, 316 F.3d at 411 (emphasis in original).  Additionally, a corporation in the process of winding up is deemed to be a citizen **only** of the state of incorporation.  *See Gavin v. Read Corp.,* 356 F. Supp. 483, 486 (E.D. Pa 1973).  Defendants' strained interpretation of Plaintiff's residence is contradicted by authority in this Circuit.

Plaintiff was an inactive company at the time the Complaint was filed.  On June 6, 2021, the Company sought chapter 11 bankruptcy protection in the Bankruptcy Court.  Complaint, p. 1, n. 1.  On October 21, 2021 the Bankruptcy Court entered the Confirmation Order.  Complaint ¶55.  Pursuant to the Confirmation Order, Katerra Delaware, as one of the Debtors, solely exists for purposes of winding down and is deemed to have withdrawn its business operations.  Specifically, the Confirmation Order states, in relevant part, that:

> Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (a) **for all purposes shall be deemed to have withdrawn their business operations from any state or country** in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations…

*See* Declaration of Sidney S. Liebesman ("Liebesman Decl."), Exhibit A at ¶98 (emphasis added).[4]

---

[4] The Confirmation Order is specifically referenced in the Complaint.  Accordingly, Plaintiff requests the Court take judicial notice of the publicly-filed document, as well as the other publicly-filed documents attached to the Liebesman Decl.  *See Nicholas v. Nat'l Union Fire Ins. Co.*, 2013 WL 1143514, at *3 (Del. Super. Ct. Mar. 19, 2013) ("[T]he Court may take judicial

The Confirmation Order bars Plaintiff from doing any business activity other than winding down and, therefore, is an inactive company.  Thus, under the Third Circuit's established standard, Plaintiff does not have a principal place of business and is solely a citizen of the State of Delaware.

Defendants argue that *Hansen* is no longer good law because the Supreme Court changed the test for a principal place of business from the "center of corporate activities" test to the "nerve center" test in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010).  However, *Hertz* did not implicitly or directly overrule *Hansen*.  *See id.*  *Hertz* provides that a "nerve center" is where "the officers direct, control and coordinate all activities…in furtherance of the corporate objective."  559 U.S.at 89.  From this definition, it is evident that an inactive or bankrupt corporation would not have an active "nerve center" to serve as its principal place of business.  This is consistent with the reasoning in *Grand Union* and *Hansen*, which provides that courts should not create a principal place of business where one does not exist.  Further, since *Hertz* was decided, courts in this Circuit have continued to cite to *Hansen* as good law.  *See Citron v. EZTD Inc.*, 2020 WL 3542332, at *3 (D. Del. June 30, 2020); *Wolman v. Petro Technik, Inc.,* 2011 WL 5082237, at *8 (D.N.J. Sept. 16, 2011).  Defendants ask this Court to ignore its own Circuit's precedent in favor of the Second and Fifth Circuits – citing cases that, under the Defendants' logic, would also have been overturned by *Hertz* as these cases also operated under the now overturned "center of corporate activities" test.  *See* D.I. 51 at 7 (*citing Circle Indus. USA v. Parke Contr. Grp., Inc.*, 183 F.3d 105, 108 (2d. Cir. 1999) and *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992)).

### B.    Delaware has Personal Jurisdiction Over Katerra Cayman and Defendants.

The Complaint alleges that the Director Defendants are directors of Plaintiff.  At this stage of the case, that allegation must be accepted as true.  Even if the Court accepts Defendants' request

---

notice of publicly available facts that are not subject to reasonable dispute, such as the fact that statements were made in filings in other courts.").

that the Court consider their "outside the pleadings" arguments, the Court has personal jurisdiction

over the parties for all the reasons set forth below.

> 1. **Katerra Cayman's and the Director Defendants' Actions Taken Through Plaintiff Establish Minimum Contacts with the State of Delaware.**

The Defendants, with the exception of Marks and Solomon,[5] argue that this Court does not

have personal jurisdiction over them because, as they allege[6], they were only directors and officers

of Katerra Cayman which, as they argue, would not subject them to jurisdiction under Delaware's

Consent Statute, 10 Del. C. § 3114.  *See* D.I. 61 at 5; D.I. 54 at 8.  However, as set forth below,

the allegations of the Complaint establish that Katerra Cayman and Defendants established

minimum contacts with the State of Delaware under  10 Del. C. § 3104(c), the Delaware Long-

Arm Statute.  The Complaint sufficiently pleads that Plaintiff was created for the purpose of

entering into acquisitions, financing agreements, and incurring debt on behalf of Katerra Cayman.

Further, Plaintiff was the operating entity of the company and all officer and Board decisions at

Katerra Cayman were executed by Plaintiff.  Thus, the Complaint adequately pleads minimum

contacts under Delaware law.  *See* Complaint ¶¶ 66-68; 189-233 315-40, 522-26.

A finding of minimum contacts under § 3104(c) requires a nexus between the formation of

the Delaware entity and the cause of action asserted.  *See LaNuova D & B, S.p.A v. Bowe Co.*, 513

A.2d 764, 768 (Del. 1986).  "[I]n suits in which the incorporation of a Delaware subsidiary is an

integral component of the conduct giving rise to the cause of action, Delaware courts have

consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes

---

[5] Marks and Solomon, therefore, are not disputing that they served as directors of Plaintiff.
[6] Defendants improperly rely on facts outside of the pleadings to attempt to prove the Defendants were not on the Board of Plaintiff.

sufficient 'minimum contacts' with Delaware." *Wolfe & Pittinger*, §3.04[c][4].[7]

The Court of Chancery has held that a cause of action is sufficiently related to the entity's formation if the formation "set in motion a series of events which form the basis for the cause of action before the court." *Microsoft Corp. v. Vadem, Ltd.*, 2012 WL 1564155, at *7 (Del. Ch. Apr. 27, 2012). Delaware courts have interpreted the relatedness requirement broadly when the underlying claims involve the internal affairs of a Delaware entity. *Terramar Retail Centers, LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712, at *6 (Del. Ch. Aug. 18, 2017).[8] This is because "the creation of a legal entity creates a forum state public interest in the governance of that entity." *In re USACafes, L.P. Litig.*, 600 A.2d 43, 51 (Del. 1991). Delaware maintains a "significant and substantial interest in overseeing the conduct of [Delaware] corporate fiduciaries" and an "obligation [for this court] to provide ... a forum." *AG Res. Holdings, LLC v. Terral*, 2021 WL 486831, at *6 (Del. Ch. Feb. 10, 2021) (*quoting Sternberg v. O'Neill*, 550 A.2d 1105, 1125 (Del. 1988), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016)).

In *Papendick v. Bosch*, the non-resident defendant was found to have minimum contacts with the state of Delaware when it incorporated its wholly owned subsidiary to effect the purchase of equity in a third party corporation. 410 A.2d 148, 152 (Del. 1979). The plaintiff then sued for

---

[7] (*Citing Aeroglobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 439–40 (Del. 2005) (finding that a stock purchase agreement between a Delaware corporation and the subsidiary of international investment bank based in Bahrain—in which the international parent company created the Delaware subsidiary for purposes of entering into a contract, the parties selected Delaware law to govern the contract, and the parties planned for the subsidiary to purchase significant stock in the Delaware corporation—was sufficient to establish personal jurisdiction over the international parent company for purposes of a third party's claim that the stock purchase agreement tortiously interfered with the third party's contract rights).

[8] (Stating that "having engaged in conduct that involved the formation of a Delaware entity, [the foreign entity] should have reasonably anticipated that [its] actions might result in the forum state exercising personal jurisdiction over [it] in order to adjudicate disputes arising from those actions" and exercising personal jurisdiction over the foreign entity).

breach of contract arising out of the purchase of equity. *Id.* The Delaware Supreme Court found that this was sufficient to establish minimum contacts for the parent because "it was an integral component of its total transaction." *Id.*; *see also Rabkin v. Philip A. Hunt Chemical Corp.*, 547 A.2d 963, 966–67 (Del. Ch. 1986) (exercising jurisdiction over a nonresident corporation where the entity incorporated a Delaware subsidiary for the purposes of effectuating a merger between the nonresident corporation and other entity).

Here, Katerra Cayman and the Director Defendants created Plaintiff for the purpose of acting as the operating entity for Katerra, entering into acquisitions, financing agreements, and incurring debt on behalf of Katerra Cayman. Katerra Cayman incorporated Plaintiff for the purposes of funneling its debt through Plaintiff, paying its extensive compensation and perk packages to Katerra Cayman's Officers, and reaping the benefits for Katerra Cayman. *See* Complaint ¶¶66-68; 189-233 315-40, 522-26.

The Defendants' use of a Delaware corporation is more than just "mere ownership" and instead shows purposeful contacts with the state of Delaware. As a result, Katerra Cayman and Defendants have sufficient minimum contacts with Delaware in order to establish personal jurisdiction.

### 2. Katerra Cayman Is the Alter Ego of Plaintiff.

Further, Katerra Cayman was the alter ego of Plaintiff, the operating entity. As such, this Court has grounds to assert personal jurisdiction over each Director Defendant. "Under the alter ego theory of personal jurisdiction, the contacts of an entity with a particular forum can be attributed to another person or entity if the entity having the forum contacts is the mere alter ego of such other person or entity." *LivePerson, Inc. v. NextCard, LLC*, 2009 WL 742617, at *4 (D. Del. Mar. 20, 2009) (internal quotation marks and citation omitted). "Thus, the alter ego theory of jurisdiction requires a finding similar to piercing the corporate veil." *Id.*

14

Under this jurisdictional theory, a court can ignore the corporate boundaries if the court finds that an entity is a mere "alter ego" of another and extend its personal jurisdiction to the alter ego entity. *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 559 (D. Del. 1998).  In order to reach a parent corporation under alter ego theory, a plaintiff must establish some fraud, injustice or inequity in the use of the corporate form. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 266 (D. Del. 1989) (explaining that alter ego theory may apply where "there is a lack of attention to corporate formalities").

In considering whether a parent and its subsidiary are separate entities, a court should consider: "adequacy of capitalization, overlapping directorates and officers, separate record keeping, payment of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the subsidiary, and subsidiary authority over day-to-day operations." *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc*., 842 F. 2d 1466, 1476 (3d Cir. 1988); *see Upjohn Co. v. Syntro Corp.*, 1990 WL 79232, at \*4 (D. Del. Mar. 9, 1990); *Mobil Oil Corp.*, 718 F. Supp. at 266; *Akzona Inc. v. E.I. Du Pont De Nemours & Co*., 607 F. Supp. 227, 237 (D. Del. 1984).

The alter ego determination is not something that should be considered on a motion to dismiss.  Where the plaintiff has sufficiently pled the requisite factors for alter ego liability, "[t]he nature and extent of the dominion and control exercised" by the defendants "is a question of fact, not subject to resolution on a motion to dismiss." *Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462, 473 (D. Del.  2010); *see also In re Buckhead America Corp.*, 178 B.R. 956, 975 (D. Del. 1994).

The Complaint plainly establishes alter ego jurisdiction. Plaintiff had no independence from Katerra Cayman.  The overlap and lack of independence between the entities is established

15

by the following:

- Katerra Cayman was the sole owner and parent company of Plaintiff. Complaint ¶ 21.

- Marks was the CEO and director of Plaintiff while at the same time he was the director and second largest stockholder in Katerra Cayman. Complaint ¶ 22.

- Solomon served as Secretary, Treasurer, and CFO of Katerra Cayman but was paid by Plaintiff. Complaint ¶30.

- Directors of Katerra Cayman treated Plaintiff as a revolving door for Officer positions or as a way to pay its own Officers. Brad Knight was on the Board of Katerra Cayman from November 2015 to March 2017 and then subsequently became employed by Plaintiff in March 2018. Complaint ¶39. Paal Kibsgaard at one time served as COO and CEO of Katerra with his salary being paid by Plaintiff. Complaint ¶31. Marsh who served as CEO of Katerra Cayman from September 2019 to September 2020 was actually employed and paid by Plaintiff. Complaint ¶29

- All day-to-day management fell to Marks who was not only CEO of Plaintiff but also the controlling member of the Board of Katerra Cayman and on the Board of Plaintiff. *See* Complaint ¶ 22.

- As the operating entity, any decisions of the Katerra Cayman Board were executed by Plaintiff. There is no record of any meetings of Plaintiff's Board because Defendants treated both entities as one and the same.

Katerra Cayman used Plaintiff to incur large amounts of debt, such as the Greensill Agreement to fuel its careless acquisition spending. Accordingly, the Complaint has sufficiently alleged that Katerra Cayman is the alter ego of Plaintiff such that personal jurisdiction exists over the Defendants.

### 3.     Plaintiff Was an Agent of Katerra Cayman.

Alternatively, this Court has grounds to assert personal jurisdiction on an agency theory, pursuant to which the court "may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard*, 997 F. Supp. at 560. Courts look to the following factors in determining if an agency relationship exists between the parent and subsidiary: "the extent of overlap of officers and directors, methods of financing,

16

the division of responsibility for day-to-day management, and the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Applied Biosystems v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991).

The requisite "evidence of agency required at the pleading stage is minimal....Although this corporate closeness may not be sufficient to succeed on agency theory at later stages in litigation, it is sufficient to survive a motion to dismiss if the parties are properly and individually identified." *T-Jat Sys. 2006 Ltd. v. Expedia, Inc.*, 2017 WL 896988, at *6 (D. Del. Mar. 7, 2017); *see Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 F. App'x 803, 808 (3d Cir. 2003) ("[Plaintiff] must allege facts sufficient to allow such a relationship to be proven at trial, but it is not required to have extensive proof at the complaint stage."); *Intellectual Ventures I LLC v. Toshiba Corp.*, 66 F. Supp. 3d 495, 499 (D. Del. 2014) (regarding allegations of an agency relationship between a corporate parent and its subsidiaries, "[t]he court must take plaintiffs' factual allegations as true, especially where, as here, the information resides with defendants who, in turn, have provided only a general denial of infringement rather than facts about the organization and relationships between the various defendant entities").

For the reasons asserted above, Katerra Cayman and the Director Defendants exercised complete control over Plaintiff and caused Plaintiff to act as their agent for entering numerous conflicted transactions and irresponsible acquisitions.

### C.     Schick Is Subject to Personal Jurisdiction in Delaware Because He is Considered An Officer Under Delaware's Consent Statute.

In addition, Schick argues that under the Consent Statute, this Court lacks jurisdiction over him because he was the President of Katerra Materials, a division of Katerra. Notably, Schick does not deny that he was an officer of the Company. Instead, he relies on *Gantler v. Stephens*,

2008 WL 401124, at *7 (Del. Ch. Feb. 14, 2008), a case in which the Court of Chancery concluded that an employee whose job titles included "chief compliance officer and corporate secretary" was not an "officer" as that term is defined in the Consent Statute. *Gantler*, however, is distinguishable from the facts relating to Schick's role at Katerra. *Id.*

In *Gantler*, the Court of Chancery correctly found that neither "chief compliance officer" nor "corporate secretary" is listed among the eight "officer" positions identified in the Consent Statute: "president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer." *Gantler*, 2008 WL 401124 at *7, (*quoting* 10 *Del. C.* § 3114(b)).  Here, by contrast, Schick's title of President of Katerra Materials is not analogous to the "chief compliance officer" or "corporate secretary" titles the Court of Court found insufficient in *Gantler* because those titles were completely absent from the Consent Statute's definition of "officer."  While the Consent Statute specifically lists certain positions with the word "officer" in their title—for example, chief operating officer and chief financial officer— "chief compliance officer" is not among them.  However, the Consent Statute contains no similar qualifier on the "president" position.  Plainly, Schick's title of President of Katerra Materials has meaning.  Accordingly, the Court should find that Plaintiff has sufficiently pleads that Schick is an officer under the Consent Statute for the purposes of defeating Schick's motion to dismiss.

## III.   PLAINTIFF SUFFICIENTLY PLEADS DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES.

### A.   The Complaint Does Not Contain Improper Group Allegations.

Contrary to Defendants' assertion, it is not "impermissible per se for a plaintiff to refer to multiple defendants collectively in a complaint." *TriDiNetworks Ltd. v. NXP-USA, Inc.*, 2020 WL 2514086, at *1 (D. Del. May 15, 2020).  Defendants incorrectly frame the allegations of the Complaint as "group pleading" against multiple defendants, when, in fact, Plaintiff is asserting

136824253.1

claims against Defendants for their collective participation in the wrongful conduct.

A complaint which "collectively refers to defendants" is permissible "if it can be reasonably inferred that each and every allegation is made against each individual defendant." *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, 2021 WL 2036671, at *4 (D. Del. May 20, 2021) (*report and recommendation not adopted on other grounds* by 2021 WL 4350591, (D. Del., Sep. 24, 2021)) (*quoting Groove Digit., Inc. v. King.com, Ltd.*, 2018 WL 6168615, at *1 (D. Del. Nov. 26, 2018)).   "[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."  *Midwest Energy*, 2021 WL 2036671, at *4 (*quoting Ausco Prods., Inc. v. Axle, Inc.*, 2020 WL 7028521, at *2 (W.D.N.Y. Nov. 30, 2020)).

In *Midwest Energy*, this Court determined that the allegations against 16 separate moving defendants were "sufficiently clear and plausible," where each was individually named but collectively alleged to have participated in varying forms of patent infringement.  2021 WL 2036671, at *4.  The Court noted that "to be sure, in describing those infringing acts, the [Second Amended Complaint] sometimes lumps together these 16 Defendants with other Defendants.  But paragraph 213 provides **sufficient notice** to these Defendants of what they are alleged to have done." *Id.* (emphasis added); *see also Adobe Sys. Inc. v. Blue Source Grp., Inc*., 125 F. Supp. 3d 945, 964 (N.D. Cal. 2015) (finding that where plaintiff defined "Defendants" as inclusive of all defendants and where the gravamen of plaintiff's allegations was that all defendants infringed on the trademarks and copyrights, complaint provided sufficient notice).

Thus, the key issue is whether the Complaint sufficiently puts each of the Defendants on notice of the allegations against them.  Here, Defendants cannot credibly argue that they are not on notice of "what they are alleged to have done."  *Id.*  The Complaint defines Officer Defendants

19

and Director Defendants by enumerating the specific individuals in each group "to the extent each such defendant was an officer/director of the Company at the time of the specified conduct." *See* Complaint ¶¶ 44-45.  All Defendants are included in either the group of Officer Defendants or Director Defendants.  Certain allegations in the Complaint refer to the Defendants by these terms because they refer to collective conduct, as in *Midwest Energy*.  For example, the Complaint alleges that:

- "**The Officer Defendants**, especially Marks and Marsh, intentionally pressured subordinates at various business units, including Renovations and Katerra West ("Katerra West"), to meet financial targets at least through fiscal years 2018, 2019 and the first half of 2020…" (¶ 352);

- "…**the Officer Defendants** oversaw and promoted multiple material violations of Generally Accepted Accounting Principles ("GAAP")" (¶ 356);

- "Katerra's key executives, including but not limited to the **Officer Defendants**, were aware of the improper manipulation of the Company's financial statements. Nevertheless, the **Officer Defendants**, specifically Marks, Marsh, and Solomon, falsely represented to the Company's auditors, Deloitte, in connection with the 2018 and 2019 financial statements that the Company had complied with GAAP in preparing its financial statements (¶ 376);

- The false and misleading financial statements were the direct result of the pressure placed by the **Officer Defendants**, especially Marks and Marsh, to meet unrealistic financial forecasts and manage earnings (¶ 384);

- "Led by Marks, the **Director Defendants** (defined *infra*) approved acquisitions without conducting sufficient diligence, reviewing historical financial information, or even negotiating the purchase price (¶ 16);

- The **Director Defendants**' willingness to approve related-party transactions in which Katerra directors, namely Marks, Davidson, and Wolff, had financial interests in both sides was a clear conflict of interest and breach of their duties of loyalty and care, which led directly to Katerra's precipitous downfall…" (¶ 69);

- "None of the **Director Defendants** took steps to re-constitute the Audit Committee following Davidson and Marks' admissions in March 2020 that the Audit Committee was never active" (¶ 153); and

- "The **Director Defendants** and other directors of Katerra had knowledge that various officers were consistently failing in their responsibilities as top management executives

20

to the Company and that as a direct result of these failures, Katerra was steadily bleeding money" (¶ 177).

The paragraphs above are a small sample of the allegations throughout the Complaint that make specific and separate allegations against Defendants using the defined terms, Officer Defendants and Director Defendants or, when allegations applied to both groups, Defendants. The claims made against the Director Defendants or the Officer Defendants apply to collective conduct of the directors and officers of Katerra; thus individual Defendants do not need to be specifically identified. *See Shaev v. Baker*, 2017 WL 1735573, at *10 n.8 (N.D. Cal. May 4, 2017) (not requiring director-by-director allegations where allegations pertained to actions of the whole board or of a specific committee). In addition, the Complaint identifies by name and makes numerous detailed allegations against individual Defendants.

The instant Complaint is unlike the pleading in *Genworth Fin., Inc. Consol. Deriv. Litig.*, 2021 WL 4452338, at *22 (Del. Ch. Sept. 29, 2021), a case cited by various Defendants for the proposition that group pleading is insufficient. In *Genworth*, plaintiff defined a group of defendants as "Executive Defendants" but then never again mentions the term elsewhere in the complaint. To the contrary, Plaintiff makes allegations against Director Defendants, Officer Defendants and the individual Defendants throughout the Complaint. Because such terms are defined, Defendants are on notice of what particular allegations applies to each of them. The Complaint alleges the specific period of time that each Defendant served in his or her role at Katerra, which gives such Defendant adequate notice of the claims against them.

While Plaintiff's pleading of "Officer Defendants" and "Director Defendants" is sufficient to state a claim and put the defendants on notice, some Defendants still claim that no allegations have been made against them. To the contrary, the Complaint clearly alleges facts attributable to such Defendants. For example:

a. **Neil Mehta** was a member of the Board from March 20, 2017 to May 11, 2020.  During

that time, he was a member of a conflicted Board that was responsible for:

- Approving the related party AlgoSquare acquisition in which Katerra acquired AlgoSquare which was owned by its Directors, Marks and Bhardwai. *See* Complaint ¶¶259-64.

- Approving the related party acquisition of Construct Corps which is owned by Katerra Directors and Executives.  Marks was a majority investor in Construct Corps.  As a result, the Board was not disinterested. *See id.*  ¶¶265-68.

- Entering into numerous transactions with the Wolff Entities, owned indirectly by Directors Marks, Wolff, and Davidson.  It is estimated that by April 2019, these transactions had sustained losses of approximately $45 million. Regardless, the Board continued to enter into these transactions.  To make matters worse, the Board provided the Wolff Entities with secured discounts ranging from 13% to 15% which resulted in Katerra taking a guaranteed loss of at least 9% on all Wolff Entities transactions. *See id.*  ¶¶ 269-84.

- Authorizing the Side Letter in which Katerra agreed to deposit money with the Wolff Entities' lenders where the cost of work was to exceed the maximum price of the transaction.  *See id.*  ¶¶285-88.

- Establishing a fraudulent Audit Committee in 2018 which actually never met or carried out its designated function. The Audit Committee consisted of interested Directors and was not independent.  The Board was aware of this at the time. *See id.*  ¶¶ 149-55.

- Failing to maintain oversight over adequate financial statements and allowing the Company's financial reporting to worsen. *See id.*  ¶¶ 156-73.

- Approving the Lifebridge and Amberglen Transactions without a majority of disinterested Directors.  *See id.*  ¶298.

- Voting to increase the salaries and benefits of both Marks and Solomon whose performance was poor and heavily criticized. *See id.*  ¶¶224-30.

- Approving the Greensill Transaction on December 9, 2019.  *See id.*  ¶293.

- Allowing Katerra to undergo many costly and irresponsible acquisitions from 2017 to 2019.  The acquisitions amounted to over half a billion dollars while Defendants failed to do proper due diligence on the acquisitions throughout this period, instead leaving it to the full discretion of Marks.  *See id.*  ¶¶189-204.

22

b. **Adam Fisher** was a member of the Board from January 21, 2018 to June 7, 2019.

During that time, he was a member of a conflicted Board that was responsible for:

- Establishing a fraudulent Audit Committee in 2018 which actually never met or carried out its designated function. The Audit Committee consisted of interested Directors and was not independent.  The Board was aware of this at the time. *See id.* ¶¶ 149-55.

- Allowing Katerra to undergo many costly and irresponsible acquisitions from 2017 to 2019.  The acquisitions amounted to over half a billion dollars while Katerra failed to do proper due diligence on the acquisitions throughout this period, instead leaving it to the full discretion of Marks. *See id.* ¶¶189-204.

c.  **Lisa Picard** was a member of the Board from June 25, 2019 to September 1, 2020.

During that time, she was a member of a conflicted Board that was responsible for:

- Establishing a fraudulent Audit Committee which actually never met or carried out its designated function. The Audit Committee consisted of interested Directors and was not independent.  The Board was aware of this at the time. *See id.* ¶¶ 149-55.

- Failing to maintain oversight over adequate financial statements and allowing the Company's financial reporting to worsen. *See id.* ¶¶ 156-73.

- Approving the related-party Lifebridge and Amberglen Transactions without a majority of disinterested Directors.  *See id.* ¶ 298.

- Voting to increase the salaries and benefits of both Marks and Solomon whose performance was poor and heavily criticized. *See id.* ¶¶ 224-30.

d. **Ga-Lane Chen** was a Director from January 16, 2019 to March 12, 2019 and from

November 1, 2019 to October 1, 2020. During that time, he was a member of a conflicted Board

that was responsible for:

- Establishing a fraudulent Audit Committee which actually never met or carried out its designated function. The Audit Committee consisted of interested Directors and was not independent.  The Board was aware of this at the time. *See id.* ¶¶ 149-55.

- Failing to maintain oversight over adequate financial statements and allowing the Company's financial reporting to worsen. *See id.* ¶ 156-73.

- Approving the related-party Lifebridge and Amberglen Transactions without a majority of disinterested Directors.  *See id.* ¶ 298.

- Voting to increase the salaries and benefits of both Marks and Solomon whose performance was poor and heavily criticized. *See id.* ¶¶ 224-30.

**e. <u>Krishna Shivram</u>** was CFO of Katerra from January 2021 to May 2021.  During this time, Shivram was an Officer at Katerra who:

- Authorized and Orchestrated the transfer of $23 million from Katerra Middle East to Katerra Saudi Arabia with the understanding it was likely that they would not ever see repayment of the $23 million. *See id.* ¶¶ 128-35.

**f. <u>John Hui</u>** was a member of the Board from June 15, 2017 to January 16, 2019. Complaint ¶ 38.  During this time, Hui was a Director on a conflicted Board that was responsible for:

- Allowing Katerra to undergo many costly and irresponsible acquisitions from 2017 to 2019.  The acquisitions amounted to over half a billion dollars while Katerra failed to do proper due diligence on the acquisitions throughout this period, instead leaving it to the full discretion of Marks.  *See id.*  ¶¶189-204.

**g. <u>Matt Tachouet</u>** was an Officer of Katerra from June 19, 2020 to October 2020 and Vice President of Finance from October 2020 to present. During this time, he was an Officer who was responsible for:

- Signing the 2019 Management Representation Letter which stated the Company was not aware of any fraud while the Officers knew the Company was underbilling and having "accounting issues." *Id.*  ¶¶ 380-83.

As evidenced by the allegations above, the Complaint alleges sufficient specific facts against the individual Defendants.

**B.     Defendants' Exculpation Clause Argument Fails.**

In a stunning reversal of position, the Director Defendants next seek protection from the exculpation clause of the Certificate of Incorporation of Plaintiff, the very entity of which they claim they are not directors.  The Director Defendants cannot have it both ways, claiming their liability is limited under "Article VII: Directory Liability" ("<u>Article VII</u>") of Plaintiff's Certificate of Incorporation and also claiming that they were not members of the Plaintiff board.  For the

136824253.1

reasons set forth below, the Court should reject the Director Defendants' argument that the well-pled claims in the Complaint should be dismissed against them because of Article VII's exculpatory language.

### 1. The Existence of Exculpatory Language is an Affirmative Defense Not Available at 12(b)(6) Stage.

The Court should disregard Defendants' exculpation clause arguments in their entirety because they are premature and misplaced. The Third Circuit has set forth that "protection of an exculpatory charter provision appears to be in the nature of an affirmative defense. As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)." *In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005). Following the Third Circuit, this Court has declined to consider exculpatory clauses and denied motions to dismiss where defendants rely on such provisions as grounds for dismissal. *See In re Sportco Holdings, Inc.*, 2021 WL 4823513, at *7 (D. Del. Oct. 14, 2021) ("The Court need not address the Defendants' arguments concerning the exculpation clause because affirmative defenses, such as exculpation, may not be considered at the motion to dismiss stage"); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008) ("Because a section 102(b)(7) provision is in the nature of an affirmative defense and following the statement of the Third Circuit that such defenses will generally not form the basis of a Rule 12(b)(6) dismissal, defendants' motion to dismiss the duty of care claims is denied"); *Mervyn's LLC v. Lubert–Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 502 (Bankr. D. Del. 2010) (agreeing with other courts that an exculpation clause is an affirmative defense not to be raised as part of a motion to dismiss).[9]

---

[9] Marks attaches the Katerra charter containing the language in question to his motion to dismiss and asks that this Court take judicial notice of the document. Marks cites *In re Essar Steel Minn. LLC* as support for his judicial notice request. *See* 2019 WL 2246712, at *8 & nn. 11&15-17 (Bankr. D. Del. May 23, 2019). However, in *Essar*, the court expressly noted that it accepted articles of incorporation, in part, because the Trustee did not object. *See id.* at n. 11. Here, Plaintiff

Accordingly, the Court should decline consideration of the issue of the exculpatory clause in its entirety at this stage.

### 2.     Article VII Does Not Apply to Officers by Plain Language.

In the event the Court determines that Article VII can be considered on a 12(b)(6) motion, its plain language states that it applies to directors only: "To the fullest extent permitted by law, no director of the corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director." *See* D.I. 78, Declaration of Brad D. Sorrels ("Sorrels Decl."), Ex. 2, ¶ 1.

Both Marks and Kibsgaard argue that they should be insulated from liability by the exculpatory language in the charter, ostensibly because they both served as directors of the Company.  However, the Complaint expressly alleges that both Marks and Kibsgaard were officers of the Company. *See* Complaint ¶ 22 (Marks was CEO from January 22, 2015 to July 20, 2020); ¶ 31(Kibsgaard was COO from August 2019 to July 2020 and CEO from July 2020 to May 2021). Accordingly, Article VII does not apply to their conduct in their capacities as officers as a matter of law. *See In re Solutions Liquidation LLC,* 608 B.R. 384, 405 (Bankr. D. Del. 2019) (finding that exculpation clause did not apply to officers where provision "unambiguously limits the liability for the company's managers with no reference to the company's officers").

To be sure, as set forth further below, the Complaint alleges non-exculpated claims against both Marks and Kibsgaard in their roles as directors.  However, because the Complaint also asserts claims against them in their roles as CEO, COO, and CFO of Katerra, Article VII does not bar Plaintiff's claims against them as a matter of law.

---

expressly objects to the Court taking judicial notice of the charter on the grounds that the law in this Circuit is clear that the exculpation issue should not be considered at the 12(b)(6) stage.

### 3.     Article VII Does Not Limit the Director Defendants' Liability.

The Complaint adequately alleges that Director Defendants breached their duties of loyalty to Katerra.  Thus, even if the Court determines that Defendants' reliance on the exculpatory clause is not premature, the exculpatory clause does not insulate Defendants from liability.  *See In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at \*9 (Del. Ch. June 18, 2018) ("an exculpatory charter provision, however, does not apply to claims of breaches of the duty of loyalty"); *see also In re Evergreen Energy, Inc.*, 546 B.R. 549 (Bankr. D. Del. 2016).  Because Plaintiff adequately alleged breach of duty of loyalty and *Caremark* claims, the Court should deny the motions to dismiss as to Count One in their entirety.  "When a duty of care breach is not the **exclusive** claim, a court may not dismiss [the duty of care claim] based upon an exculpatory provision." *Evergreen*, 546 B.R. at 561(emphasis in original).

As set forth below, Plaintiff sufficiently alleged that the Director Defendants breached their duties of loyalty because they failed to act in the best interest of Katerra through self-dealing and misuse of their roles as directors and officers for personal gain. *See In re Autobacs Strauss, Inc.*, 473 B.R. 525, 562 (Bankr. D. Del. 2012).

### C.     Defendants Breached their Duties of Loyalty.

### 1.     Plaintiff Sufficiently Pleads That the Board Was Interested and Is Subject to the Entire Fairness Standard.

The business judgment rule presumption "can be rebutted by alleging facts, which, if accepted as true, establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of the company and all of its shareholders."  *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). To establish a board member lacked independence, a plaintiff must show that the directors "have a financial interest in the transaction or were dominated or controlled by a materially interested

investor." *Id.* "[I]f a board approves a transaction and at least half of the directors who approved the transaction were not disinterested or independent, it is subject to entire fairness review." *Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020).

When entire fairness review applies, this "conclusion normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss." *Orman*, 79 A.2d at 21 n. 36; se*e also Salladay* at *1 ("It is nearly as axiomatic that, where entire fairness is the standard of review, a motion to dismiss is rarely granted, because review under entire fairness requires a record to be meaningful"); *Klein v. H.I.G. Cap., LLC*, 2018 WL 6719717, at * 16 (Del. Ch. Dec. 19, 2018); *Hamilton Partners L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at * 12 (Del. Ch. May 7, 2014). "A determination of whether the defendant has met [its] burden will normally be impossible by examining only the documents the Court is free to consider on a motion to dismiss." *Orman*, 79 A.2d at 21 n. 36. "Even in the face of an exculpatory charter provision 'when a complaint pleads facts creating an inference that seemingly independent directors approved a conflicted transaction for improper reasons, and thus, those directors may have breached their duty of loyalty, the pro-plaintiff inferences that must be drawn on a motion to dismiss counsels for resolution of that question of fact only after discovery.'" *In re CBS Corp. S'holder Class Action & Derivative Litig.*, 2021 WL 268779, at *31 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021).

### a.      Complaint Adequately Alleges Lack of Independence.

Certain Defendants argue that Plaintiff has failed to rebut the business judgment rule because the Complaint does not allege that a majority of the directors were interested or concedes that certain directors, such as Hoopes and Picard, were disinterested. *See* D.I. 61 at 7; D.I. 66 at 9-10. This argument fails on multiple grounds.

First, as set forth above, the business judgment rule is not grounds for a dismissal on a 12(b)(6) motion. Second, even if the Court were to consider the business judgment rule, Plaintiff

28

pleads facts "sufficient to question the disinterestedness of a majority of the board of directors." *In re Troll Communications, LLC*, 385 B.R. 110, 119 (Bankr. D. Del. 2018) (finding that business judgment rule was not a basis to dismiss breach of fiduciary claim where complaint adequately pled that board members stood on both sides of transactions or were not independent).

Here, Plaintiff has established that 1) Katerra had voting agreements in place that guaranteed the Board would stay under Marks' control – and therefore conflicted, and 2) the Complaint includes various allegations calling into question the actions of the supposedly disinterested and independent Director Defendants.  At all relevant times during the numerous transactions with the Wolff Company, the Board was conflicted because at least half of the Board stood on both sides of the transaction.  Katerra had a voting agreement that ensured that no majority of the Board was disinterested in any Wolff transactions.  *See* Liebesman Decl., Exhibit B.  Marks, Wolff, and Davidson are interested directors in any Wolff transaction as they own stock in Paxion, Wolff's parent company.  Complaint ¶11.  Due to their aligned interests, Marks, Wolff, and Davidson voted to get approved numerous related party transactions for their own benefit. Complaint ¶¶12, 65, 69.  As detailed further below, Marks maintained complete control over the Board until 2020.

Under the Amended and Restated Voting Agreement dated July 15, 2017 (the "Voting Agreement"), there were to be seven directors:  Marks, Wolff, Foxconn Designee Hui, GreenOaks Designee Mehta, Davidson,  Kibsgaard, and a vacant seat to be filled.  *See* Liebesman Decl., Exhibit B.   Additionally, Davidson and Kibsgaard were required to vote together.  The Voting Agreement provided that Davidson and Kibsgaard, as the "Remaining Designees" were to vote "together as a single class on an as-converted basis."  *Id.*  As a result, Kibsgaard and Davidson had to be aligned in their votes meaning that Davidson's conflicts would – and did – influence

Kibsgaard who consistently approved the related party transactions with Wolff Entities.  *See* Complaint ¶¶282, 298.  From July 15, 2017 to December 20, 2018, at least four of the seven directors were interested in all Wolff Company transactions.

The Voting Agreement was amended and restated again in December 2018, where it called for an eight member board consisting of: Greenoaks Designee Mehta, Foxconn Designee Hui, SoftBank Designee Housenbold, Soros Designee Fisher,  Marks, Wolff, Davidson, and Kibsgaard. *See* Liebesman Decl., Exhibit C.  Consistent with the previous Voting Agreement, Marks, Wolff, Davidson, and Kibsgaard were all conflicted directors and, therefore, the Board remained interested in all Wolff Company transactions during this period.  *See id.*

While it is clear that the Voting Agreements allowed for Marks, Wolff, and Davidson to continue their total control over the Board, the Board was not disinterested as to the other transactions either, because Marks consistently maintained control over the Board.  Even those Directors who were supposedly independent failed to act as such.  The Complaint sufficiently alleges facts that call into question the independence and disinterestedness of the Director Defendants such as:

- The Director Defendants and other directors of Katerra knew that Marks was failing as a CEO but were hesitant to remove him because of his founder status, his reputation and his domination over the Board. *See* Complaint ¶¶ 179, 184.

- The Director Defendants approved agreements between Katerra and the Wolff Company, the latter of which was owned by Paxion, a venture capital firm founded by Marks, Wolff, and Davidson. *See id.* ¶¶ 10-11.

- The Director Defendants were aware of and approved numerous related party transactions with entities in which Marks, Davidson, Wolff, and Knight had an interest. *See id.* ¶¶ 250-88.

- The Complaint, citing an email from Marks to the Board dated March 16, 2020, alleges "there are only two truly independent directors, who are Lisa Picard and Jeff Hoopes. No other director is independent, because they are either investors in the Company or

members of management.  In addition, of those who may purport to be 'independent', there are conflicts of which we should all be aware."  *Id.* ¶ 154.

- The March 16, 2020 email further states that "Foxconn is currently in the market attempting to sell their shares, they have actively engaged in requesting Softbank not to invest in Katerra. So clearly, they are not doing what is in the best interest of Katerra, and they are conflicted because they have made it clear they just want to sell and get out. So they are not representing any shareholders who have any long term view." *Id.*

- Finally, the email sets forth that: "Jim Davidson is a principle [sic] in both Kandle and the Wolff Company (owned by Paxion) which is invested in the bulk of Katerra's legacy projects and is entirely US focused.  So when Jim talks about getting out of Saudi and India, and I quote "I don't give a shit about Saudi or India", that is of course a conflict because he is involved in real estate activities only in the U.S., so he is again not representing the views of investors who are not involved in US construction. . . . In addition, Jim Davidson is still actively engaged with Silver Lake Partners, where GIC is one of the largest investors.  So again, behind the scenes he has conflicts of interest." *Id.*

Such allegations establish the lack of independence and disinterestedness of **all** of the Director Defendants.

In addition to their alleged willingness to pander to Marks and his business interests, the Complaint alleges that Chen, Hui, and Yeung were all executives at Foxconn during the times they sat on the Katerra Board.  *See id.* ¶¶ 35, 38, 43.  The Complaint further alleges that Foxconn had a strategic relationship with Riverwood Capital, a venture capital firm started by Marks.  *See id.* ¶ 25.  The conflicted nature of Chen, Hui, and Yeung's positions on the Katerra Board are confirmed in Marks' March 16, 2020 email quoted above.  The Court should disregard Chen, Hui and Yeung's conclusory arguments that they were disinterested, as it is contradicted by the allegations of the Complaint.  Chen, Hui, and Yeung attempt to minimize the March 16, 2020 email by citing to *Rudd v. Brown*, 2020 WL 549526, at *12 (Del. Ch. Sept. 11, 2020), in which plaintiff asserts, in opposing a motion to dismiss, that an investor-appointed director prioritized the investor's interest over that of the company were "unsupported by well-pleaded facts in the Amended Complaint."  *Id.*  To the contrary, the instant Complaint, quoting an email from Marks, expressly

31

alleges that Chen, Hui, and Yeung, as Foxconn executives, were not disinterested and independent.

Hui's claim that he was "incentivized to act in the best interest of Katerra" (Dkt. 58 at 14), rather than looking to sell and get out as Marks states, is a fact-based dispute and cannot provide grounds for dismissal at this early stage in the case. *See Orman*, 794 A.2d at 31 (finding that plaintiff "pled facts that make it reasonable to question the independence and/or disinterest of a majority of the General Cigar Board" and denying motion to dismiss fiduciary duty claims).

In a footnote in his motion to dismiss, Kibsgaard cherry-picks an example of one transaction, the Greensill Receivables Facility, and claims that Plaintiff has failed to adequately allege that the Board was majority disinterested when it approved the loan. *See* D.I. 71 at 11, n.5. In the Complaint, Plaintiff alleges that at least fourteen months passed between the time that director Housenbold moved to replace Marks as a CEO and when the Board ultimately forced him out in May 2020. *See* Complaint ¶¶ 183, 188. The Complaint further alleges that the Director Defendants who were on the Board during this period, February 2019 to May 2020, had a loyalty to Marks, over Katerra, calling into question their independence and disinterestedness. The approval of the Greensill Receivables Facility occurred squarely during this period at the end of December 2019; accordingly, the Complaint establishes the lack of independence of all of the Director Defendants who approved the Greensill transaction.

Finally, the fact that the Complaint alleges that Hoopes and Picard were independent members of the Board does not defeat Plaintiff's breach of fiduciary duty claims. The Complaint alleged facts regarding Director Defendants' (including Hoopes' and Picard's) intentional disregard of their duties as directors of Katerra in failing to oversee or to address the red flags in the Company's business operations which were brought to their attention.

### b.    The Conflicted Transactions Harmed Katerra

Plaintiffs have alleged numerous well-pled facts that establish that the Director Defendants

136824253.1

approved conflicted transactions that harmed Katerra, including the following:

- The Director Defendants approved the purchase of Construct Corps, a labor staffing company, which had numerous ties to the Katerra, including Marks as a majority investor in Construct Corps who controlled operations and management of the company and Brad Knight served as CEO of Construct Corps prior to serving as Director and COO of Katerra post acquisition. Complaint ¶¶ 265-67. Marks personally received $200,000 from this transaction. *See id*. ¶ 268.

- The Company lost money on every project with the Wolff Entities. *See id*. ¶272. The April 2019 Loss Provision Discussion Memo estimated the Company lost approximately $45 million on Wolff projects. *See id*. ¶ 276.

- Katerra entered into a Most Favored Nation Pricing Agreement with the Wolff Entities which secured them a discount from 13% to 15% which caused Katerra to enter into these contracts at (or below) actual cost. *See id*. ¶¶ 232-83.

- Katerra entered into the Side Letter Agreement with the Wolff Entities which required Katerra to deposit money with the Wolf Entities where Katerra's cost of the work was forecasted to exceed the price. *Id*. ¶ 285. This resulted in a shift of the cost of work exceeding the price to Katerra regardless of the cause of the cost overrun and providing the Wolff Entities with no incentive to terminate below cost price contracts. *Id*. ¶¶ 286-87. This agreement was solely beneficial to the Wolff Entities and detrimental to Katerra. *See id*. ¶ 288.

- Katerra entered into the Lifebridge and Amberglen Transaction with the Wolff Entities for $164.7 million when the forecasted cost to Katerra was $425 million. *See id*. ¶¶289-90.

### 2. Plaintiff Sufficiently Pleads That the Directors and Officers Breached their Fiduciary Duties and Created Waste When They Paid Out Numerous Unreasonable and Unwarranted Compensations Packages and Perks.

Defendants Marks, Solomon, Kibsgaard, and Schick assert that Plaintiff does not plead the Board's compensation decisions involved self-dealing because a majority of the Board was not interested and their compensation was as the Company's Officers. This is incorrect as a matter of fact and law. While a Board fixing executive compensation is normally subjected to the business judgment rule, when there is a controlling shareholder involved, "it ought to provoke heightened judicial suspicion." *Tornetta v. Musk*, 250 A.3d 793, 797 (Del. Ch. 2019). "Delaware courts have

long recognized the risk to sound corporate governance posed by conflicted controllers and generally review these transactions for entire fairness." *Id.* at 798.

Additionally, "when a board fixes its compensations, it is self-interested in the decision because the directors are deciding how much they should reward themselves for board service." *In re Investors Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1217 (Del. 2017).   "[T]he board's decision will lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation." *Id.* (citations omitted).   "Self-interested compensation decisions are subject to the entire fairness standard of review, unless a 'fully informed, uncoerced, and disinterested majority of stockholders' has approved the compensation decisions and therefore ratified them." *Knight on behalf of Nominal Defendant Universal Health Services, Inc.*, 2022 WL 1233370 (Del. Ch. Apr. 27, 2022) (*citing Investors Bancorp, Inc. S'holder Litig.*, 177 A.3d at 1217.

In *Tornetta*, the court found that where the defendant was the controlling stockholder, exerted control over the board, and was deciding his own executive compensation for serving as an officer, the transaction was conflicted and subject to the entire fairness standard. 250 A.3d at 800.   The court reasoned that "[b]ecause the conflicted controller...is able to exert coercive influence over the board and unaffiliated stockholders, our law has required that transactions with conflicted controllers be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders." *Id.* at 800.   Similarly here, the Board's determination of executive compensation is subject to the entire fairness review.   As previously explained, Marks had complete control over the Board.   Any decision to provide executive compensation should be considered conflicted and subject to the entire fairness standard.

The compensation that Marks attempted to provide himself "as an officer" served as another front for funneling more of Katerra's assets to himself, abusing his authority as a director. In fact, the Board's decision to increase Marks' pay occurred after its members expressed dissatisfaction with his performance as an officer.  Complaint ¶¶ 226-27.  This perfectly exemplifies Marks' control over at least half the Board and his eagerness to provide himself a payout while he still had the chance.

 As set forth above, Kibsgaard was also at all times a member of the Board under Marks' control.  Plaintiff paid Solomon's salary. *See* Complaint ¶¶ 30, 224.  These circumstances do not support the application of the business judgment rule, but instead reveal conflicted controllers seeking to increase their compensation.  Because all of these officers are actually directors who would be conflicted in assigning their own compensation, they should not be afforded the same deference that generally applies to a board when assigning executive compensation.  Instead, the entire fairness standard should apply.

Further, officers can be found to have breached their duties of loyalty for accepting certain compensation packages they know are clearly improper.  *Knight*, 2022 WL 1233370, at *12. Under the "clearly improper" standard, Delaware courts have found that actions for breach of fiduciary duty for accepting compensation can survive a motion to dismiss where (1) the compensation awarded  was *ultra vires,* and  the  recipients  knew  it,  or  (2) where compensation was repriced advantageously in light of confidential and sensitive business information which the recipients knew, and which they accordingly used to the company's detriment.  *Id.*  This scienter standard is equivalent to a bad faith standard.  *Id.*  Plaintiff adequately pleads that Marks, Solomon, and Schick knew their compensation was improper based on the following allegations:

- In July 2019, Solomon was sidelined as CFO. However, Solomon demanded that she stay on Katerra's payroll for another five months, through December 31, 2019 and be paid an additional $500,000 "separation payment." Complaint ¶ 224.

- Both the Board and Marks' knew that Solomon's tenure as CFO rendered the Company financials a "disgrace," but approved the additional months of compensation and separation payment. *Id.* ¶225.

- Solomon freely used the companies' private jets for personal reasons. *See id.* ¶¶ 239-42.

- Between February 2018 and 2020, the Board raised Schick's compensation by $150,000 dollars even though he was later terminated for falsifying financial records and reporting at Katerra. *See id.* ¶¶ 222, 229.

- In February 2020, after the Board had continuously expressed concerns about Marks' leadership and the Board attempted to remove Marks from his role as CEO, Marks received an increase in executive compensation to $1,000,000 salary and a $687,500 bonus payment. *See id.* ¶¶ 226-27.

- The Board further granted Marks 5.4 million shares of stock. *See id.* ¶ 228.

The Director Defendants knew that Marks, Solomon, and Schick's compensation packages were vastly disproportionate to their responsibilities and not in line with their performance. Further, the Board was aware of their failings and granted the bloated raises and compensation packages because Marks controlled the Board. The entire fairness doctrine applies when directors have a self-interest in their own compensation and when an officer, who is also a controlling stockholder and director, gives his or herself a raise and millions of stock options. Finally, when officers accept compensation, he or she knows is impermissible, it can amount to a breach of the duty of loyalty. All of these things happened here. Due to the conflicted and unreasonable nature of the compensation, it would be inequitable to allow these officers to hide behind the business judgment rule.

### 3. The Complaint Adequately Alleges a *Caremark* Claim.

Because Defendants cannot overcome the Complaint's overwhelming assertions regarding

36

self-dealing, Defendants focus on the allegations regarding their lack of oversight and failure to monitor under *Caremark*, another feature of Plaintiff's breach of duty of loyalty claim.  As set forth below, Plaintiff adequately alleges facts stating non-exculpated *Caremark* claims against Defendants.

To state a Caremark claim, a plaintiff must allege particularized facts that establish either (1) the directors utterly failed to implement any reporting or information system or controls (a prong one claim), or (2) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention (a prong two claim). *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

On a 12(b)(6) motion, the Court's determination of whether a *Caremark* claim has been stated involves "drawing **all reasonable inferences** in favor of the Plaintiff… if it is **reasonably conceivable** that he may prevail." *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A. 3d 963, 981 (Del. Ch. 2013) (emphasis added) (*citing In re American Intern. Group, Inc.,* 965 A. 2d 763, 799 (Del. Ch. 2009)) (declining to dismiss a *Caremark* claim under Rule 12(b)(6)).  A plaintiff may still defeat a motion to dismiss even if plaintiff is not yet "able to tie all of the defendants directly with the specific facts to all of the schemes" and can only "**outline** the misconduct that occurred." *Id*. at 982 (emphasis added).

With respect to a prong one claim, the question is whether the board made a "good faith effort…to put in a place a reasonable board-level system of monitoring and reporting." *Marchand v. Barnhill,* 212 A.3d 805, 821 (Del. 2019) (citations omitted).  Delaware courts typically have sustained a prong one claim based on the plaintiff adequately alleging that there was no board level monitoring and reporting system or such a woeful system as to effectively constitute the absence

of one. *See, e.g., Hughes v. Xiaoming Hu*, 2020 WL 1987029, at \*14 (Del. Ch. Apr. 27, 2020) (holding that a prong-one claim was adequately alleged where the "complaint alleges facts that support an inference that the Company's Audit Committee met sporadically, devoted inadequate time to its work, had clear notice of [the financial irregularities at issue], and consciously turned a blind eye to their continuation"); *In re China Agritech, Inc. S'holder Deriv. Litig*., 2013 WL 2181514, at \*19 (Del. Ch. May 21, 2013) (holding that a prong-one claim was adequately alleged where, among other things, there was no "documentary evidence that the Audit Committee ever held a single meeting during [the] two year period" after the company had disclosed material weaknesses in its disclosure controls and procedures, suggesting that the Audit Committee "existed in name only"); *see also Rich*, 66 A. 3d at 983 (concluding that, despite existence of audit committee and independent auditor, the company "had no meaningful controls in place"); *Guttman v. Huang*, 823 A. 2d 492, 507 (Del. Ch. 2003) (observing that a *Caremark* claim might include "contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation"); *David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 WL 391931, at \*5 (Del. Ch. Feb. 13, 2006) (observing that "a plaintiff can allege that a board violated its fiduciary duty by utterly failing to exercise oversight of the corporation, such as by failing to assure the existence of reasonable information and reporting systems" which "might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet") (*citing Guttman*, 823 A.2d at 507).

Defendants argue that the Complaint alleges that a number of "controls" did actually exist,

e.g. the Audit Committee that never met, the high turnover of C-suite level executives, and the engagement of an external auditor (which was subsequently party to a SEC investigation). However, such "controls" were so inadequate that they were tantamount to an utter lack of monitoring by the officers and directors of the Company.

For example, though an Audit Committee was formed, the Complaint specifically alleges that Marks was aware and informed the other Defendants that the Audit Committee never met. *See* Complaint ¶¶ 148-53.  An Audit Committee that never met is not a "control."  An Audit Committee formed with a conflicted director as its head is not a "control."  Plaintiff set forth a lack of controls per *China Agritech*, *Rich*, and *Armstrong*.

Similarly, the Complaint devotes a section of allegations to the lack of procedures at Katerra Saudi Arabia, LLC ("KSA").  *See* Complaint ¶¶ 115-35.  Kibsgaard was aware of the high rate of cash burn at KSA, caused by the lack of procedures around invoicing, quality assurance, and logistics and the same issues were happening to Katerra in the United States.  *See id.* ¶ 127. Defendants failed to impose any internal controls or procedures with respect to estimating and bidding construction projects, resulting in substantial and ongoing financial losses.  *See id.* ¶¶ 13, 73, 14, 81, 100, 102, 104, 369-70.  Such allegations establish a prong-one *Caremark* claim.

As to prong two, a plaintiff may sufficiently plead this type of *Caremark* claim by alleging a "conscious failure to monitor is to identify 'red flags,' obvious and problematic occurrences, that support an inference that the…directors knew that there were material weaknesses in… internal controls and **failed to correct such weaknesses**."  *Rich*, 66 A.3d at 983.  (emphasis added).  In *Rich*, the court denied a motion to dismiss breach of fiduciary duty claims where the complaint alleged the board was aware that it had problems with accounting systems and financial statements, they were aware of the pervasive, fundamental weaknesses in the company's controls and

"knowingly failed to stop further problems from occurring."  *Id*. at 984.

The Complaint alleges that Defendants did not act in good faith by intentionally ignoring various "red flags" across various areas of Katerra's business operations, from estimating and bidding projects to acquiring new companies without performing sufficient diligence to creating false and misleading financial statements.  For example, the Complaint alleges that:

- Defendants willfully lacked oversight over Katerra's accounting practices, leading to years of false and misleading financial statements to be produced and disseminated to the Company's investors.  *See* Complaint ¶ 17.

- Defendants intentionally bid for new projects at a substantial loss under the guise of being a start-up business, resulting in huge losses and jeopardizing its business operations. *See id.* ¶¶ 14, 81, 102, 104, 369-70.

- Defendants were aware that the lack of financial controls was resulting in devastating financial consequences, but failed to act.  *See id.* ¶¶ 136-38.

- Marks knew (and informed the Board) that the Audit Committee was a farce and never met and neither Marks nor the Director Defendants took remedial measures *See id.* ¶¶ 151-53.

- Director Defendants knew that Marks was failing in his role but ignored his deficiencies because of his status as founder and his domination over the Board. *See id .* ¶¶ 179, 184.

- Director Defendants approved acquisitions knowing that due diligence was not performed on the target companies or negotiations conducted over the purchase price. *See id .* ¶¶ 198-99.

- Director Defendants approved the Lifebridge and Amberglen Transaction (1) knowing of the dire financial position it would place the Company in (2) knowing that Marks, Davidson and Wolff stood on both sides of the transaction and (3) after allowing Marks and Davidson to vote to approve the deal. *See id.* ¶¶ 292-303.

- Marks and Marsh intentionally ignored their fiduciary duties to Katerra and focused on pursuing side deals for their own benefit. *See id.* ¶¶ 447-82.

- The Officer Defendants, especially Marks and Marsh, intentionally pressured subordinates at various business units, including Renovations and Katerra West, to meet unrealistic imaginary financial targets at least through fiscal years 2018, 2019 and the first half of 2020 to falsely represent that Katerra was a viable, growing, and successful enterprise. *See id.* ¶¶ 17, 352, 373, 354-55.

- Marks and Marsh intentionally tried to hastily finalize the Deloitte audit, which did not contain information on the financial misstatements, in order to hide the recently uncovered financial misreporting. *See id.* ¶¶ 483-94.

In doing so, the Complaint states a non-exculpated prong two *Caremark* claim for breach of fiduciary duty against Defendants. *See Buckley v. O'Hanlon*, 2007 WL 956947, at *6 (D. Del. Mar. 28, 2007) (rejecting exculpatory provision argument where complaint alleged that defendants consciously disregarded warnings in auditor letters and ceased examining delinquent accounts); *see also Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins*, 2004 WL 1949290 at *15 (Del. Ch. Aug. 24, 2004) (finding the exculpatory provision did not insulate the directors from liability when they acted with knowing and deliberate indifference by approving a loan program without consideration, deliberation, or advice from an expert). The Complaint's allegations that Defendants engaged in such reckless and grossly negligent conduct defeat any contentions by Defendants that their business decisions are being critiqued in "hindsight" by Plaintiff (*see* D.I. 66 at 11-12).

## D.     Plaintiff Has Sufficiently Alleged Breach of Duty of Care.

"The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) 'use that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances;' and (2) 'consider all material information reasonably available.'" *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.*), 388 B.R. 548, 568 (Bankr. D. Del. 2008) (*quoting In re The Walt Disney Company Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)).

Defendants downplay the serious lapses in management and oversight alleged against them in the Complaint by characterizing them as "business judgment" choices, citing selective and mischaracterized allegations in the Complaint to minimize Defendants' grossly negligent conduct.

41

*See, e.g.* D.I. 51 at 10.  As a threshold matter, the business judgment rule is an affirmative defense that should not be considered at the motion to dismiss phase.  *See Shamrock Holdings, Inc. v. Arenson*, 456 F. Supp. 2d 599, 609-610 (D. Del. 2006) (finding breach of duty claim sufficiently alleged and stating that party is not required to "plead around" the business judgment rule at this stage in the proceedings); *see also In Re OPP Liquidating Company, Inc*., 2022 WL 774063, at *7 (Bankr. D. Del. Mar. 14, 2022) (declining to consider business judgment rule on motion to dismiss stage where complaint did not raise business judgment rule on its face).

Even if the Court were to consider the business judgment rule, the Complaint alleges that methods employed by Defendants were not merely strategic choices, but reckless decisions based on a lack of oversight and sheer inexperience in the construction industry.  *See In re W.J. Bradley Mortg. Cap., LLC*, 598 B.R. 150, 164 (Bankr. D. Del. 2019) ("a plaintiff can rebut the rule by showing that the fiduciaries "in reaching [their] challenged decision, violated any one of [the] triad of fiduciary duties: due care, loyalty, or good faith") (*quoting In re Troll Commc'ns*, 385 B.R. at 118).  Many of the Defendants rely on *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 216 (Del. Ch. 2009), in which the Chancery Court explains the rationale behind not holding directors and officers liable for taking business risks and getting "unlucky" in the results.  The allegations of the Complaint make clear that Katerra's Defendants were not "unlucky" but intentionally and grossly negligent in their management of the Company over a sustained period of time.

As set forth above, the Complaint contains numerous allegations as to Defendants' breach of the duty of loyalty, specifically with respect to their approval of transactions benefitting Marks and the other founders, Davidson and Wolf, as well as approval of excessive compensation and rewards to themselves.  *See* Section III(C)(2).  Thus, such allegations alone rebut the business

42

judgment argument.   However, the Complaint also includes allegations regarding Defendants' reckless conduct that go far beyond ordinary business decision-making and into willful failure to recognize and/or correct "red flags" in Katerra's business operations.  *See* Section III(C)(3).

Even assuming, as Defendants argue, the serious deficiencies in management and oversight set forth in the Complaint were mere strategic business decisions, the Complaint is replete with additional allegations that Defendants took no actions to correct course when they were aware of the significant losses Katerra was incurring as a direct result of these decisions.

The Complaint alleges various categories of conduct in which Defendants breached their duties of care.  In each of these categories, the Complaint adequately alleged that Defendants breached their duties of care, even under the standard of gross negligence applied by Delaware courts. *See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 192 (Del. Ch. 2005) (defining standard as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason").  The gross negligence standard is flexible in that the "exact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner."  *In re USA Detergents, Inc.*, 418 B.R. 533, 544 (Bankr. D. Del. 2009) (*quoting In re Fedders*, 405 B.R. at 540 (*citing Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 368 (Del. 1993)).

### 1.      Failure to Keep Informed About Katerra's Financial Condition.

The Complaint alleges facts demonstrating that Defendants willfully failed to keep themselves informed of Katerra's financial condition as the Company fell further and further into financial decline.  *See* Complaint ¶¶ 156-73.  Such allegations state a claim for grossly negligent conduct in breach of the Defendants' duty of care.  *See In re USA Detergents, Inc.*, 418 B.R. at 544.

Notwithstanding the Complaint's allegations that many of the Defendants considered

Solomon to be incompetent, the Complaint alleges that Solomon purposely remained in her position, shielding herself from financial information because she was "afraid." *See* Complaint ¶¶ 161-63.  The Complaint also alleges that Solomon failed to ensure financial forecasts were accurate or reliable.  *See id*. ¶¶ 165-68.  Delaware courts have determined that precisely these types of allegations state a claim for grossly negligent conduct. *See The Litigation Trust of MDIP, Inc. v. Rapoport*, 2004 WL 3101575, at *4-5 (D. Del. Nov. 29, 2004) (finding that officers and directors ignoring a lack of accuracy and reliability of financial statements or deficiencies in internal control and accounting systems are facts supporting a claim for breach of duty of care).  Solomon knew Davidson was not independent, given his affiliation with Katerra customers, Paxion and the Wolff Company. *See* Complaint ¶ 144.  Yet, Davidson was named as the head of the Audit Committee, despite the fact that "any member of the Audit Committee was required to be free from any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a Committee member." *See id*. ¶¶ 143-45.

In addition, contrary to the plain language of the Complaint, Marsh attempts to argue that the allegations against him do not rise to the level of gross negligence and even assert that he improved conditions at Katerra.  The citations provided by Marsh as support for this tenuous argument include critical assertions such as "Marsh intentionally pressured subordinates…to falsely represent that Katerra was a viable, growing and successful enterprise" (*id.* ¶ 352) by urging them to aggressively drive collections and increase billings (*see id.* ¶¶ 352-53); neutral claims like Marsh attended a Board meeting and gave a presentation (¶¶ 508-09); or compliments from Michael Marks (*see id.* ¶¶ 170, 173) some of which pre-date his employment.  Such allegations, which Marsh is citing as praise among the dozens of allegations which he seems to acknowledge accuse him of wrongful conduct, are a far cry from the factual findings which the court in *HH*

*Liquidation*, the case cited by Marsh, made following trial, regarding "extensive evidence that [a CEO] made every effort to work for [his company's] success." *In re HH Liquidation LLC,* 590 B.R. 211, 280 (Bankr. D. Del. 2018). Given 1) the significant disparity between the allegations in the Complaint against Marsh and the factual findings as to the *HH Liquidation* CEO and 2) the completely different procedural postures and standards of the cases (stating a claim under Fed. R. Civ. P. 8 versus the burden of proof at trial), the Court should reject Marsh's argument.

### 2. Failure to Recognize and Correct Egregious Estimating and Bidding Problems That Cause Severe Financial Losses.

The Complaint alleges that a critical breach of fiduciary duty by Defendants was their failure to ensure that an estimating procedure was in place to manage the costs associated with new construction projects. *See* Complaint ¶¶ 14, 81, 102, 104, 369-70. This precise type of conduct forms the basis for a well-plead duty of care claim that will survive a 12(b)(6) motion. In *In re Solutions Liquidation,* a trustee alleged that officers and directors failed to inform themselves that their company, an IT security firm, was underestimating client contracts and losing money by fulfilling the contracts and that they took no actions to correct the poor estimation process once they were aware of the problem. 608 B.R. at 403. The court found that the trustee met the pleading burden under the gross negligence standard by making such allegations. *Id*. Similarly, an officer or director's reckless expansion and overpayment for inventory forms the basis for a breach of duty of care claim. *See Autobacs*, 743 B.R. at 560.

Here, similar to the adequately pled duty of care claims in *In re Solutions Liquidation* and *Autobacs,* the Complaint alleges numerous facts against the Defendants that focus on their knowledge of the lack of spending controls, their undue focus on scaling rapidly and their failure to take any corrective actions despite being aware of the continual losses being incurred by Katerra. *See* Complaint ¶¶ 73-104.

45

### 3. Failure to Perform Due Diligence Prior to Acquisitions and Entry into the Greensill Receivables Facility.

Contrary to Defendants' assertions, the Complaint adequately pleads that Defendants plowed ahead with over half a billion dollars' worth of acquisitions at the same time that Katerra was failing to obtain new investment sources (¶¶ 189, 191), gave Marks sole authority and total control, with no oversight, to approve acquisitions up to $5 million (¶¶ 192-96), and sidelined the Head of Mergers and Acquisitions, Emily Mills, and forced her to rubber stamp deals at pre-approved prices and without allowing her to perform due diligence or engage in negotiations (¶ 198). The Complaint also alleges that Defendants consciously ignored significant red flags about companies they were acquiring such as balance sheets showing negative net assets, negative net working capital and projects operating at a loss (¶ 203).

Similarly, the Complaint alleges that Marks sought out the Greensill Receivables Facility at the end of 2019, when the Company was running out of money due to its uncontrolled rate of cash burn. *See* Complaint ¶ 67. The Complaint alleges that the Board approved the Greensill Receivables Facility without conducting due diligence on or an analysis of the transaction. *See id*. ¶ 68. The Complaint claims that the Director Defendants did not adequately assess the terms of the Greensill Receivables Facility, which provided for no more than five months of net borrowing availability based on the untenable structure of the Greensill Receivables Facility and the Katerra's borrowing needs. *See id*. ¶ 318. In addition, the Complaint asserts that "the unsuitability of the Greensill Receivables Facility with Katerra's business model and financial operations would have been obvious to the Director Defendants if they had conducted even a cursory review of the audited financial statements from 2017, 2018 and 2019." *Id.*; *see also* ¶¶ 315-337.[10]

---

[10] The Complaint further alleges that:

The Complaint does not merely claim that "Defendants did not adequately assess the terms" of the Greensill Receivables Facility.  Rather, the Complaint asserts that Defendants failed to engage in even the most cursory review of the terms of the facility, a burdensome debt which hastened Katerra's downfall.  Nor does the Complaint merely allege that Katerra overpaid for the acquisitions, as Defendants erroneously argue.  *See, e.g.,* D.I. 51 at 18-19.  Rather, Defendants willfully failed to inform themselves of critical data for acquisition targets that would have allowed them to determine whether the purchase prices were reasonable.  *See* Complaint ¶¶ 189-219.

Courts have repeatedly held that similarly pled facts are sufficient to state a fiduciary duty claim.  *See In re Fedders North America Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) (determining that plaintiff sufficiently pled facts to support a claim for the breach of duty of care by alleging that directors approved a loan transaction with various lenders without conducting the due diligence typically conducted by a borrower); *see also Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *8 (Del. Ch. Dec. 20, 2012) (gross negligence adequately alleged where plaintiff plead facts showing that the defendant "**willfully and consciously** ignored warning signs about those investments") (emphasis added); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 194 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007) (finding that

---

For example, the Statement of Operations for this three-year period just prior to Katerra's entering into the RPA, shows operating losses that grew from approximately $141 million to $769 million from 2017 to 2019.

In addition, the Statements of Cash Flows show that Katerra's Operating Activities burned through $119 million, $351 million and $787 million in cash for the years 2017, 2018 and 2019, respectively.

Clearly, as the Director Defendants should have recognized, a $440 million line of credit structured to require repayments within 90 days from advanced monies, was woefully insufficient to ensure Katerra's cash needs were met for any extended period.

Katerra began to rely on the Greensill advances, in some instances prior to the inception of a project, and fueled its operations by borrowing against future invoices. *See id*. ¶¶ 329-32.

breach of duty of care may be sufficiently stated by alleging board approved an acquisition without conducting due diligence, retaining advisors, and after holding only a single meeting with a cursory presentation).

In addition, Defendants' argument that the Court should disregard the Complaint's allegations supported by confidential witness testimony lacks merit.  The mere fact that the Complaint includes allegations arising from confidential witnesses does not disqualify them or render them conclusory.  For each confidential witness in the Complaint, Plaintiff describes the witness' role at Katerra.  *See* Complaint ¶¶ 74, 79, 97, 308.  The authority cited by Marks to make this point, *Shoemaker v. Cardiovascular Sys., Inc.*, 2017 WL 1180444, at *9 (D. Minn. Mar. 29, 2017), is an out-of-jurisdiction Private Securities Litigation Reform Act ("PSLRA") case, which imposes a heightened pleading standard.  The requirement that a plaintiff plead how a confidential witness "came into possession" of information is predominately restricted to such PSLRA cases. *See id.*; *see also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476 (D. Del. 2019) ("if a **securities fraud complaint** relies on allegations from confidential witnesses, then the complaint must describe the confidential witness with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (emphasis added).  Marks has provided no authority demonstrating why this case should be held to this heightened standard.  Accordingly, the Court should disregard this argument.

### E.   Tachouet Owes Fiduciary Duties to Katerra as its Controller.

Similarly, the Court should reject Tachouet's half-hearted attempt to extricate himself from this litigation based on his bald assertion that he "did not owe fiduciary duties to Katerra" even though he was the Global Corporate Controller of the Company.  D.I. 61 at 19.  Citing only to a single case from the Northern District of California, Tachouet makes the conclusory assertion that "[a] controller is not senior enough to be considered an 'officer' for these purposes."  *Id.*

A "controller" is among the "officer" positions listed in the Consent Statute.  *See* 10 *Del. C.* § 3114(b).  Thus, Tachouet's argument fails.  Further, his assertion that the claims against him should be dismissed because the Complaint's "allegations show only that Tachouet was fulfilling a functionary role—not that he was an officer or key managerial employee of Katerra" (D.I. 61 at 19) strains credulity.  Tachouet is asking this Court to believe that, as Global Corporate Controller of Katerra, he did nothing besides "receive[] a few emails" and "sign[] a management representation letter for Katerra's auditor."  *Id.*  To the contrary, the Complaint alleges that Tachouet was a key officer charged with signing Katerra's management representation letter and that he knowingly failed to disclose information about Katerra's financial misreporting to Deloitte.  *See* Complaint ¶¶380-83.  Further, the Court must "accept[] all well pleaded allegations in the complaint as true, and view[] them in the light most favorable to plaintiff…."  *In re Burlington Coat Factory Sec. Lit.*, 114 F.3d at 1420.  Here, the Complaint alleges that Tachouet, as a corporate officer, owed fiduciary duties to Katerra.

### F.   Plaintiff Successfully Pleads Corporate Waste.

The allegations of the Complaint state a plausible and actionable claim that Defendants engaged in waste of Katerra's corporate assets.  Under Delaware law, Defendants are guilty of corporate waste through their authorization of transactions that are "so one sided no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).  "The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes."  *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979).  To plead a claim of waste, Plaintiff must allege facts showing that no person of ordinary sound business judgment could view the benefits received in a transaction as a fair exchange for the consideration paid by the corporation. *Resnik v. Woertz*, 774 F.Supp.2d 614, 633 (D. Del. 2011)(*citing Michelson*, 407 A.2d

at 224).  A claim for waste survives a motion to dismiss if the court cannot conclude that "there is

no reasonably conceivable set of facts under which [the plaintiff] could prove a claim of waste."

*Michelson*, 407 A.2d at 224 (*citing Weiss v. Swanson*, 948 A.2d 433, 450 (Del. Ch. 2008).

        As detailed above in Section III(C) & (D), the Complaint alleges that the Directors

continuously and consistently entered into acquisitions for excessive prices (*see* Complaint ¶¶ 189-

204) for the benefit of other entities owned by Katerra Directors; entered into contracts at a deep

discount in which the Directors knew **they could never make a profit** by entering into the Side

Letter (*see id*. ¶¶ 285-88); and the Director Defendants continued to spend money on elaborate

perks, such as a private jet for personal use (*see id*. ¶¶ 237-44)  and NBA box seats (*see id*. ¶¶ 246-

49), even as the Company sunk further into insolvency and debt.   These facts as well as numerous

others alleged in the Complaint sufficiently pleads "a conceivable set of facts" that prove the

Defendants engaged in waste and therefore, the claim should survive Defendants' 12(b)(6)

motions.

## IV.   PLAINTIFF SUFFICIENTLY PLEADS THAT DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BASED ON DEFENDANTS' ACCOUNTING FAILURES.

        Several Defendants attempt to argue that the Complaint fails to assert a viable claim based

on the Defendants' accounting failures at Katerra.  *See* D.I. 51 at 13-17; D.I. 61 at 12-13; D.I. 58

at  8) (incorporating motions of other defendants); D.I. 55 at 10-13.  Defendants assert that Plaintiff

does not allege a material lack of accounting controls that caused harm to Katerra.  D.I. 51 at 13-

14.  The argument ignores the Complaint's allegations.

        For example, Marks states that the "Complaint alleges that Katerra's use of the percentage-

of-completion accounting method resulted in inaccurate estimates."  D.I. 51 at 14.  This is

incorrect.  Plaintiff does not blame the accounting method used; it blames Defendants' failures to

have controls and protocols in place.  "Percentage of Completion accounting can only be used

where a company can reasonably estimate the costs of a project ...."  Complaint ¶ 71.  From the Company's inception, Defendants failed to implement internal controls and procedures with respect to a core component of its business: the entry into construction agreements.  *See id.* ¶ 73. There were significant, i.e., material, process gaps in the way Katerra bid on and priced new work. *See id.* ¶74.  Katerra was committed to contracts without first obtaining estimates of costs and the project would go to field without an estimate or budget.  *See id.* ¶¶85-87.  Defendants were aware they had insufficient protocols in place (*see id.* ¶¶92-97) and the lack of such protocols was contrary to industry norms.  *See id.* ¶¶98-99.

Notwithstanding these facts, Defendants attempt to argue that the Complaint admits that controls were in place that worked.   However, Marks mischaracterizes the Complaint by referencing "controls" that did not function.  He construes the Complaint to state that he "pushed for more transparent financials."  D.I. 51 at 14 (*citing* Complaint ¶¶ 170, 172).  The Complaint alleges that Marks formed Katerra in 2015.  *See* Complaint ¶ 3.  Yet, four years later, in July 2019, the Complaint alleges, Marks admitted that "our finance organization is a disgrace.  We don't have the financial capability to provide us with what we need," leading him to not "trust" the financial numbers, making him "embarrassed."  *Id.* ¶ 170.  Beyond Marks' admission that four years after the Company's founding, financial controls were not in place, months later, "[b]y October 2019, the Company's financial reporting was worsening."  *Id.* ¶ 171.  Indeed, Marks admitted that he could not understand the financials, did not know what was happening with accounting issues, did not know if the accounting numbers he had just given the Board were even related to the actual finances and that the reporting was so bad that the Company misses "every number all the time" "the reporting isn't good, and the results are worse."  *Id.* ¶ 172.  Further, Marks was aware that the CFO was not preparing and issuing regular financial forecasts based on current and accurate

financial data. *Id.* ¶ 165.

Marks argues the Complaint admits accounting controls were in place because he "replaced the CFO" and flagged issues for the Audit Committee.  D.I. 51 at 14.  The assertion is ironic because those paragraphs actually state that the Board did not take its financial oversight "responsibility seriously" and that Marks knew that the Audit Committee had never met. Complaint ¶¶ 150-51.  He cites no authority supporting the proposition that replacing the CFO is a control on the Company's defective accounting practices.  Marks seeks credit for engaging a well-respected independent auding firm that "never withheld an opinion or failed to complete an audit."  D.I. 51 at 14.  Marks provides no citation to the Complaint for that statement because it cannot be found in the Complaint.  Instead, the Complaint specifically states that Marsh and Marks intentionally tried to push through the Deloitte audit in order to hide Defendants' financial misreporting.  Complaint ¶¶ 483-94.  Marks cannot create allegations in the Complaint that do not exist and does not get the benefit of an audit when he hid financial misreporting.  Finally, Marks argues that he "promptly" identified accounting incidents and raised them to the Board.  He cites to paragraphs (*See id.* ¶¶ 408-10) that show that even in 2020 – years after the Company was founded—Marsh and Marks still did not have confidence in the financial reporting.  This is not prompt, does not evidence controls were in place, and does not establish that the "controls" worked.

Marsh also misconstrues the Complaint.  He argues he played "an important role in *improving* Katerra's management and controls."  D.I. 51 at 12.  Yet, he cites to paragraphs in the Complaint that pre-date his employment (Complaint ¶ 170) or skips over all the factual allegations, cited above, concerning the financial mismanagement while he was CFO.

As for materiality, Defendants cherry pick a couple paragraphs in the Complaint to argue

that a misstated financial statement of $9.85 million is not material to Katerra.  D.I. 51 at 16.  First, the $9.85 million misstatement is an admission by Defendants and was not offered for the truth that the misstatement was only that amount.  *See* Complaint ¶443.  Indeed, Defendants' argument evidences that they **still** do not understand percentage of completion accounting.  *See id.* ¶¶ 357-69.  The Complaint sets forth that Defendants, at all material times, could not reasonably estimate costs or progress toward completion.  *See id.* ¶ 368.  Solomon tries to minimize Katerra's losses arguing that the 2018 and 2019 financial statements showed losses of $249 million and $223 million respectively.  *See id.* ¶ 369.  The Complaint, in detail, sets forth how Defendants oversaw and directed the manipulation of the Company's financial statements.  *See id.* ¶¶ 370-422.  Given that active manipulation, the losses reported on the financial statements are admissions of the lowest possible level of such losses – not admissions by Plaintiff that the losses are limited to the reported numbers.  Finally, Defendants hold up the fact that they self-reported to the SEC.  They gloss over the fact they admitted to the SEC that they did not have adequate controls in place and that they pressured those they supervised to meet "unrealistic" targets.  *See id.* ¶¶ 423-46.

Finally, Defendants assert that their misconduct did not harm Katerra.  To the contrary. Katerra was never profitable and had operating losses from $141 million to $769 million from 2017 to 2019.  *See id.* ¶¶ 530-33.  The Company experienced a total of approximately $2.78 billion in financial losses in 2018, 2019 and 2020.  Complaint ¶ 533.

Nor do the cited cases help Defendants.  For example, Defendants cite to *Cooke v. Oolie*, 2000 WL 710199, at *17 (Del. Ch. May 24, 2000) for the proposition that estimating costs and revenue of construction projects, when a company is innovating, is difficult and perfection is not the standard.  D.I. 51 at 14.  *Cooke* does not discuss estimating costs and construction revenue or the alleged difficulty of estimating costs for a company that is trying to innovate.  The Court in

*Cooke* merely stated, in a totally different context, that "directors' actions need not achieve perfection to avoid liability." *Id.* This is an unremarkable statement that has no bearing on the facts alleged here.

Marks also overstates the holding of the unreported decision of *Butorin v. Blount,* 2018 WL 4700217, at *5 (D. Del. Sept. 30, 2018), in which the Court dismissed a shareholder derivative action because the plaintiff failed to first make a demand on the board. Further, in stark contrast to  Katerra and the facts alleged in the instant Complaint, the plaintiff in *Butorin* detailed in the complaint the multiple controls that were in place and alleged that the directors and officers ignored only a limited number of red flags. *Id.* at *2, *6 (senior management received whitepaper briefs that included cost estimates and risk calculations before approving major projects; senior management approval required before entering a new construction contract without drawings; complaint specified risk management role of the Board and its Audit Committee; and "significant projects reviewed quarterly in detail by senior management" (at *2); yet "[f]ew, if any, 'red flags' are adequately alleged" (at *6)).  It is unclear why Defendants cite to *Trenwick*, 906 A.2d at 193 (explaining that there is no claim when merger approved by independent board members after thorough due diligence and with advice of outside independent professionals and separately approved by shareholder vote with no controlling shareholder).  The allegations in the Complaint here are materially different than those in *Butorin* and *Trenwick*.

## V.   PLAINTIFF'S COMPLAINT ADEQUATELY STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY TO CREDITORS.

Plaintiff's second cause of action alleges that "Defendants breached their fiduciary duties to Katerra's creditors by failing to exercise the care that an ordinary person would use under similar circumstances when the Defendants caused and/or allowed Katerra to engage in the wrongful acts despite that they were not in Katerra's best interests or the interests of its creditors."  Complaint ¶

54

559.  Under Delaware law, "the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).  To allege insolvency, "a plaintiff must plead facts showing that the debtor-corporation has either (1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof; or (2) an inability to meet maturing obligations as they fall due within the ordinary course." *In re Draw Another Circle*, 602 B.R. 878, 903 (Bankr. Del. 2019).  *See also Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (citations omitted) ("A plaintiff can plead insolvency through allegations that meet either the 'balance sheet' test or the 'cash flow' test. Under the balance sheet test, an entity is insolvent if it 'has liabilities in excess of a reasonable market value of assets held'"). Facts may be alleged in a complaint demonstrating insolvency, even where "insolvency" itself is not explicitly pled—though Katerra in fact **did** plead insolvency, as discussed below. *See, e.g.*, *In re Essar Steel* 2019 WL 2246712, at *6 (finding insolvency to be adequately pled, considering the facts alleged in the complaint, including "a staggering amount of debt and lack [of] a meaningful revenue stream"). In In alleging insolvency, "plaintiff must allege either that a corporation was insolvent or became insolvent as a result of the misconduct." *In re Tropicana Ent., LLC*, 520 B.R. 455, 471 (Bankr. D. Del. 2014) (*citing Trenwick America Litig. Trust*, 906 A.2d at 202).

Defendants further argue that the Complaint does not plead facts that Katerra was insolvent while they were with the company, ignoring paragraphs 527-533 of the Complaint.  Whether a company was insolvent is "**best left to discovery… and should not be decided on a motion to dismiss**." *In re Pennsaver USA Publ'g, LLC*, 587 B.R. 445, 459 (Bankr. D. Del. 2018) (determining that trustee plaintiff met pleading requirements by alleging that "Debtors were either

insolvent, or rendered insolvent; were engaged in business or transaction, or were about to engage in such business or transaction for which any property remaining with the Debtors was an unreasonably small amount of capital; or intended to incur debts that would be beyond the ability of the Debtors to pay as such debts matured") (emphasis added); *see also In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) ("insolvency is generally a factual determination not appropriate for a motion to dismiss").

Defendants argue that Count II should be dismissed for two reasons.  First, they argue that because Plaintiff's breach of fiduciary duty claim fails, the breach of fiduciary duty to creditors must also fail.  The Court should reject this argument because, as discussed above in Section III, Plaintiff has adequately stated a claim for breach of fiduciary duty.

Second, Defendants incorrectly argue that the Complaint does not plead facts showing that Katerra was insolvent while they were with the Company.  This argument entirely ignores the relevant legal standard: "plaintiff must allege either that a corporation was insolvent **or became insolvent as a result of the misconduct**." *Tropicana*, 520 B.R. at 471 (emphasis added).  Notably, none of the Defendants' briefs mentions this standard.

Here, the Complaint alleges that the Defendants' actions directly contributed to Katerra's downfall—i.e., Katerra became insolvent as a result of their misconduct.  As just one example, Plaintiff alleges that the Greensill Receivables Facility, which Marks approved during his tenure, ultimately led to Katerra's collapse:

- "On or about December 9, 2019, following unanimous approval by the Board, Katerra entered into a Receivable Purchase Agreement ("RPA") with Greensill, governing the terms of the Greensill Receivables Facility, in which Katerra would sell its receivables to Greensill."  Complaint ¶ 316.

- "The structure of the Greensill Receivables Facility plunged the Company further into financial distress and led to its ultimate demise, which the Director Defendants should

56

have recognized at the outset before causing the Company to enter into the RPA." *Id.* ¶ 317.

There are numerous other instances in the Complaint where the Plaintiff has alleged insolvency. *See, e.g.*, Complaint ¶¶ 19 ("Katerra's insolvency eventually forced it to file bankruptcy."); 527.  These allegations readily meet the relevant pleading standard requiring factual allegations that the Company "became insolvent as a result of the misconduct." *Tropicana*, 520 B.R. at 471.  If the Company met its "demise" due to Defendants' misconduct, then the Company certainly is unable to meet its "maturing obligations as they fall due within the ordinary course." *Draw Another Circle*, 602 B.R. at 903.  Indeed, Marks admits that "the Complaint affirmatively alleges that events occurring **after** Marks departed Katerra caused Katerra's downfall," thus tacitly admitting that the Complaint sufficiently alleges that Katerra became insolvent as a result of his misconduct. D.I. 51 at 27 (emphasis in original).

Defendants Hui, Chen, and Yeung advance a similar argument: that "Katerra was not insolvent while Messrs. Hui, Chen, and Yeung were directors."  D.I. 58 at 29.  However, unlike Marks and Picard, who argue that **the Complaint does not plead facts** showing that Katerra was insolvent during their tenures, Hui, Chen, and Yeung affirmatively assert that "**Katerra was not insolvent**" while they were with the company.  *See* D.I. 58 at 29.  It is improper for Hui, Chen, and Yeung to raise an issue of material fact in this manner at the pleadings stage.  *See Hydrogen Master Rights, Ltd. v. Weston,* 228 F. Supp. 3d 320, 335 (D. Del. 2017) ("The court cannot resolve on a motion to dismiss a factual dispute...."); *Falco v. Alpha Affiliates, Inc.*, 1997 WL 782011, at *4 (D. Del. Dec. 10, 1997) ("The purpose of a motion to dismiss is not to resolve disputed facts or to decide the merits of the case, but instead to test the sufficiency of a complaint.").  Hui, Chen, and Yeung further argue that:

In fact, the Complaint concedes that, by "the first quarter of 2021,

> the Company believed it was turning the corner financially," based on a new investment from Softbank. (Complaint ¶¶ 341-42.) By that point in time, Messrs. Hui, Chen, and Yeung were no longer Katerra directors, and the company remained solvent. (Marks Opening Br. at V.C.) This precludes their liability as a matter of law.

D.I. 58 at 29.

These statements are further attempts by Hui, Chen, and Yeung to introduce fact disputes and prevail on the merits at the pleadings stage. The Court should therefore disregard Hui, Chen, and Yeung's entire argument. In any event, the Complaint adequately alleges that actions taken by the Director Defendants (which include Hui, Chen, and Yeung) caused Katerra to become insolvent. *See* Complaint at, e.g., ¶¶ 19, 63, 68, 69, 102, 103-04, 177, 179, 250, 265, 269, 282, 289, 293, 296, 298, 317, 527, 530.

Defendants' reliance on *In re Tropicana Ent., LLC*, 520 B.R. 455 (Bankr. D. Del. 2014) and *In re Draw Another Circle*, 602 B.R. 878 (Bankr. Del. 2019) is misplaced. In *Tropicana*, the bankruptcy court dismissed the trustee's breach of fiduciary duty claim because the allegations of insolvency were conclusory, failing to allege facts showing that the debtor-corporation had either "(1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the fact thereof; or (2) an inability to meet maturing obligations as they fall due within the ordinary course." *In re Tropicana*, 520 B.R. at 471-72. Similarly, the bankruptcy court in *Draw Another Circle* dismissed the breach of fiduciary duty to creditors claim because the trustee's bare allegations of insolvency were based on a mere four paragraphs of conclusory factual allegations. *See Draw Another Circle*, 602 B.R. at 902-03. In stark contrast to the bald allegations of insolvency in *Tropicana* and *Draw Another Circle*, Plaintiff's Complaint here is rife with factual allegations from which the Court can reasonably infer that Katerra "was insolvent before any of the challenged transactions or that . . . the challenged transactions would,

when consummated, leave [the corporation] unable to satisfy its creditors." *Trenwick America Litig. Trust*, 906 A.2d at 202.  For example, the Complaint alleges the following:

- As detailed further below, Defendants engaged in a course of conduct that caused the Company to incur billions of dollars in damages in just a few years. . . . [A]s described *infra,* Katerra's Board of Directors breached their fiduciary duties to the Company and other interested parties to whom fiduciary duties were owed, Katerra's key executives breached their fiduciary duties to benefit themselves at the expense of the Company and the Company's auditor failed to properly audit the Company during the entire relevant time period. Katerra's insolvency eventually forced it to file bankruptcy. *See* Complaint ¶ 19.

- In their quest to broaden Katerra's footprint, the Defendants caused the Company to commit itself to projects for contract prices significantly below market rate. As a result, the Company experienced waves of staggering losses, as it faced significant cost overruns trying to complete projects for which it underbid. *See id.* ¶ 63.

- The Company also incurred losses on numerous jobs for the Wolff Company, pursuant to a contract which offered the Wolff Company a non-standard, highly-lucrative double digit discount. *See id.* ¶ 64.

- From the start, the Greensill Receivables Facility burdened the Company with significant costs that outpaced the money loaned by Greensill. In just a few months, the Company owed $440 million under the Greensill Receivables Facility. The Board approved the Greensill Receivables Facility without conducting sufficient due diligence on or analysis of the agreement with Greensill. Had the Board performed even a modicum of analysis, the Director Defendants would have realized that the facility had a short lifespan and an inadequate lending limit, which resulted in the Company becoming $440 million in debt to Greensill in a matter of months. *See id.* ¶ 68.

- The Director Defendants' willingness to approve related-party transactions in which Katerra directors, namely Marks, Davidson, and Wolff, had financial interests in both sides was a clear conflict of interest and breach of their duties of loyalty and care, which led directly to Katerra's precipitous downfall, as the Director Defendants caused the Company to enter into deals on terms that were highly unfavorable to Katerra. *See id.* ¶ 69.

- Despite its ready access to funding and innovative ideas, the Company never generated a profit, due to rapid cash burn, lack of internal financial controls, egregious mismanagement and a lack of expertise on the ground. *See id.* ¶ 70.

- The Company was committed to perform contracts for knowingly less than market price, thus guaranteeing an avalanche of loss-making projects, under the guise of being a start-up business and needing to scale its business rapidly. *See id.* ¶ 81.

59

- Marks estimated that "30% discount to market" on a project called 2.1 and a 40% discount on a project called K4 was "eminently doable." *See id*. ¶ 84.

- To the contrary, Marks, the CEO himself, was encouraging employees to underbid projects by as much as 40%. *See id*. ¶ 101.

- The Defendants intentionally jeopardized its business operations, by knowingly bidding for projects at a substantial loss. *See id*. ¶ 102.

- The losses incurred by Katerra, at the hands of the Defendants, not only caused the Company to become increasingly unprofitable, but in turn, trickled down to its subsidiaries, the individual companies which operated on a project-level basis. *See id*. ¶ 103.

- As a result of these loss drivers, which the Defendants were aware of but ignored, the Company entered into a never-ending cycle of higher costs to complete existing projects, delayed project timelines, and failure to earn a profit on an increasing number of contracts, most if not all of which were underbid. *See id*. ¶ 104.

- The KSA Transfer was subsequently approved, despite Kibsgaard, Shivram and Franich's knowledge that the "loan" would not be able to be repaid to the Company, which was suffering from its own liquidity crisis, given KSA's substantial losses. *See id*. 134.

- In the fourteen months between when Housenbold first raised the idea that Marks should be replaced to when he was forced to resign in May 2020, the Company continued to suffer millions of dollars in losses, at the hands of Marks. *See id*. ¶ 188.

- Marks' obsession with rapid growth led to the Company's acquisition of businesses at a cost of over half a billion dollars, approximately $528 million, during the Company's short existence. *See id*. ¶ 189.

- These acquisitions put significant financial strain on the Company at the same time that it was continuing to lose money from its backlog of construction projects, failing to obtain new investment sources, and exhausting the Greensill Receivables Facility. *See id*. ¶ 191.

- In addition, the sale of some of these companies following Katerra's bankruptcy filing in June 2021 further shows how the Company paid significantly over market value, as evidenced by the pennies on the dollar return. *See id*. ¶ 205.

- For example, Katerra purchased the United Renovations business for $59.7 million in April 2017 and sold it for just $1 million in July 2021. *See id*. ¶ 206.

- Similarly, the Company purchased Lord Aeck & Sargent, Inc. for $18 million in June 2018 and sold it for only $1.6 million in July 2021. *See id*. ¶ 207.

- The Company lost money on every project with the Wolff Entities, its largest customer. *See id*. ¶ 272.

- In fact, in an April 2019 Loss Provision Discussion Memo, the Company stated that the losses on Wolff projects had risen to approximately $45 million. *See id*. ¶ 273.

- The transaction was approved in December 2019, when the Company was also already in severe financial distress and had just entered into the Greensill Receivables Facility. Nonetheless, the Board made the decision to take on the financial liability of a massive, four-part construction project with a projected $425 million in development costs. *See id*. ¶ 293.

- The purchase required the Company, already in a liquidity crisis, to make an immediate $146 million payment to the Wolff Entities and ended a secure revenue stream from the Wolff Entities, as owner, for the construction of the four projects already underway. *See id*. ¶ 294.

- Notably, Katerra had already accrued $71.7 million in losses related to the Lifebridge and Amberglen projects by the date they acquired the property and the contracts. *See id*. ¶ 305.

- The structure of the Greensill Receivables Facility plunged the Company further into financial distress and led to its ultimate demise, which the Director Defendants should have recognized at the outset before causing the Company to enter into the RPA. *See id*. ¶ 317.

- At the time that Katerra entered into all of the transactions set forth herein and while the Defendants engaged in wrongful acts, Katerra was insolvent in that its total liabilities exceeded the fair value of its assets and/or was rendered insolvent as a result of these transactions. *See id*. ¶ 527.

- At the time that the Company entered into all of the transactions set forth in this Complaint, it was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with Katerra was an unreasonably small amount of capital. *See id*. ¶ 528.

- At the time that the Company entered into all of the transactions set forth in this Complaint, Katerra intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured. *See id*. ¶ 529.

- As a direct result of Defendants' mismanagement and self-interested conduct, the Company was never profitable and experienced consistent net losses. *See id*. ¶ 530.

61

- The Company's project backlog consisted of 147 unprofitable projects out of 428 active jobs as of April 30, 2021.  *See id.* ¶ 531.

- As shown below, Katerra's operating losses grow from approximately $141 million to $769 million from 2017 to 2019.  *See id.* ¶ 532.

- In fact, the Company experienced a total of approximately $2.78 billion in financial losses in 2018, 2019 and 2020.  *See id.* ¶ 533.

These allegations make clear that Katerra plummeted from a company that raised "almost $3 billion in the six years between its founding and the filing of the Petition" to one that "experienced a total of approximately $2.78 billion in financial losses in 2018, 2019, and 2020," while steadily losing hundreds of millions of dollars throughout its short lifespan by severely underbidding on projects, overpaying to acquire other companies, and otherwise entering into woefully unfavorable transactions.  Based on these factual allegations, the Court can reasonably infer that Katerra became insolvent because of the Defendants' misconduct.   Indeed, the Complaint's factual allegations of insolvency are similar to those at issue in *Quadrant Structured Prods. Co*, 102 A.3d at 177, which the Court of Chancery held were adequate under the balance sheet test.[11]

---

[11] "The Complaint's allegations support a reasonable inference that Athilon has been insolvent under the balance sheet test since before the EBF takeover.  The Complaint alleges that the Company started with only $100 million in equity capital, borrowed six times that much in the form of longterm debt, and then leveraged its equity capital another 500 times writing credit default swaps. The Complaint describes substantial payments that the Company made to unwind two unsuccessful swap transactions for mortgage backed reference obligations, starting with a $48 million payment in 2008 that wiped out half of the Company's equity capital, followed by a $320 million payment in 2010 that exceeded six times its remaining equity capital.  The Complaint explains that in light of the demise of the credit product company business model due to the financial crisis, the Company has no realistic prospect of returning to solvency.  The Complaint further explains that by the end of 2008, the Company and Asset Acceptance lost their AAA/Aaa ratings and entered runoff, and by August 2010, the Company and Asset Acceptance no longer had any investment grade debt or counterparty credit ratings.  Focusing on the September 2011 Financials, the Complaint alleges that the Company had $600 million of outstanding bond debt and assets with a fair saleable value of only $426 million. . . . These facts adequately plead insolvency under the balance sheet test." *Quadrant*, 102 A.3d at 177

## VI.     THE COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY.

Plaintiff's fifth cause of action alleges, in the alternative, that "[t]o the extent any named Defendant claims or asserts that she or he was not a director or officer of Katerra, such named Defendant" is liable for aiding and abetting the breaches of fiduciary duties committed by the Directors and Officers of Plaintiff."  Complaint ¶ 576.  The following defendants have asserted in their Motions to Dismiss that they were never directors or officers of Plaintiff, but rather were directors and/or officers of Katerra Cayman: Hoopes (*see* D.I. 61 at 5-6); Picard (*see* D.I. 66 at 7-8); Hui, Chen, and Yeung (*see* D.I. 58 at 5-7); Mehta (*see* D.I. 54 at 7); Fisher (*see* D.I. 54 at 7); Kibsgaard (*see* D.I. 72 at 8-9); and Shivram (*see* D.I. 69 at 4-5) (collectively, the "Aiding & Abetting Defendants").[12]  Accordingly, for purposes of resolving the Motions to Dismiss, Plaintiff will assume that Count V applies only to these Aiding & Abetting Defendants.

The Defendants advance two principal arguments as to why they believe the aiding and abetting claim should be dismissed.  First, they argue that the Court lacks personal jurisdiction over the Aiding & Abetting Defendants.  Second, they argue that the Complaint fails to state a claim for aiding and abetting breach of fiduciary duty.  For the reasons discussed below, the Court should reject these arguments.

### A.     This Court has Personal Jurisdiction Over the Aiding & Abetting Defendants.

Although Defendant Marks is not among those Defendants claiming to have only been an officer or director of Katerra Cayman (and thus he is not among the Aiding & Abetting Defendants), Marks nonetheless advances the argument (which the Aiding & Abetting Defendants incorporate by reference into their briefs) that the aiding and abetting claim should be dismissed

---

[12] Schick, who argues that the Court lacks personal jurisdiction over him "because the Complaint alleges Schick was president of a *division* of Katerra—not of Katerra itself" (D.I. 61 at 14), is among the "Aiding & Abetting Defendants."

because it "reaches conduct over which the Court lacks personal jurisdiction under the Consent Statute." D.I. 51 at 29. According to Marks, because the Consent Statute grants personal jurisdiction for claims against directors in their capacity as directors, Count V should be dismissed because it is expressly alleged "in the alternative" "[t]o the extent any named Defendant claims or asserts that she or he was not a director or officer of Katerra." *Id.* (quoting Complaint ¶ 576).

The rationale as to why this Court may exercise personal jurisdiction over the purported non-Delaware directors and officers discussed in Section II above applies with equal force here. Accordingly, for the reasons discussed in Section II, the Aiding & Abetting Defendants are subject to personal jurisdiction in Delaware.

### B. Plaintiff's Complaint Adequately States a Claim for Aiding and Abetting Breach of Fiduciary Duty.

The Aiding & Abetting Defendants assert that Count V fails to state a claim for two reasons. First, they argue that because Plaintiff's breach of fiduciary duty claim fails, the aiding and abetting claim must also fail. The Court should reject this argument. For the reasons explained in Section III above, Plaintiff's breach of fiduciary duty claim states a plausible claim for relief and should not be dismissed.

Second, the Aiding & Abetting Defendants make a conclusory argument that Count V fails to state a claim because Plaintiff did not adequately plead that they "knowingly participated" in the Delaware officers' and directors' breaches of their fiduciary duties. Contrary to the Aiding & Abetting Defendants' assertion, the Complaint sufficiently alleges knowing participation and therefore meets the pleading standard for an aiding and abetting claim.

Under Delaware law, "[a] third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty . . . if the third party 'knowingly participates' in the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). "To survive a motion to dismiss, the complaint

must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Id.*

The third element of "knowing participation involves two concepts: knowledge and participation." *Firefighters' Pension System of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021). "To establish knowledge, 'the plaintiff must demonstrate that the aider and abettor had actual **or constructive knowledge** that their conduct was legally improper.'" *Id.* (*quoting RBC Cap. Mkts, LLC v. Jervis*, 120 A.3d 816, 862 (Del. 2015) (emphasis added). Importantly, "a plaintiff can plead knowledge generally; there is no requirement that knowing participation be pled with particularity." *Id.* (citation omitted). "For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge." *Id.*

Further, "[t]o satisfy the requirement of participation, a plaintiff can plead that the third party 'participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue.'" *Id.* (*citing Malpiede*, 780 A.2d at 1098). "In particular, a third party can participate in a fiduciary breach by facilitating or inducing a breach of the duty of care." *Id.* (citation omitted). "A third party may facilitate a breach by misleading the fiduciary with false or materially misleading information." *Id.* "Or a third party can facilitate a breach by withholding information in a manner that misleads the fiduciary on a material point." *Id.*

Here, the Complaint is rife with factual allegations supporting the reasonable inference that the Aiding & Abetting Defendants "had actual or constructive knowledge that their conduct was legally improper" and "participated in the board's decisions, conspired with [the] board, or

65

otherwise caused the board to make the decisions at issue." *Presidio*, 251 A.3d at 275.  As stated in Count V, the Aiding & Abetting Defendants knowingly participated in the other Defendants' breaches of fiduciary duty "each time they approved an improper insider transaction, failed to take action to stop the creation and distribution of false financial statements, failed to fully inform other Defendants of knowledge they had with regard to the wrongful conduct detailed in [the] Complaint and acted in their own personal interest to the detriment of Katerra."  Complaint ¶ 577.  These instances of aiding and abetting are detailed at length throughout the Complaint.  For example, the Complaint alleges that:

- The Director Defendants' willingness to approve related-party transactions in which Katerra directors, namely Marks, Davidson, and Wolff, had financial interests in both sides was a clear conflict of interest and breach of their duties of loyalty and care, which led directly to Katerra's precipitous downfall, as **the Director Defendants[13] caused the Company to enter into deals on terms that were highly unfavorable to Katerra**.  Complaint ¶ 69 (emphasis added);

- [I]n and around February 2021, **Kibsgaard, Shivram**, and Brendan Franich ("Franich"), Vice President of Legal, orchestrated the transfer of an intercompany loan of approximately $23 million to KSA for the purposes of keeping KSA in compliance with a net worth covenant in one of its loan agreements…. The KSA Transfer was subsequently approved, despite **Kibsgaard, Shivram** and Franich's **knowledge that the "loan" would not be able to be repaid** to the Company, which was suffering from its own liquidity crisis, given KSA's substantial losses. *Id.* ¶¶ 129, 134 (emphasis added);

- **Kibsgaard**, who started as a director of Katerra in 2016 and eventually stepped in as CEO in July 2020, was aware of the problems plaguing the Company. In an interview on July 2, 2021, Kibsgaard stated that when he became CEO, he already **knew the Company had a problem with poor internal controls** and the Company had a number of jobs that were loss-making. Thus, since 2016, **Kibsgaard had knowledge** that the Defendants' failure to adequately monitor the Company's operations was directly resulting in devastating financial consequences, **but did not take remedial steps**. *See id*. ¶ 137 (emphasis added);

---

[13] The defined term "Director Defendants" in the Complaint includes the following Aiding & Abetting Directors: Chen, Hoopes, Fisher, Hui, Kibsgaard, Mehta, Picard, and Yeung.

- The **Director Defendants** and other directors of Katerra **had knowledge** that various officers were consistently failing in their responsibilities as top management executives to the Company and that as a direct result of these failures, Katerra was steadily bleeding money. *Id.* ¶ 177 (emphasis added);

- The **Director Defendants** and other directors of Katerra **knew** that Marks was failing in his role as CEO but tolerated his deficiencies because of his domination over the Board, as well as his status as founder and chief operating decision maker of Katerra. *Id.* ¶ 179 (emphasis added);

- In May 2018, the Company completed its acquisition of Fields Hi-Rise Construction Company, LLC ("Fields"), a New Jersey-based company that provided residential and commercial construction services, for approximately $167 million.  209. The acquisition was **unanimously approved** at a Board meeting on April 30, 2018 by Marks, **Kibsgaard**, Davidson, Wolff, **Mehta, Hui**, Housenbold, and **Fisher**.  210. Confidential Witness 3 stated that the Fields acquisition was particularly egregious, as it amounted to a 10 to 12 market multiple, which was far in excess of the typical 3 to 4 times market multiple for construction companies. *Id.* ¶¶ 208-10 (emphasis added);

- [T]he Board voted to increase Schick's compensation yet again, to $700,000. **Schick** was terminated several months later, effective July 1, 2020, for his role in the **creation of false and misleading financial statements** for the Katerra Renovations business unit ("Renovations"). *Id.* ¶ 229 (emphasis added);

- The **Director Defendants were aware of and approved** numerous related party transactions with entities in which top Company executives had an interest. *Id.* ¶ 250 (emphasis added);

- The **Director Defendants also approved** the purchase of Construct Corps, a labor staffing company later known as Katerra Labor Management, which had numerous ties to the Company. *Id.* ¶ 265 (emphasis added);

- From December 2016 through July 2019, the **Director Defendants approved** several agreements ("Prime Contractor Agreements") between the Company and the Wolff Company and the Wolff Entities, in which Paxion had an ownership interest. *Id.* ¶ 269 (emphasis added);

- Making matters worse for Katerra, on May 21, 2019, the **Director Defendants caused** Katerra to enter into a Most Favored Nation Pricing Agreement with the Wolff Entities pursuant to which Wolff Entities secured discounts on its projects ranging from 13% to 15%. *Id.* ¶ 282 (emphasis added);

- In December 2019, the **Director Defendants approved** a transaction in which Katerra purchased four large, loss-making multi-family and senior independent living projects in Washington and Oregon, Amberglen Market Rate, Amberglen

Senior, Lifebridge Market Rate and Lifebridge Senior (the "<u>Lifebridge and Amberglen Transaction</u>"), from one of the Wolff Entities, Wolff Real Estate Partners ("<u>WREP</u>").... The transaction was approved in December 2019, when the Company was also already in severe financial distress and had just entered into the Greensill Receivables Facility. Nonetheless, the Board made the decision to take on the financial liability of a massive, four-part construction project with a projected $425 million in development costs.... In addition, the approval of the Lifebridge and Amberglen Transaction breached the Director Defendants' duties of loyalty to the Company. The transaction was approved despite the fact that **the Director Defendants did not disclose the conflicts of some of the voting directors**, Marks and Davidson, who stood on both sides of the transaction.... At a December 17, 2019 Board meeting, the directors present, Marks, Davidson, Housenbold, **Kibsgaard**, **Mehta**, **Picard**, and Wilson, approved the Lifebridge and Amberglen Transaction. *Id.* ¶¶ 289, 293, 296, 298 (emphasis added);

- On or about December 9, 2019, following **unanimous approval by the Board**, Katerra entered into the RPA with Greensill, governing the terms of the Greensill Receivables Facility, in which Katerra would sell its receivables to Greensill.... The structure of the Greensill Receivables Facility plunged the Company further into financial distress and led to its ultimate demise, which the Director Defendants should have recognized at the outset before causing the Company to enter into the RPA.... The unsuitability of the Greensill Receivables Facility with Katerra's business model and financial operations **would have been obvious to the Director Defendants** if they had conducted even a cursory review of the audited financial statements from 2017, 2018 and 2019. *Id.* ¶¶ 316-17, 328 (emphasis added);

- As evidenced below, **at Renovations, costs were intentionally manipulated and front loaded to create artificially inflated revenue**.... On November 21, 2019, **Schick emailed leaders of Renovations** about the business unit's budget. *Schick* wrote: "I want everyone to take a last review of your 2020 plans. I do not expect any change to the Management plans, as that is what you signed up for in 2020. . . . As I have said over and over, and for those with Michael this week you heard it again, we need to hit the numbers for Q4 and 2020, every month, every quarter. No more excuses."…. On January 30, 2020, **Schick** emailed a group of subordinates at Renovations summarizing a meeting he had attended with Marks' staff earlier that day. Schick told the group that "[t]he most important thing in front of us is to maximize Q1. Getting the revenue and EBIT over the next 60 days, and being creative where necessary is job #1 for meeting investors expectations. . . . [d]riving the revenue gets us the profits and company growth. . . ." . . . On February 19, 2020, **Schick** and Deleon exchanged emails about fourth quarter 2019 costs at Renovations. Schick began by asking Deleon whether they were able to "move some of the Q4 costs back to Q$?" Deleon responded that he did not think the Company finance group approved moving those costs. **Schick** responded: "We should push it, as I would rather show in Q4, as people forget that quickly. I will need to live with this Q1 number for the next 11 months." The

following day, February 20, 2020, Deleon write to **_Schick_**: "I told Robert to push the $600k loss back to 2019. This should make Q1 $2.6 net profit now."…. On February 27, 2020, **Schick cut Renovations' forecast by $10 million, but told Deleon not to tell the team** or reduce pressure on the team to meet forecast. *Id.* ¶¶ 373, 394, 400, 403, 404 (emphasis added);

- By May 23, 2020, Marks had nearly developed the plan to spin out MaterialsCo. ("MatCo"), a second business from Katerra for his own taking, in addition to Apollo. Marks limited those involved in the discussions to a small group that involved Katerra executives linked with Marks' side venture work at WRVI: Marsh, Ryan, **Schick** and Brathwaite.  In an email dated May 23, 2020, using the Subject line "Materials NewCo" to Marsh (using a WRVI email address), Ryan (using a WRVI email address) **Schick** (using his Katerra email address) and Brathwaite (using a WRVI email address), Marks laid further evidence of his and each of the recipients' continued efforts to pursue self-interested transactions for their benefit and to the detriment of Katerra…. **Schick responded** to Marks' email providing an analysis of financials relevant to the spinning off of MatCo…. Ignoring all corporate formalities and fiduciary duties, Marks pitched his spinning off of MatCo in an email to **Kibsgaard** (who was to be given a board seat in the spun off entity) dated May 30, 2020…. Marks later forwarded the above email to his group of Katerra insiders (Schick, **Marsh**, Ryan, Brathwaite and Clewley) in an email dated May 30, 2020….  *See id.* ¶¶ 511-12, 514, 519, 520 (emphasis added).

These paragraphs—which directly allege that Schick, Kibsgaard, Mehta, Picard, Hui, Fisher, Shivram, and the Director Defendants had knowledge of and participated in several breaches of fiduciary duty—are merely a few examples of the numerous allegations supporting a reasonable inference that the Aiding & Abetting Defendants knowingly participated in the Plaintiff officers' and directors' breaches of their fiduciary duties.  The Aiding & Abetting Defendants' assertion that the Complaint lacks specific allegations as to how they aided and abetted Plaintiff's directors or officers is simply not accurate.  This case is therefore readily distinguishable from Defendants' cited cases, such as *In re Xura, Inc. S'holder Litig.*, in which the Court of Chancery found that the plaintiff failed "to allege facts that would allow a reasonable inference that the Siris Defendants took steps to assist the Xura Fiduciaries in breaching their fiduciary duties knowing that the breaches were occurring and knowing that they were assisting in those breaches."  2019

69

WL 3063599, at *3 (Del. Ch. July 12, 2019).

Further, to the extent certain Aiding & Abetting Defendants assert that the Complaint lacks specific allegations regarding their "knowing participation" in others' breaches,[14] this argument ignores the Complaint's numerous allegations that specific groups of Defendants—namely, Officer Defendants and/or Director Defendants—jointly participated in various breaches. Thus, for the reasons discussed above in Section III(A) as to why Defendants' "group pleading" argument fails, so too does any argument that the Complaint does not include specific aiding and abetting allegations against each individual Aiding & Abetting Defendant.

Finally, even if the Court dismisses Plaintiff's duty of care claims against certain Director Defendants based on exculpation clauses, any Director Defendant who is also an Aiding & Abetting Defendant cannot, as a matter of law, rely on an exculpation clause as a basis to dismiss the duty of care claims. This is because, "[b]y their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abetters." *See In re: Wayport, Inc. Litig.*, 76 A.3d 296, n.3 (Del. Ch. 2013). Indeed, the Chancery Court has made clear that it is "possible for a non-fiduciary to be liable for aiding and abetting 'even if the Board breached only its duty of care' and is exculpated for that breach." *Id.* (*quoting In re Celera Corp. S'holder Litig.,* 2012 WL 1020471, at *28 (Del. Ch. Mar. 23, 2012)), *aff'd in part, rev'd in part,* 59 A.3d 418 (Del. 2012). *See also Arnold v. Soc'y for Sav. Bancorp, Inc.,* 1995 WL 376919, at *8 (Del. Ch. June 15, 1995) (holding that plaintiffs could maintain a claim against acquirer for aiding and abetting a breach of the duty of disclosure, notwithstanding that defendant directors were protected by an exculpatory provision), *aff'd,* 678 A.2d 533, 541–542 (Del. 1996) (affirming analysis and remanding for further proceedings on aiding and abetting claim); *see also In re Shoe-Town Inc. S'holders Litig.,* 1990 WL 13475, at

---

[14] *See* Mehta and Fisher (D.I. 54 at 16); Shivram (D.I. 69 at 7); Kibsgaard (D.I. 72 at 20); Picard (D.I. 66 at 16-17).

136824253.1

*8 (Del. Ch. Feb. 12, 1990) (denying motion to dismiss aiding and abetting claim against financing advisor in going-private transaction where financial advisor "was closely involved with the management group, the special committee and the Shoe–Town board").  Accordingly, any argument by an Aiding & Abetting Defendant that an exculpation clause absolves them of liability for participating in a breach of the duty of care must be rejected.

## VII.   PLAINTIFF IS NOT REQUIRED TO ARBITRATE AGAINST MARSH AND SCHICK.

The Court should reject Marsh and Schick's arguments that Plaintiff should be compelled to arbitrate the claims because such claims were expressly rejected by Plaintiff in the bankruptcy proceeding.  As a threshold matter, this argument fails because Marsh and Schick rely on their employment contracts, documents outside the allegations of the Complaint, to support their defenses.  *See In re W.J. Bradley Mortg. Cap*., LLC, 598 B.R. 150, 164 (Bankr. D. Del. 2019) ("in deciding a motion to dismiss, courts generally only consider the allegations contained in the complaint, exhibits attached thereto, and matters of public record") (citations omitted).

Further, the argument fails due to the plain language of the Amended Joint Chapter 11 Plan of Katerra Inc. and Its Debtor Subsidiaries (the "Plan"), which the Bankruptcy Court confirmed on October 21, 2021.  *See* Liebesman Decl., Exhibit D.  The Plan sets forth that:

> …each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, **shall be deemed automatically rejected** pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, including the Schedule of Assumed Executory Contracts and Unexpired Leases, or otherwise is specifically described in the Plan to not be rejected…

On October 20, 2021, the Katerra Debtors filed a Third Amended Plan Supplement, which

71

contained an Exhibit A, Schedule of Assumed Executory Contracts and Unexpired Leases (the "<u>Schedule</u>").  *See* Liebesman, Exhibit E.  The Bankruptcy Court entered an order confirming the Amended Plan.  Neither Schick nor Marsh's employment contracts, containing the arbitration clauses, are set forth in the Schedule.  "[A]n arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought." *Highland Capital Mgmt. v. Dondero (In re Highland Capital Mgmt.)*,2021 WL 5769320, at *6 (Bankr. N.D. Tex. Dec. 3, 2021).

Because the employment contracts were rejected by the plain language of the Plan, Plaintiff is no longer bound by the employment contracts or the arbitration clauses contained therein. *Id.* at *7 (holding that because an agreement was specifically rejected pursuant Section 365 of the Bankruptcy Code plaintiff "cannot be forced to specifically perform under the Arbitration Clause" in the agreement).  Plaintiff expressly rejected the employment contracts and should not be required to specifically perform under the arbitration clauses contained therein.  *See also Janvey v. Alguire*, 2014 WL 12654910 (N.D. Tex. July 20, 2014) *aff'd on different grounds* at 847 F.3d 231 (5th Cir. 2017) (finding a receiver who had rejected an arbitration agreement not bound to specifically perform under the agreement).

In addition, the Court should reject Marsh's argument that the breach of fiduciary claims relating to the $1 million signing bonus he has refused to return should be dismissed because they are governed by the Marsh Employment Letter.  *See* D.I. 51 at 13-14.  The breach of fiduciary duty allegations against Marsh are extensive and significantly "broader in scope" than merely the allegations that Marsh has failed to return his signing bonus in violation of the Marsh Employment Letter.  Because the breach of fiduciary claims against Marsh "depend on additional facts," the fiduciary duty claims are not "substantially identical" to the signing bonus claims and should not

136824253.1

be dismissed. *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008). The fact that Marsh was fired does not absolve him of the responsibility to return his signing bonus. *See Navigant Consulting, Inc. v. Kostakis*, 2007 WL 2907330, at *1 (E.D.N.Y. Oct. 4, 2007) (finding that complaint state claim for breach of fiduciary duty, in part, by alleging that defendant failed to return pro-rated portion of bonus when he left the company).

## VIII.   PLAINTIFF HAS STATED A CLAIM FOR UNJUST ENRICHMENT.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). To state a claim for unjust enrichment, a plaintiff must allege that (1) the defendant received a benefit, (2) the defendant's receipt of the benefit was unjustified, and (3) "there is some connection between the benefit unjustly received and an invasion of the plaintiff's legally protected rights." *Garfield on behalf of ODP Corp. v. Allen*, 2022 WL 1641802, at *39 (Del. Ch. May 24, 2022).

In their opening briefs in support of their motions to dismiss, Defendants cite the standard for unjust enrichment set forth in *Nemec*, *supra*, which includes two additional elements: (1) the impoverishment of the plaintiff and (2) the absence of an adequate remedy at law. *See Nemec*, 991 A.2d at 1130. As the Court of Chancery recently observed, however, the standard is flexible and "there are situations where a plaintiff need not plead a distinct impoverishment to support a claim for unjust enrichment." *Garfield*, 2022 WL 1641802 at *37-39. As the Court explained, "[t]he claim is about unjust **enrichment**, not the plaintiff's impoverishment." *Id.* at *39 (*citing* Restatement of Unjust Enrichment § 1 cmt. a). In other words, the impoverishment of the plaintiff may be a relevant consideration, but "permitting restitution even where the plaintiff has no measurable loss whatsoever is consistent with the principles underlying the concept of unjust enrichment." *Id.* at *38 (citation and quotation marks omitted). In any event, as discussed in detail

73

above, Katerra was harmed by Defendants' conduct.  In addition, the Court of Chancery has observed that "it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law," and asserting a claim for breach of fiduciary does not defeat a claim for unjust enrichment. *Id.* at \*44-45.

Here, Plaintiff sufficiently pleads each element of its claim for unjust enrichment against Defendants.  As alleged in the Complaint, Defendants received benefits such as debt forgiveness, excessive compensation payments, transfers, raises, bonuses, and other benefits as a result of their positions on the Board or as appointed officers of Katerra.  Complaint ¶ 572.  The Complaint then establishes that the benefits were unjustified in the allegation that, "by their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Katerra by virtue of the debt forgiveness, excessive compensation payments, raises, bonuses and other benefits paid to them."  *Id.* ¶ 573.  Plaintiff's allegations support the reasonable inference that Defendants were unjustly enriched to the Katerra's impoverishment.

In addition, Plaintiff's allegations clearly demonstrate an impoverishment of the Company as a result of Defendants' enrichment (*see* Complaint ¶¶ 220-33; 237-49; 250-68) but as set forth above, even if that were not so, Plaintiff has alleged that the compensation and benefits "constituted 'something of value' that the defendants received 'at the expense of the corporation and its shareholders,'" and that is enough to support a claim for unjust enrichment.  *Garfield*, 2022 WL 1641802 at \*37.  Plaintiff sets forth additional arguments against certain Defendants' unjust enrichment arguments below.

## A.    Plaintiff Has Stated a Claim for Unjust Enrichment Against Marks.

Marks argues that the Court should dismiss the unjust enrichment claim because such a claim cannot be premised on allegations that an officer or director merely received payment while breaching his or her fiduciary duties. *See* D.I. 51 at 28.  This argument is contrary to Delaware

law.  A plaintiff may state a claim for unjust enrichment based on allegations that the company's directors and officers enriched themselves through the receipt of excessive compensation and bonuses while breaching their fiduciary duties to the company.  *See Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 591 & n. 130 (Del. Ch. 2015) (denying motion to dismiss unjust enrichment claim where plaintiff alleged defendants received excessive compensation including large issuance of company stock while breaching their fiduciary duties).  As alleged in the Complaint, that is exactly what occurred here.

Marks' reliance on *Behrmann v. Brandt*, 2020 WL 4432536 (D. Del. July 31, 2020), is misplaced.  *Behrmann* is readily distinguishable based on the adequacy and specificity of the allegations in the Complaint.  The Court in *Behrmann* dismissed the plaintiff's unjust enrichment claim because "the amended complaint lack[ed] particularized allegations giving rise to a reasonable doubt that the challenged compensation levels were the product of a valid business judgment." *Id.* at *17.  Here, the Complaint contains numerous specific, particularized allegations that support the reasonable inference that Marks was not merely receiving his normal paycheck while breaching his fiduciary duties, but was receiving extraordinary and objectively excessive compensation and perks at the Company's expense at a time when the Company was suffering with Marks at the helm. Complaint ¶¶ 226-28, 237-38, 254-58, 265-67, 271-78, 280-302.

Delaware courts have consistently upheld unjust enrichment claims based on the types of enrichment alleged here, including based on the receipt of backdated stock options, which alone would suffice to support Plaintiff's claim.  *See Garfield*, 2022 WL 1641802 at *37 (plaintiff sufficiently pleaded unjust enrichment claim based on defendant's receipt of backdated stock options).

### B.     Plaintiff Has Stated a Claim for Unjust Enrichment Against Solomon.

Solomon argues that the Complaint fails to allege that she received compensation or

benefits beyond the value of her contributions, *i.e.*, that her compensation was not unjustified.  D.I. 55 at 18-20.  The argument rings hollow as the Complaint is replete with allegations demonstrating Solomon's receipt of compensation vastly out of proportion with any contributions she may allege to have made to the Company.

As alleged in the Complaint, Solomon was richly rewarded for her destructive stint as the Company's CFO.  *See* Complaint ¶¶ 224-25, 237-239, 240-44.  These allegations support the inference that Solomon was personally enriched through excessive and unearned payments and perks at the Company's expense.

In any event, arguments as to whether an executive, officer, or director's compensation is justified based on his or her contributions to the Company "are more properly viewed as defenses to the merits of th[e] claim, not reasons to dismiss the claim at the pleading stage." *Balin v. Amerimar Realty Co.*, 1993 WL 542452, at *9 (Del. Ch. Dec. 23, 1993) (denying motion to dismiss unjust enrichment claim and rejecting defendant's arguments that salary was justified as premature at pleading stage); *Pfeiffer v. Leedle*, 2013 WL 5988416, at *10 (Del. Ch. Nov. 8, 2013) (same).

### C.    Plaintiff Has Stated a Claim for Unjust Enrichment Against Kibsgaard.

Kibsgaard joins the arguments of Marks and Solomon concerning Plaintiff's unjust enrichment claim and asserts that the Complaint fails to plead an absence of justification for the benefits and compensation that he received.  D.I. 72 at 18.  The argument should be rejected. Kibsgaard's enrichment at the Company's expense stands in stark relief against the backdrop of his well-documented mismanagement of the enterprise that he so briefly oversaw as CEO.

After Marks was terminated as CEO, during a time when the Company was falling apart, "the Board approved a massive compensation package for Kibsgaard" and other benefits. Complaint ¶¶ 230-32.  Ultimately, Kibsgaard contributed little value to the Company during his brief tenure at the helm but was handsomely rewarded with millions of dollars from the Company's

depleted coffers.  The Complaint supports the reasonable inference that Kibsgaard was enriched at the Company's expense without justification.

### D.     Plaintiff Has Stated a Claim for Unjust Enrichment Against Schick.

Schick also argues that Plaintiff fails to state a claim against him because, among other things, his compensation increases were not excessive and he is not alleged to have taken advantage of any perks.  *See* D.I. 61 at 16.  Whether Schick's salary increases were excessive or justified involves questions of fact that are not before the Court on this motion.  For now, it is sufficient that Plaintiff has set forth ample factual allegations to support the reasonable inference that Schick's compensation was excessive and unjustified.  *See* Complaint ¶¶ 222-23, 229.

As Plaintiff alleges, while Schick was receiving multiple relatively large salary increases in rapid succession, the Company was in dire financial straits.  In addition, the evidence suggests that Schick enjoyed personal use of the Company's corporate box at the Golden State Warriors games for him and his family while the Company was spiraling deeper into insolvency. *See id.* ¶¶ 246-49.  Schick benefited from this and other perks at the unjustified expense of the Company.

### E.     Plaintiff Has Stated a Claim for Unjust Enrichment Against Marsh.

The Complaint alleges that Marsh was unjustly enriched, without justification, at the Company's expense, based on his refusal to return a $1 million signing bonus after leaving Katerra. Complaint ¶¶ 522-26.  Marsh argues that the Complaint fails to state a claim for unjust enrichment against him because his signing bonus was governed by an employment agreement. *See* D.I. 61 at 13.  At the pleading stage, however, under the circumstances alleged, the mere existence of a contract is not dispositive. *Pfeiffer*, 2013 WL 5988416, at *10.

The Court in *Pfeiffer* observed that the complaint did not contain a breach of contract claim and it was conceivable that the plaintiff could demonstrate that the claim was governed by

fiduciary principals and not an enforceable contract.  *Id.*  Here, as in *Pfeiffer*, the Complaint does not assert a breach of contract claim, so Plaintiff is not invoking the underlying contract.  In addition, as in *Pfeiffer*, it is reasonably conceivable that Plaintiff can demonstrate that Marsh was unjustly enriched.

### F.      Plaintiff Is Entitled to Plead Unjust Enrichment and Breach of Fiduciary Duty Theories in the Alternative at the Pleading Stage.

Plaintiff may assert claims for unjust enrichment and breach of fiduciary duty at the same time.  Under Delaware law, a party may plead claims of unjust enrichment and breach of fiduciary duty in the alternative at the pleading stage. *See, e.g.*, *Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012) ("A plaintiff will only receive, at most, one recovery, but, at least at this procedural juncture, [plaintiff] may simultaneously assert a claim for breach of fiduciary duty and a claim for unjust enrichment against the [defendants]."); *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011) (denying motion to dismiss fiduciary duty claim and an ostensibly duplicative unjust enrichment claim).

An unjust enrichment claim may be stated in parallel with a fiduciary duty claim because a defendant may ultimately have a defense to liability, yet the defendant may nevertheless have been unjustifiably enriched by excessive compensation and bonuses, in which case "unjust enrichment could provide a vehicle for the Company's recovery."  *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *43 (Del. Ch. Apr. 14, 2017), as corrected (Apr. 24, 2017) (citation omitted).

Additionally, an unjust enrichment claim is not duplicative of a fiduciary duty claim where the complaint alleges that certain director defendants "have benefited at the expense of the company through self-dealing transactions and breaches of fiduciary duties," because such a claim "presents an opportunity to assign liability to an individual director without requiring plaintiffs to

78

demonstrate fault with respect to that director." *In re Tyson Foods, Inc.*, 919 A.2d 563, 602 (Del. Ch. Feb. 6, 2007).  An unjust enrichment claim does not require any culpability or wrongdoing; "[a] defendant may be liable 'even when the defendant retaining the benefit is not a wrongdoer' and 'even though he may have received [it] honestly in the first instance.'" *Id.* (*quoting Schock v. Nash*, 732 A.2d 217, 232–233 (Del. 1999)).

Based on the foregoing, Plaintiff's unjust enrichment claim is not subject to dismissal as duplicative at the pleading stage.  Plaintiff is entitled to pursue the theory that the Defendants have been enriched at the expense of the Company, without justification, even though their conduct also constitutes a breach of their fiduciary duties or was otherwise wrongful.

IX.    **KATERRA MAY MAINTAIN CLAIMS AGAINST SCHICK RELATING TO HIS ROLE IN THE FINANCIAL MISREPORTING SCHEME ORCHESTRATED BY THE OFFICER DEFENDANTS.**

As a threshold matter, Schick's invocation of the release in the Renovation Sale Order is an affirmative defense which is not grounds for dismissal on a motion to dismiss because the Complaint does not make reference to the order or sale agreement.  *But see Jordan v. Mirra*, 2017 WL 4070646, at *7 (D. Del. Sept. 14, 2017), report and recommendation adopted, 2017 WL 5749664 (D. Del. Nov. 28, 2017) (holding the court could consider a release agreement on a motion to dismiss because it was "integral to or explicitly relied upon in the complaint").  Thus, the Court should disregard Schick's release argument.

Nonetheless, Plaintiff does not dispute that the Renovation Sale Order releases certain claims against various individuals associated with ONX's purchase of Renovations.  *See* Sorrels Decl., Exhibit 11, ¶ 29.  Notably, Schick is expressly listed as a non-released individual against whom Plaintiff can pursue "any claims…arising out of…allegedly improperly recognizing costs prematurely in 2018, 2019 or Q1 2020 or any similar or ancillary claims."  *Id.*  Schick acknowledges that such claims against him are not released and may be satisfied by the proceeds

of Katerra's D&O insurance policies.  D.I. 61 at 18.  In addition, the Renovations Sale Order

expressly lists Michael Marks and Matt Marsh as "non-released individual[s]" and does not limit

recovery against them to Katerra's available insurance policies.  Sorrels Decl., Exhibit 11, Ex. 3.

**X.  NONE OF PLAINTIFF'S CLAIMS ARE TIME-BARRED, IN LIGHT OF DEFENDANTS' FRAUDULENT CONCEALMENT AND STATUS AS FIDUCIARIES.**

Defendants' argument that Plaintiff's claims are time-barred to the extent they are based

on conduct occurring before June 6, 2018 fails for two reasons: the Defendants fraudulently

concealed the basis for Plaintiff's claims and misused their positions as fiduciaries to do so, thereby

tolling the statute of limitations periods.

The applicable statute of limitations for the counts at issue is three years.  *See In re AMC*

*Inv'rs, LLC,* 637 B.R. 43, 56 (Bankr. D. Del. 2022) (fiduciary duty and aiding and abetting);

*Chertok v. Zillow, Inc.,* 2021 WL 4851816, at *6 (Del. Ch. Oct. 18, 2021) (unjust enrichment),

*aff'd*, 2022 WL 1789337 (Del. June 1, 2022); 10 *Del. C.* § 8112 (waste).

It is also important to note the high bar that must be met before a court may dismiss claims

based on a statute of limitations defense.  This Court has made clear that the statute of limitations

defense may only support a motion to dismiss under Rule 12(b)(6) "when it is facially clear both

that the complaint was filed after the statute of limitations had run and that the defendants raised

the affirmative defense in the motion to dismiss." *Manuel v. Mears*, 947 F. Supp. 2d 426, 429 (D.

Del. 2013) (*citing Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir.

1994) (*overruled on other grounds*)).  "If the bar is not apparent on the face of the complaint, then

it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel v. Jendoco*

*Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978).  Concealment by a corporate fiduciary detailed

in the Complaint as discussed below, will be further developed and understood through fact

discovery, including by revealing the exact role each Defendant played, and when.  It would be

improper to dismiss any claims based on a statute of limitations defense in light of such alleged misconduct.

Defendants assert that Plaintiff's claims concerning conduct prior to June 6, 2018 are untimely, but such claims are timely for two independent reasons. First, limitations periods are tolled where defendants actively attempt to conceal the existence of claims, thereby preventing a plaintiff from learning of their claim. Second, limitations periods are tolled where a plaintiff reasonably relies on the good faith conduct of defendant fiduciaries, preventing discovery of a claim. Plaintiff's claims must therefore be equitably tolled, as "[f]ederal courts may toll statutes of limitations for federal laws where the plaintiff in some extraordinary way has been prevented from asserting his or her rights," including "(1) where a defendant actively misleads a plaintiff with respect to his or her action; or (2) where the plaintiff has been prevented from asserting his or her claim as a result of other extraordinary circumstances." *Lake v. Arnold*, 232 F.3d 360, 370 n. 9 (3d Cir. 2000).

Delaware courts have emphasized the importance of tolling limitations periods in the exact type of circumstance present here:

> Where the fiduciaries of a Delaware corporation engage in wrongdoing that involves the manipulation of the corporation's financial statements and public disclosures, and where the manipulation of those statements has the effect of misleading investors, it is no defense to argue that the stockholders were somehow on inquiry notice simply because the misconduct did not involve pure self-dealing. Many of the worst acts of fiduciary misconduct have involved frauds that personally benefited insiders as an indirect effect of directly inflating the corporation's stock price by the artificial means of cooking the books. To allow fiduciaries who engaged in illegal conduct to wield a limitations defense against stockholders who relied in good faith on those fiduciaries when their disclosures provided no fair inquiry notice of claims would be inequitable.

*In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 813 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011). "The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing

81

their misconduct as a method of immunizing themselves from accountability for their wrongdoing." *Id.* (footnote omitted). "[E]ven an attentive and diligent investor relying, in complete propriety, upon the good faith of fiduciaries may be completely ignorant of transactions that constitute self-interested acts injurious to the [entity]." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) (internal quotation marks and footnote omitted).

### A.   Defendants Fraudulently Concealed the Basis for Plaintiff's Claims.

"Fraudulent concealment of a cause of action is an independent ground for tolling a statute of limitations." *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973) (citations omitted). "Where there has been fraudulent concealment from a plaintiff, the statute is suspended only until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence." *Id.* (*citing Giordano v. Czerwinski*, Del. Super., 216 A.2d 874 (1966)). "Fraudulent concealment requires that something affirmative be done by a defendant, some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry." *Id.* (citations omitted).

In *Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, plaintiff alleged that financial and other disclosures made by the defendant as part of a securities sale process were misleading. 2020 WL 5054791 at *9 (Del. Super. Ct. Aug. 17, 2020). The plaintiff alleged that financial statements misrepresented assets and income, an error in calculating GAAP led to an overstated EBITDA, and that the defendants were aware of these misrepresentations and concealed them from plaintiff. *See id.* at *9–10. The court found these allegations sufficient to toll the statute of limitations under the doctrine of fraudulent concealment. *See id.* at *11. *In re Liquid Holdings Grp., Inc.*, 2018 WL 2759301 (Bankr. D. Del. June 6, 2018), another analogous case, where the basis for fiduciary duty claims were only discovered through an Audit Committee investigation,

82

leading the court to hold that the limitations period did not begin to run until that investigation uncovered the claims. *See id.* at *13.

Similarly, *In re Tyson Foods, Inc.*, tolled the three-year statute of limitations for breach of fiduciary duty claims under the doctrine of fraudulent concealment.   The plaintiffs alleged defendants breached their fiduciary duty by making mischaracterizations in the corporate proxy statement describing "other annual compensation" to shareholders in early 2002 as business or travel expense payments that could not be properly characterized as such.  *Id.* at 588.  Such mischaracterizations in the proxy statements prevented plaintiffs from gaining knowledge of the facts before the Securities and Exchange Commission ("SEC") investigation in 2004 and rose to the level of actual malice.  *Id.*  The plaintiffs had the right to rely upon the defendants' proxy statement because there was no reason to suspect that the information was inaccurate when defendants assured plaintiffs that all related party transactions were reviewed ahead of the SEC's investigation.  *Id.* at 600.  Plaintiffs also alleged "that defendants knowingly spring-loaded options to key executives and directors while maintaining in public disclosures that such options were issued at market rates."  *Id.* at 590.  The court found such partial disclosures to constitute an act of 'actual artifice' that satisfies the requirements of fraudulent concealment.  *Id.*  Accordingly, the court held plaintiffs' allegations sufficient to toll the statute of limitations.  *Id.* at 591.

Here, Plaintiff alleges that "[t]he Board also granted Marks options for over 5.4 million shares with a backdated vesting commencement date to February 1, 2017." Complaint ¶ 228. Such "improper backdating of options just a few years earlier while Marks was the chair of the compensation committee of KLA-Tenacor cost that company a $65 million settlement with that company's shareholders," satisfies the requirements of fraudulent concealment.  *Id.*  Delaware cases have applied the doctrine of fraudulent concealment to toll the statute of limitations in similar

circumstances. *See Assured Partners of Virginia, LLC v. Sheehan*, 2020 WL 2789706, at *13, *17-18 (Del. Super. Ct. May 29, 2020) (tolling the statute of limitations under the doctrine of fraudulent concealment); *BTIG, LLC v. Palantir Techs., Inc.*, 2020 WL 95660 (Del. Super. Ct. Jan. 3, 2020) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2013 WL 4013306, at *9 (Del. Ch. July 31, 2013) (same); *Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007) (same); *Weiss*, 948 A.2d at 433 (noting fraudulent concealment may apply to toll the statute of limitations if plaintiff demonstrates directors' intent to deceive stockholders); *cf. Freedman v. Beneficial Corp.*, 406 F. Supp. 917 (D. Del. 1975) (granting plaintiffs leave to amend complaint to plead facts essential to establish fraudulent concealment).

The Complaint is replete with other examples of Defendants' efforts to conceal their misconduct. *See, e.g.*, Complaint ¶ 447 ("By mid-May 2020, Marks and Marsh were not able to continue concealing the false and misleading financials"); ¶ 439 ("Finally, Katerra West's business unit redistributed project losses between other projects to conceal those losses"); ¶ 375 ("at Katerra West, a $40 million slush fund (cookie jar reserve) was wrongfully used to conceal losing contracts and artificially inflate earnings"). This concealment included misrepresentations related to the preparation of Katerra's public filings: "Katerra's key executives, including but not limited to the Officer Defendants, were aware of the improper manipulation of the Company's financial statements. Nevertheless, the Officer Defendants, specifically Marks, Marsh, and Solomon, falsely represented to the Company's auditors, Deloitte, in connection with the 2018 and 2019 financial statements that the Company had complied with GAAP in preparing its financial statements." Complaint ¶ 376; *see also* Complaint ¶¶ 17, 222, 229, 352–56, 370–422 (discussing "misleading financial statements" created at the direction of the defendants, as well as that the "Officer Defendants oversaw and promoted multiple material violations of GAAP." (Complaint ¶ 356.))

84

Furthermore, the "Director Defendants stayed publicly silent while the Company suffered irreparable harm from the public's belief that the $440 million debt was not satisfied." Complaint ¶ 350.

Additional concealment is specifically alleged against Defendants Marks and Solomon from May 31, 2018 and June 28, 2019 (which itself was after the June 6, 2018 date before which Defendants assert Plaintiff's claims were time barred). The Complaint specifically alleges:

> The management representation letter addressed to Deloitte for the Company's audit of fiscal year 2018, dated June 28, 2019 and signed by Defendants Marks and Solomon, falsely stated that the Company's financial statements were prepared in accordance with GAAP and presented the Company's financials fairly and that the Company was not aware of any allegations of fraud.

Complaint ¶ 379.[15]

This conduct therefore operated to toll the limitations period from running until the claims could have reasonably been discovered, which occurred after June 6, 2018. For example, "[o]n December 4, 2020, Katerra self-reported the wrongdoing at Katerra West to the SEC and presented the SEC with another power-point describing an investigation undertaken at Katerra West and the results of the investigation." Complaint ¶ 430. This disclosure revealed that "the misstatements in the first quarter 2020 financial statements were materially misleading because they reported a $1.17 million profit instead of the actual $8.68 million loss – a swing of approximately $9.85 million." Complaint ¶ 443.

Accordingly, Plaintiff pleads more than sufficient facts about Defendants' active concealment of their misconduct, thereby tolling any statute of limitations.

---

[15] Identical allegations are raised concerning fiscal year 2017 and a letter signed by Marks and Solomon dated May 31, 2018. (Complaint ¶ 378).

**B.     Plaintiff Reasonably Relied on the Competence and Good Faith of the Defendant Fiduciaries.**

Plaintiff's claims are also timely given its reliance on the wrongful self-dealing of the Defendant fiduciaries.  "Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary."  *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008) (footnote omitted); *see also Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 n.11 (Del. Ch. Jan. 24, 2005).  When equitable tolling applies, the limitations period is tolled "until the plaintiff is on inquiry notice of their cause of action." *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *17 (Del. Ch. Oct. 31, 2013).

*In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 811 (Del. Ch. 2009), is directly analogous.  There, plaintiff brought breach of fiduciary duty and malpractice claims against former company officers and directors, alleging that the corporation's financial statements overstated the value of the corporation.  *See id.* at 774–75.  The defendant directors asserted that the claims were time barred, having accrued over a decade before the lawsuit was filed.  *See id.* at 812.  The court applied the doctrine of equitable tolling based on the plaintiffs' reliance on the directors' fiduciary conduct to find the claims timely.  "[T]he only reason that it took so long to bring any of these claims is because AIG's public filings, upon which its stockholders were entitled to rely, concealed the wrongdoing."  *Id.*  "Under the doctrine of equitable tolling, if {the directors} did betray AIG in the manner that the … Plaintiffs allege, [the directors] cannot escape liability because it took time for [plaintiffs] to discover their bad faith."  *Id.* (citation omitted); *see also Weiss*, 948 A.2d at 452 (tolling three-year statute of limitations for breach of fiduciary duty under the doctrine of equitable tolling because plaintiff was not on inquiry notice to discover directors' alleged practice of timing option grants); *In re Tyson Foods, Inc.*, 919 A.2d at 588 (applying equitable tolling to toll the

statute of limitations where plaintiffs relied upon fiduciaries' proxy statements containing misrepresentations).

Here again the Defendants were each either an Officer or Director (or both) of Katerra, (Complaint ¶¶ 44–45), and therefore owed fiduciary duties to the Plaintiff that the Plaintiff reasonably relied on. Indeed, Plaintiff's entire Complaint, and therefore each of the claims Defendants assert are time-barred, is based on misconduct by the directors of Katerra and related breaches of their fiduciary obligations owed to Plaintiff:

> As detailed further below, Defendants engaged in a course of conduct that caused the Company to incur billions of dollars in damages in just a few years. Deloitte, Katerra's auditor also caused substantial damage to the Company. The bottom line being that, as described *infra,* Katerra's Board of Directors breached their fiduciary duties to the Company and other interested parties to whom fiduciary duties were owed, Katerra's key executives breached their fiduciary duties to benefit themselves at the expense of the Company and the Company's auditor failed to properly audit the Company during the entire relevant time period. Katerra's insolvency eventually forced it to file bankruptcy.

Complaint ¶ 19; *see also* ¶¶ 306, 314, 455, 458 (each discussing Defendants' breach of their fiduciary duties). Katerra's public filings did not give Plaintiff "good reason to be suspicious about the existence of a claim." *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 813 (Del. Ch. 2009). To the contrary, Plaintiff could not ascertain Defendants' misconduct and misrepresentations until they came to light, which occurred after June 6, 2018. For example, as explained above, "[o]n December 4, 2020, Katerra self-reported the wrongdoing at Katerra West to the SEC and presented the SEC with another power-point describing an investigation undertaken at Katerra West and the results of the investigation." Complaint ¶ 430. This disclosure revealed that "the misstatements in the first quarter 2020 financial statements were materially misleading because they reported a $1.17 million profit instead of the actual $8.68 million loss – a swing of approximately $9.85 million." Complaint ¶ 443.

## **CONCLUSION**

For all the foregoing reasons, the Court should deny the Motions to Dismiss in their entirety.

Dated:  August 12, 2022

**FOX ROTHSCHILD LLP**

*/s/ Sidney S. Liebesman*

Sidney S. Liebesman (No. 3702)
E. Chaney Hall (No. 5491)
Kasey DeSantis (No. 5882)
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
sliebesman@foxrothschild.com
chall@foxrothschild.com
kdesantis@foxrothschild.com

*Of Counsel:*

William H. Stassen
2000 Market St., 20th Floor
Philadelphia, PA 19103
Telephone: (215) 299-2853
Facsimile: (215) 299-2150
wstassen@foxrothschild.com

Elizabeth C. Viele
101 Park Avenue, Suite 1700
New York, NY 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
eviele@foxrothschild.com

*Counsel to Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors, except with respect to matters involving the following insurers:  ACE American Insurance Company and Chubb Ltd; Starr Indemnity & Liability Company; Allied World Specialty Insurance Company; Markel American Insurance Company; and Argonaut Insurance Company*

Michael A. Sweet
345 California Street, Suite 2200
San Francisco, CA 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
msweet@foxrothschild.com

**DLA PIPER LLP (US)**

*/s/ Matthew P. Denn*

Matthew P. Denn (No. 2985)
1201 North Market Street
Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
matthew.denn@dlapiper.com

*Of Counsel:*

Brett Ingerman
The Marbury Building
6225 Smith Avenue
Baltimore, MD  21209-3600
Telephone: (410) 580-4177
Facsimile: (410) 580-3177
brett.ingerman@dlapiper.com

*Counsel to Katerra Inc., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors*

89

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of August, 2022, I caused the foregoing document to be served, by CM/ECF, upon all counsel of record.

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman, Esquire (No. 3702)